# 13-0618-cv

## United States Court of Appeals

*for the*

## Second Circuit

THE REPUBLIC OF IRAQ, including as Parens Patriae
in behalf of the Citizens of the Republic of Iraq,

*Plaintiff-Appellant,*

v.

SECALT S.A., BNP PARIBAS USA, BNP PARIBUS LONDON BRANCH,
BNP PARIBAS PARIS, BNP PARIBAS HONG KONG, DRESSER
INTERNATIONAL, DAVID BROWN GUINARD PUMPS S.A.S., FKA BROWN
DAVID GUINARD PUMPS S.A.S., ATLAS COPCO CMT SWEDEN AB,
ABB INDUSTRIE CHAMPAGNE, ABB NEAR EAST TRADING LTD.,
ABB SOLYVENT VENTEC, AGCO DENMARK AS, AGCO S.A.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

BERNSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
(212) 779-1414

– and –

MANEY & GONZALEZ-FELIX PC
700 Louisiana, Suite 4545
Houston, Texas 77002
(713) 806-2500

*Attorneys for Plaintiff-Appellant*

VALTRA DO BRAZIL, AIR LIQUIDE ENGINEERING, AKZO NOBEL N.V., N.V. ORGANON ORGANON, INTERVET INTERNATIONAL B.V. INTERVET, MAIS CO. FOR MEDICAL PRODUCTS, ATLAS COPCO CMT, AWB LTD., B. BRAUN MEDICAL FRANCE, B. BRAUN MELSUNGEN A.G., B. BRAUN MEDICAL INDUSTRIES SDN BHD MALAYSIA, AESCULAP AG AND KG, AESCULAP MOTRIC S.A., AESCULAP SURGICAL INSTRUMENTS SDN, BOSTON SCIENTIFIC S.A., FIATAVIO, BNP PARIBAS SUISSE SA, GLAXO WELLCOME EXPORT LTD., ABB INDUSTRIE AC MACHINES, BNP PARIBAS UK HOLDINGS LIMITED, ABB ELEKTRIC SANAYI AS, BNP PARIBAS SUISSE SA, BUHLER LTD., DAVID B. CHALMERS, JR., CHEVRON CORPORATION, including as successor to Texaco Corp., DAEWOO INTERNATIONAL CORP., DAIMLER CHRYSLER AG, DOW AGROSCIENCES, EASTMAN KODAK S.A., EL PASO CORP. successor to Coastal Corp., EVAPCO EUROPE S.R.L., AVIO FLOWSERVE CORP., FLOWSERVE CORP., FLOWSERVE POMPES formerly Ingersoll Dresser Pompes, FLOWSERVE B.V., GLAXOSMITHKLINE WALLS HOUSE, GLAXO SMITHKLINE EGYPT SAE, SMITHKLINE BEECHAM INTERNATIONAL, ABB AUTOMATION, ABB AG, INGERSOLL RAND ITALIANA SPA, RAND ITALIANA, SPA, GLAXO WELLCOME SA SOUTH AFRICA PRY LTD., THERMO KING IRELAND LIMITED, INGERSOLL RAND BENELUX N.V. PAUL, INGERSOLL RAND WORLD TRADE LTD., CILAG AG INTERNATIONAL, JANSSEN PHARMACEUTICAL, KIA MOTORS, LIEBHERR EXPORT AG, LIEBHER FRANCE SA, SERONO PHARMA INTERNATIONAL, MERIAL, NOVO NORDISK, PAUWELS, RAILTECH INTERNATIONAL, F. HOFFMAN LA ROCHE, ROCHE DIAGNOSTICS GMBH, ROHM AND HAAS FRANCE S.A., SIEMENS S.A.A. OF FRANCE, SIEMENS SANAYI VE TICARET A.S. OF TURKEY, OSRAM MIDDLE EAST FZE, SOLAR TURBINES EUROPE, ST. JUDE MEDICAL EXPORT GMBH, SULZER BUCKHARDT ENGINEERING WORKS LTD., SULZER PUMPEN DEUTSCHLAND GMBH, SULZER TURBO LTD., TEXTRON INC., EVAPCO (AUSTRIA), DAVID BROWN TRANSMISSIONS FRANCE S.A., RENAULT TRUCKS SAS, RENAULT AGRICULTURE AND SONALIKA INTERNATIONAL, RENAULT V.I, VOLVO CONSTRUCTION EQUIPMENT AB, a successor company to Volvo Construction Equipment International, THE WEIR GROUP, OSCAR S. WYATT, JR., VITOL S.A., WOODHOUSE INTERNATIONAL, YORK AIR CONDITIONING AND REFRIGERATION FZE, UNION PUMP S.A.S., FKA DAVID BROWN GUINARD PUMP S.A.S., ATLAS COPCO AIRPOWER N.V., ELI LILLY EXPORT S.A., ASTRA ZENECA AB, EBEWE PHARMA GES M.B.H., DOW AGROSCIENCES S.A.S., DOW AGROSCIENCES LLC, ABG ALLGEMEINE BAUMASCHINEN GESELLSCHAFTMBH,

*Defendants-Appellees,*

CLYDE UNION S.A.S., FKA UNION PUMPS S.A.S., FKA DAVID BROWN GUINARD PUMPS S.A.S.,

*Movant.*

# TABLE OF CONTENTS

Statement of Jurisdiction................................................................1

Statement of the Case..................................................................3

    1.      Course of the Proceedings...................................................3

    2.      Statement of Facts ............................................................3

          A.     The Conspiracy to Corrupt the Programme...............................3

          B.     The Defendants' Role in the Conspiracy..................................5

          C.     The UN Report and the Criminal Charges................................6

    3.      The Republic of Iraq's Claims for Relief.................................6

    4.      The District Court's Opinion................................................7

Standard of Review..................................................................9

Summary of the Argument............................................................10

Argument.............................................................................13

    1.      The Hussein Regime's participation in the Defendants' conspiracy does not, as a matter of law, excuse the Defendants' violations of United States law.............................................13

          A.     Hussein and his Regime were the Republic's agents. ..............13

          B.     The Hussein Regime's conduct is not attributable to the Republic if the Regime utilized its power against the national interest. ...................................................................14

               (1)    Agents who exercise their authority against the principal's interest, and those that participate in such conduct, are liable to the principal. .......................15

               (2)    The adverse interest exception applies even to governmental agents that have great power. .................20

(3)   The lower court's absolute attribution rule creates unjust results. ...............................................26

C.   Application of the in pari delicto defense raises fact questions........................................................28

(1)   Whether the Hussein Regime abandoned the national interest is a fact question. ..................................28

(2)   Comparison of fault is question of fact. ........................29

D.   The lower court's denial of leave to amend focuses the legal inquiry. .........................................................31

(1)   The Republic of Iraq should have been granted leave to amend its complaint. ..........................................32

(2)   The Republic disagrees with the lower court's view of its factual allegations, and if granted leave to amend, would clarify its factual allegations..............33

a.   Hussein and his Regime stole money from the Programme for personal use...........................33

b.   The Hussein Regime's "governmental" diversions from the Programme also damaged the nation................................................35

2.   The Republic's RICO claims are territorial. ........................................37

A.   A RICO claim is territorial if either (1) the enterprise or (2) pattern of racketeering activity is domestic. .......................37

B.   The Programme and its activities were within the territorial jurisdiction of the United States. ..............................39

(1)   The UN headquarters is territorial....................................40

(2)   United States law applies to UN activities and within the headquarters district. .....................................41

C.   The Republic alleges a domestic enterprise and a domestic pattern of racketeering activity..............................46

D.    In the alternative, the Republic's Complaint alleges predicate acts that are expressly extraterritorial. ......................50

3.    The Republic pleaded proximate cause................................51

A.    The Republic was the direct victim of the Defendants' scheme..................................................................................51

B.    The Defendants' conspiracy targeted the Republic's property. ...............................................................................52

C.    The actions of the Hussein Regime and the UN were not intervening causes. ..................................................54

4.    This Court should infer a private right of action under the FCPA. .......................................................................................56

5.    The Republic's non-statutory claims are governed by federal common law. ...............................................................................59

Conclusion ........................................................................................61

iii

# TABLE OF AUTHORITIES

## CASES

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
483 U.S. 143 (1987)..................................................................38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................9

*Bank of China v. NBM LLC*,
359 F.3d 171 (2d Cir. 2004) ................................................ 16, 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................9

*Bridge v. Phoenix Bond & Indem. Co.*,
128 S. Ct. 2131 (2008)..............................................................52

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979)..................................................................57

*Cenco Inc. v. Seidman & Seidman*,
686 F.2d 449 (7th Cir. 1982) .....................................................7

*CGC Holding Co., LLC v. Hutchens*,
824 F. Supp. 2d 1193 (D. Colo. 2011) .......................................38

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .......................................................9

*Chevron Corp. v. Donziger*,
871 F. Supp. 2d 229 (S.D.N.Y. 2012) ........................................38

*El-Hadad v. Embassy of United Arab Emirates*,
69 F. Supp. 2d 69 (D.D.C. 1999),
*rev'd in part on other grounds*, 216 F.3d 29 (D.C. Cir. 2000).....................43

*European Community v. RJR Nabisco, Inc.*,
No 02-CV-5771(NGG)(VVP), 2011 WL 843957
(E.D.N.Y. Mar. 8, 2011).............................................................38

*Fatemi v. United States*,
    192 A.2d 525 (D.C. 1963) ............................................................43

*First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission*,
    877 F.2d 189 (2d Cir. 1989) ............................................... *passim*

*Foman v. Davis*,
    371 U.S. 178 (1962)....................................................................32

*Hayden v. Cnty. of Nassau*,
    180 F.3d 42 (2d Cir. 1999) ........................................................32

*Hemi Grp. LLC v. City of N.Y.*,
    559 U.S. 1 (2010).................................................................. 52, 53

*In re Am. Express Co. S'holder Litig.*,
    39 F.3d 395 (2d Cir. 1994) ........................................................53

*In re Bennett Funding Group, Inc.*,
    336 F.3d 94 (2d Cir. 2003) ........................................................25

*In re CBI Holding Co., Inc.*,
    529 F.3d 432 (2d Cir. 2008) ................................................ 16, 29

*In re HealthSouth Corp. S'holders Litig.*,
    845 A.2d 1096 (Del.Ch. 2003) ..................................................17

*In re Lemington Home for the Aged*,
    659 F.3d 282 (3d Cir. 2011) ......................................................29

*In re Le-Nature's, Inc.*,
    No. 9-MC-162, 2011 WL 2112533 (W.D. Pa. May 26, 2011) ............. 37, 38

*In re Toyota Motor Corp.*,
    785 F. Supp. 2d 883 (C.D.Cal. 2011)........................................38

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    140 F.3d 442 (2d Cir. 1998) ......................................................60

*Jimenez v. Aristeguieta*,
    311 F.2d 547 (5th Cir. 1962) ......................................................24

*Jin v. Metro. Life Ins. Co.*,
    310 F.3d 84 (2d Cir. 2002) ....................................................................32

*Johnson v. Priceline.com, Inc.*,
    711 F.3d 271 (2d Cir. 2013) ................................................................26

*Johnson v. Yellow Cab Transit Co.*,
    321 U.S. 383 (1944)...........................................................................30

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995) ...............................................................46

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) ..................................................... 45, 53, 54

*Lamb v. Phillip Morris, Inc.*,
    915 F.2d 1024 (6th Cir. 1990) ................................................. 56, 57, 59

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ................................................................53

*Mastafa v. Australian Wheat Board, Ltd.*,
    No. 07 Civ. 7955(GEL), 2008 WL 4378443
    (S.D.N.Y. Sept. 25, 2008)........................................................ 55, 56

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ..................................................................9

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
    871 F. Supp. 2d 933 (N.D. Cal. 2012)...............................................38

*Morrison v. National Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010)..................................................................... *passim*

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
    631 F.3d 29 (2d Cir. 2010) ...........................................................9, 37

*Norex Petroleum Ltd. v. Access Indust., Inc.*,
    304 F. Supp. 2d 570 (S.D.N.Y. 2004),
    *rev'd*, 416 F.3d 146 (2d Cir. 2004) .................................................47

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
    540 F. Supp. 2d 438 (S.D.N.Y. 2007)...............................................47

*People v. Coumatos*,
224 N.Y.S.2d 504 (1961)...................................................... 43, 44

*People v. Weiner*,
85 Misc. 2d 161 (N.Y. Crim. Ct. 1976).........................................43

*Pinter v. Dahl*,
486 U.S. 622 (1988)..............................................................30

*Republic of Haiti v. Duvalier*,
211 A.D.2d 379 (1st Dept 1995) .............................................24

*Republic of Iraq v. First Nat'l City Bank*,
353 F.2d 47 (2d Cir. 1965) ................................................ 59, 60

*Republic of the Philippines v. Marcos*,
806 F.2d 344 (2d Cir. 1986) ................................................59

*Republic of the Philippines v. Marcos*,
818 F.2d 1473(9th Cir. 1987), *rev'd*, 862 F.2d 1355............................ 23, 27

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) (en banc) ................................. 23, 24

*Republic of the Philippines v. Westinghouse*,
774 F.Supp. 1438 (D.N.J. 1991) ........................................ 22, 23

*Schacht v. Brown*,
711 F.2d 1343 (7th Cir. 1983) ...............................................17

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985).......................................................... 39, 53

*Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*,
404 U.S. 6 n. 9 (1971) ........................................................57

*The Sapphire*,
78 U.S. 164 (1870)........................................................ 13, 28

*Touche Ross & Co. v. Redington*,
442 U.S. 560 (1979)...........................................................57

*United States v. Alcan Aluminum Corp.*,
315 F.3d 179 (2d Cir. 2003) ........................................................................53

*United States v. Bahel*,
662 F.3d 610 (2d Cir. 2011) ............................................................ 44, 45, 47

*United States v. Chalmers*,
410 F.Supp. 2d 278 (S.D.N.Y. 2006) ..........................................................45

*United States v. Chalmers*,
474 F. Supp. 2d 555 (S.D.N.Y. 2007) ..........................................................45

*United States v. Chao Fan Xu*,
706 F.3d 965 (9th Cir. 2013) ............................................................... 38, 48

*United States v. Giffen*,
326 F. Supp. 2d 497 (S.D.N.Y. 2004) ..........................................................44

*United States v. Marcano Garcia*,
456 F.Supp. 1358 (D. Puerto Rico 1978) ....................................................42

*United States v. Noriega*,
746 F.Supp. 1506(S.D. Fla. 1990),
*aff'd*, 117 F.3d 1206 (11th Cir. 1997) ..........................................................21

*United States v. Turkette*,
452 U.S. 576 (1981)......................................................................................37

**STATUTES**

18 U.S.C. § 1343 ............................................................................................6

18 U.S.C. § 1952 ..........................................................................................50

18 U.S.C. § 666 ............................................................................................47

18 U.S.C. § 2332(a) ......................................................................................50

22 U.S.C. § 287 ............................................................................................42

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

28 U.S.C. § 1367(c) ........................................................................60

50 U.S.C. § 1701, et seq. ................................................................48

**RULES**

Fed. R. App. P. 32(a) ......................................................................1

Fed. R. App. P. 32(a)(5) ..................................................................1

Fed. R. App. P. 32(a)(6) ..................................................................1

Fed. R. App. P. 32(a)(7)(B) .............................................................1

Fed. R. App. P. 32(a)(7)(B)(iii) ........................................................1

**OTHER AUTHORITIES**

Private FCPA Enforcement,
    49 Am. Bus.L.J. 419 (2012) ....................................................57

Restatement (Third) of Agency § 8.01 ..........................................26

The Sixth Circuit Gets Sheepish on Foreign Corrupt Practices
    Act Enforcement, 5 Transnat'l Law. 533 (1992) .............56, 58, 59

Restatement (Third) of Foreign Relations Law, Section 207 ..................19

International Law Commission's Report on the Responsibility
    of State's for Internationally Wrongful Acts ...........................19, 20

Restatement (Third) of Foreign Relations Law, Section 331(c) ............20

Restatement (Third) of Foreign Relations Law, Section 8.01 ...............26

Restatement (Third) of Foreign Relations Law, Section 466 ..........41, 42

Restatement (Third) of Foreign Relations Law, Section 468 ..........40, 43

Restatement (Third) of Foreign Relations Law, Section 223 ...............41

W. Seavy, Hornbook ON THE LAW OF AGENCY § 102 (2d ed. 1964) ......................27

A. Wrage, Bribery And Extortion: Undermining Business,
    Governments and Security (2007) ........................................33, 34

ix

U.S. Department of State Bureau of Public Affairs, *National Strategy Against High-Level Corruption: Coordinating International Efforts to Combat Kleptocracy* (8/10/2006)...............................................................34

B. Nolan,The Greenwood Encyclopedia
of International Relations, vol. 2 (2002) ........................................35

CRS Report: *Foreign Regimes' Assets: The United States Faces Challenges in Recovering Assets, but Has Mechanisms That Could Guide Future Efforts* at 44 (Sept. 2004)..........................................................................36

Goodrich and Hambro, Charter of the United Nations:
Commentary and Documents (1946)...........................................40

H. Kelsen,  The Law of the United Nations:
A Critical Analysis of its Fundamental Problems 353 .................41

*Reparation for Injuries Suffered in the Service of the United Nations*, 1949 I.C.J. 174, 179 .........................................................................................41

Headquarters Agreement of the United Nations,
Sections 7(b)-(c), 61 Stat. 756 (1947),
reprinted following 22 U.S.C. § 287 note ....................................42

P. Malanczuk,
Akehurst's Modern Introduction to International Law (7th ed. 1997)..........43

P. Neumann, United Nations Procurement Regime (2008)....................................44

International Emergency Economic Powers Act, 50 U.S.C. § 1701 ......................48

www.treasury.gov/resource-center/fin-mkts/Documents/marsh_response.pdf.......42

http://forbes.com/2003/02/24/0224kings.html..........................................35

www.nbcnews.com/id/3340771/t/saddams-palaces-triple-years/ ..........................35

http://www.nytimes.com/2003/05/06/world/aftereffects-presidental-theft-bank-official-says-hussein-s-son-took-1-billion.html .............................................36

*Statement of Jurisdiction*

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Republic of Iraq raised claims under a federal statute.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final and appealable order of the district court.

This appeal is timely. The Order was entered on February 6, 2013, SPA-1, and the Republic filed its notice of appeal on February 20, 2013.

*Statement of the Issues*

*1.*    The Defendants conspired with the Hussein Regime to corrupt the United Nations Oil for Food Programme.

      *A.*    Are the actions of the Hussein Regime attributable to the Republic as a matter of law, even if the Hussein Regime committed wrongs against the national interests?

      *B.*    Does the involvement of the Republic's self-appointed agent—the Hussein Regime—in the Defendants' scheme bar the Republic's claims against the Defendants as a matter of law?

*2.*    The Republic's RICO claims are based on the Defendants' corruption of the United Nations Oil for Food Programme.

      *A.*    What is the proper standard for determining if a RICO claim is territorial?

1

   *B.*  Are the United Nations Headquarters District and related UN activities within the territorial jurisdiction of the United States?

   *C.*  Are the Republic's RICO claims territorial?

  *3.*  Did the district court abuse its discretion in denying the Republic leave to amend without stating a reason for the denial?

  *4.*  Should this Court infer a private right of action under the Foreign Corrupt Practices Act (the FCPA)?

  *5.*  Does the federal common law govern the Republic's non-statutory claims?

*Statement of the Case*

1.    *Course of the Proceedings*

The Republic of Iraq filed its First Amended Complaint, the live pleading, on July 31, 2009.

The Defendants jointly moved to dismiss the Complaint on January 15, 2010. On the same day, BNP Paribas filed a separate motion to dismiss raising additional arguments for its dismissal.

The district court heard oral argument on October 26, 2012.

The district court granted the motions to dismiss and entered judgment on February 6, 2013.

The Republic filed its notice of appeal on February 20, 2013.

2.    *Statement of Facts*

A.    *The Conspiracy to Corrupt the Programme*

Following the invasion of Kuwait in August of 1990, the United Nations imposed sanctions to isolate Saddam Hussein and his Regime. A-105/¶¶239-40. The sanctions had unintended yet dire consequences for the welfare of the Iraqi people. To alleviate their suffering, in 1996 the UN created the Programme, which allowed the sale of Iraqi oil to purchase needed humanitarian aid and other limited purposes.

The UN carefully structured the Programme to assist the Iraqi people while avoiding the Hussein Regime's enrichment. For this reason, the Hussein Regime

3

was prohibited from receiving any Programme funds directly. All proceeds from the sale of Iraq's oil were to be deposited in the escrow account managed by Defendant BNP Paribas in New York ("BNP"). Humanitarian purchases were funded directly from the BNP escrow account. *E.g.*, A-115-125/¶¶306-49.

The Programme funds were held at BNP in New York, so they were subject to United States laws controlling blocked property of a Terrorist State. All transactions involving the BNP account required approval from the United States Department of the Treasury.

Combined, the Treasury Department regulations and UN procedures prevented the Hussein Regime from unilaterally diverting Programme funds.

To circumvent the protections, the Hussein Regime needed the Defendants' help.

The Defendants gave it. In exchange for the Regime's approval of windfall profits on their Programme contracts, the Defendants agreed to transfer hundreds of millions of dollars in kickbacks and bribes to the Hussein Regime in violation of UN and US sanctions. A-136-162/¶¶ 420, 439, 458, 475, 513. Specifically, the oil purchasing Defendants agreed to pay the Hussein Regime a bribe for every barrel they purchased. As a result, the BNP escrow account did not receive the full price for oil sales as required by Programme rules. The Defendants selling humanitarian goods agreed to pay kickbacks to the Hussein Regime on their sales. To further its

4

economic interests, BNP facilitated the overall scheme by agreeing to hide information about the conspiracy from the UN and the Treasury Department. A-241-255/¶¶ 975-1066.

### B.    The Defendants' Role in the Conspiracy

The Defendants played a central role in the conspiracy. They were the chief actors in the linchpin fraud on the UN and the Treasury Department.

The conspiracy's goal was to divert Programme assets under the UN's and BNP's guard in New York. To do that, the Defendants had to defraud the Programme overseers that approved all Programme contracts. The UN would not approve a contract knowing it contained unwritten terms, much less promises to make payments directly to the Hussein Regime. *E.g.*, A-119-122/¶¶ 325, 332, 339-40.

The Defendants' scheme also necessitated misleading the Treasury Department. Following September 11 and adoption of the PATRIOT Act, those misrepresentations were RICO predicates. *E.g.,* A-112/¶¶ 288-90.

In keeping with their critical role, the Defendants received the lion's share of the proceeds of the conspiracy—conservatively estimated at $9 billion—more than five times the share received by Saddam Hussein and his Regime. A-260-262/¶¶1100-14.

5

### C.    The UN Report and the Criminal Charges

The Defendants' culpability was established by an independent UN investigation, headed by Paul Volcker. The report of that investigation outlines the Defendants' conspiracy, including the manner in which BNP "fostered the payment of illicit surcharges." A-955. In addition, more than half the Defendants have entered into criminal plea agreements in which they admit to criminal wrongdoing under United States law. A-1349/A-1456-2168. Those admissions sharply contrast with the contention that there was no US fraud or conspiracy. For example, Defendant York admits in its plea agreement that it conspired "to defraud the United Nations and the Oil-for-Food Program and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, through the use of interstate and foreign wire communications, in violation of 18 U.S.C. § 1343...." A-1611-13.

### 3.    The Republic of Iraq's Claims for Relief

On these facts, the Republic asserted claims under three federal statutes— RICO (sections 1962(c) and 1962(d)), the Robinson-Patman Act, and the Foreign Corrupt Practices Act (the FCPA). The Republic also brought non-statutory claims for fraud, conspiracy to commit fraud, breach of fiduciary duty, participation or inducement of a breach of fiduciary duty, breach of contract, and unjust enrichment.

4.    *The District Court's Opinion*

The district court denied many of the Defendants' arguments for dismissing the Republic's Complaint. In particular, the lower court rejected the Defendants' standing argument, stating that "the Republic of Iraq had a concrete, if not exclusive, interest in the funds contained within the UN escrow account." SPA-17. The court also rejected the Defendants' act of state and political question challenges.

Ultimately, however, the lower court ruled that the Defendants could avoid civil liability for their admittedly criminal conduct on two chief grounds. First, the district court held that, as a matter of law, the Republic is bound by the "governmental acts" of the Hussein Regime, and therefore the Republic's damage claims were barred under the *in pari delicto* defense because the Hussein Regime was intimately involved in the Defendants' conspiracy. Second, the district court held that the UN Programme and its activities were outside the territorial jurisdiction of United States law. In addition, the lower court found a lack of proximate cause as to the Defendants' RICO claims, and rejected claims under the FCPA and federal common law. With its dismissal of the Republic's federal claims, the district court declined to exercise supplemental jurisdiction over non-federal claims.

Notably, the district court's conclusions are partially based on its narrow view of the Republic's allegations. Those allegations, however, could have been clarified if the district court had granted the Republic's motion for leave to amend its pleading, but the request was not addressed by the lower court.

*Standard of Review*

This Court reviews *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiffs' favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level;" that is, the claims must lie "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555.

The same standard applies to the lower court's conclusion that the Republic's RICO claims are extra-territorial. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32 (2d Cir. 2010).

Denials of leave to amend are reviewed under an abuse of discretion standard. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

*Summary of the Argument*

This action tests whether private companies and individuals who assist an oppressive dictator in corrupting a United Nations humanitarian program are liable to the victimized nation or whether their clear violations of law are excused by the dictator's complicity in the scheme.

The Defendants conspired with the Hussein Regime to convert property from a United Nations humanitarian program. The property was owned by the Republic, but guarded by the UN. To convert the property, the Defendants had to deceive the UN and the United States Department of the Treasury and bribe the Hussein Regime.

The lower court held that because Hussein used his governmental authority to effect the corruption, the Republic was *in pari delicto* with the Defendants, and therefore, its claims are barred. In the lower court's view, so long as a government official acts under "color of authority," the official's conduct binds the nation foreclosing any damage claims related to the conduct, "however deplorable" or "depraved" such conduct might be. This analysis contravenes the basic agency law that governs the relationship between a nation and its governmental officials and establishes an unprecedented rule that is unworkable and unjust.

Saddam Hussein arrogated great power, but he was not the nation. He was a government official, the Republic's agent, bound by law and duty to serve the

nation and its citizens. Like any agent, Hussein could abuse his authority to serve his own ends. And, therefore, like any principal, the Republic can seek redress against those that aided its agent in damaging the nation.

The lower court's absolute attribution rule—in which all governmental conduct binds the nation—confuses power with authority, and authority with the abuse of authority.

Even if the lower court's absolute attribution rule applies, the court still committed error by misreading the Republic's Complaint. The court stated that the Republic's "Complaint does not allege that the Hussein Regime committed acts of personal misconduct as distinct from governmental misconduct," but the Republic squarely alleges that Hussein and his Regime committed personal corruption against the nation. The Republic also questions as a matter of fact and law the court's ruling that an exercise of governmental authority can never constitute personal corruption. The court's factual error is heightened by the court's unexplained and unjustified denial of the Republic's motion for leave to amend.

As to the territoriality of the Republic's RICO claims, the lower court's error is even more basic. The court simply rewrites the map, excising the UN headquarters district from Manhattan. The lower court's jurisdictional gerrymandering contradicts the UN Headquarters Treaty and the well-established rules of international law.

11

The lower court's attribution conclusions also distorted its proximate cause analysis. The Republic was the sole victim of the Defendants' scheme, which targeted the Republic's property controlled by the Programme. As the intended and foreseeable victim, the Republic has alleged proximate cause. The fact that the Defendants' scheme was complicated and required participation of the Hussein Regime does not negate the fact that the very goal of the scheme was to obtain the Republic's property.

Finally, the lower court erred in blindly following misguided precedent on the existence of a private right of action under the FCPA and in rejecting application of the federal common law.

*Argument*

1.    *The Hussein Regime's participation in the Defendants' conspiracy does not, as a matter of law, excuse the Defendants' violations of United States law.*

    A.    *Hussein and his Regime were the Republic's agents.*

In the lower court's words, the "legal relationship between the sovereign Republic of Iraq, the Hussein Regime, and the Iraqi people frames this litigation." SPA-23.

The district court correctly observed the relevant legal rule that a government is not the nation, but the nation's agent, a distinction the Supreme Court highlighted in 1870: "The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty." *The Sapphire,* 78 U.S. 164, 168 (1870).

The lower court, however, misjudged the specific relationship among the parties. According to the lower court, the parties agree that "Hussein, the Hussein Regime, and the Republic of Iraq are not one and the same; they are different governments over time that represent the same sovereign state." SPA-23-24.

The Republic disagrees. None of "Hussein, the Hussein Regime, and the Republic of Iraq" is a government.

Hussein was a self-appointed government official, not the government. While powerful, Hussein did not embody the nation or the national government.

13

Hussein's Regime was also not a government. The Regime was a faction of the Bath Party that controlled the national government, but it did not comprise the national government. As explained in the Republic's Complaint, the Hussein Regime was a "group of corrupted government officials" that controlled the government by harshly oppressing all opposition. A-101-102/¶¶221-23. *See also* Library of Congress, Federal Research Division: Country Profile: Iraq, at 9 (August 2006) ("Under Saddam Hussein, the levers of economic power were solely in the hands of corrupt elite in the ruling Baath Party; for the 25 years prior to 2003, no national budget was prepared.").

The Republic is the nation itself, not a government of the nation. The Republic's government is now a constitutional democracy.

Thus, Hussein and his Regime were governmental agents, but not the government itself, of the Republic.

> B.   *The Hussein Regime's conduct is not attributable to the Republic if the Regime utilized its power against the national interest.*

The district court went further astray by incorrectly applying the general agency principles that set forth the relationship between government and nation, ultimately concluding that, "as a matter of law, the Republic of Iraq bears responsibility in this action for the Hussein Regime's corruption of the Programme." SPA-24. The lower court based this conclusion on two legal

14

predicates—(1) the Republic is barred from recovering for any damage connected to the Hussein Regime's "governmental" conduct, and (2) "the Hussein Regime's conduct was 'governmental' if it was undertaken in the purported or apparent execution of official duties," even if such conduct was against the national interest. SPA-27.

That analysis does not go far enough. While these predicates, standing alone, might determine the nation's liability to a third party for the misconduct of its agents, the court omits a third step necessary to determine whether the nation can recover against its agent and those that conspire with him to harm the nation— whether the conduct was an abuse of authority committed against the national interest.

> *(1)    Agents who exercise their authority against the principal's interest, and those that participate in such conduct, are liable to the principal.*

The district court's legal error is basic: The fact that the principal (the Republic) can be held liable to third parties under the doctrine of *respondeat superior* when its agent (Hussein) uses his authority wrongfully to harm others does not mean that the principal is foreclosed from suing its agent and its agent's co-conspirators for damage to the principal when the agent acts against the principal's interest.

15

The lower court, however, leaps from the fact that the Republic has been held liable for the wrongful conduct of the Hussein Regime, to the conclusion that all "governmental" actions of the Hussein Regime are attributable to the Republic even when the Republic is the plaintiff against its agent's co-conspirators. Based on that unqualified attribution, the lower court conflates the Republic with the Regime that terrorized it, resulting in the lower court's conclusion: "Having engineered the wrongdoing alleged in the Complaint, and having alleged that the wrongdoing directly harmed the Programme, Iraq cannot recover from that wrongdoing." SPA-5.

Agency law, however, sets forth a clear exception to the general rule of attribution—the adverse interest exception: "when an agent acts adversely to its principal, the agent's actions and knowledge are not imputed to the principal." *Bank of China v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004). In the corporate context, the rule is simply expressed: Is the agent's fraud for or against the corporation?[1] When corporate managers commit fraud *for* the corporation, their wrongdoing is imputed to the corporation; when managers commit fraud *against*

---

[1] While the Republic agrees that general agency principles apply to the relationship between the Hussein Regime and the Republic, it notes that many aspects of agency law as applied to corporations are inapplicable to a foreign nation. There is, for example, no difficulty in determining the appropriate plaintiff as between the corporation, its creditors, or its shareholders. *See In re CBI Holding Co., Inc.*, 529 F.3d 432, 447 (2d Cir. 2008).

16

the corporation, there is no imputation. *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 435-54 (7th Cir. 1982). Courts use "a two-pronged analysis to determine whether such imputation should occur: whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing." *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983). A judgment for the Republic meets that test: The judgment would compensate the sole victims of the Defendants' wrongs—the people and nation of Iraq—and would deter others who think they can help an oppressive dictator loot humanitarian aid with impunity.

The district court placed particular emphasis on the fact that the Republic has had to pay damage claims based on previous Regime conduct. SPA-32. But, under basic agency law, a principal's liability for an agents' action does not mean that the principal has no redress when agents abuse their authority and damage the principal's interest:

> The reality that HealthSouth itself might be liable to third-parties due to the failure of its managers … does not mean that HealthSouth has no right to seek recompense from those managers for the harm they caused it. To hold otherwise would be to leave the constituencies of corporate entities—including public stockholders and creditors—with no recourse when their corporation is injured by its managers.

*In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107-08 (Del.Ch. 2003).

The district court rejects application of the adverse interest exception to sovereigns as a matter of law, stating "there is no case law that suggests it" applies

17

to sovereigns. SPA-43. On this basis, the lower court held that every act of governmental authority necessarily binds the nation.

This Court, however, stated in *First Fidelity Bank* that the existence of authority (much less raw power) in a foreign governmental agent is not enough to bind a foreign nation. *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission,* 877 F.2d. 189, 192 (2d Cir. 1989).

"Put another way, the possession of authority does not, *ipso facto*, validate every exercise of it." *Id*. In *First Fidelity*, the bank claimed that Antigua was liable as a matter of law on a note signed by Antigua's UN ambassador. This Court rejected the lower court's core contention "as a matter of law, that an ambassador's actions under color of authority automatically bind the state that he represents:"

> The implication of First Fidelity's argument is that Antigua is bound by Jacobs' actions solely because he was Antigua's ambassador to the U.N. In effect, First Fidelity is telling us: "L'état, c'est lui." If it were true, as a matter of law, that an ambassador's actions under color of authority automatically bind the state that he represents, then we must affirm the decision below . . . . We do not believe, however, that a person's position as ambassador, and nothing more, should be dispositive in this case, let alone all cases . . . .

*Id.* at 192.

In contrast, the lower court selectively adopted some of the agency rules that set out the relationship between nation and government and its officials, omitting without reason the adverse interest exception. Without the adverse interest exception, any action by Hussein or his Regime "in the purported or apparent

18

execution of official duties" is attributable to the Republic without exception. SPA-27.

Distinguishing *First Fidelity* on the basis that it deals with a single official, while Hussein controlled an entire government and nation, the lower court based its absolute attribution rule on two sources no party had previously cited—Restatement Section 207 of the Restatement (Third) of Foreign Relations Law ("Restatement") and the International Law Commission's Report on the Responsibility of State's for Internationally Wrongful Acts ("ILC").[2] Neither provision, however, is relevant to this dispute, and neither supports an absolute rule of attribution.

As an initial matter, both sections deal exclusively with violations of international law. This Court noted in *First Fidelity,* that, "by its own terms, [Restatement] section 207 applies only to violations of international law." 877 F.2d at 193. ILC Article 2 also expressly limits the ILC rules to international obligations, and ILC Article 33 limits the rules to obligations "to another State, to several States, or to the international community as a whole." Thus, these provisions have no application to determining the relation of foreign nations to individuals or corporations.

---

[2] The parties were notified of the lower court's interest in these sources two weeks before the hearing on the motions to dismiss and more than two and a half years after the Defendants' motions were filed. A-3581.

Even within their narrow scope, neither authority supports the lower court's selective application of general agency principles. To the contrary, both expressly state that a governmental agent's actions are not attributable to the nation if the agent has been corrupted. This Court noted in *First Fidelity*: "Moreover, an assessment under section 207 of the scope and color of authority introduces elements of agency law: one must 'consider all the circumstances.' These include matters that are relevant in this case: 'whether the affected parties reasonably considered the action to be official, [and] whether the action was for public purpose or for private gain.'" *First Fidelity*, 877 F.2d at 193 (citation omitted; brackets in original). The Restatement also notes that a nation can deny its assent to an international agreement if such assent was caused by "the corruption of the state's representative by another negotiating state." Restatement Section 331(c). Likewise, assent under the ILC articles is vitiated by "corruption or coercion," particularly the bribery of a government official. ILC Article 20, comment (6).

> *(2)*    The adverse interest exception applies even to governmental agents that have great power.

The lower court's equation of power with attribution is express and made without exception. In the lower court's words, so long as the Hussein Regime acted for "purportedly public purposes" and acted with governmental authority, its actions are attributable to the nation "however deplorable" or "depraved" those actions might be. SPA-48.

20

The argument is not unprecedented. A number of dictators, including Hussein in his criminal trial,[3] have raised this exact claim: They can wield their great power in any depraved manner they desire without legal consequence.

The lower court, however, stands alone in accepting this claim and attributing even a dictator's abuse of power to the nation. For example: "The inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama." *United States v. Noriega*, 746 F.Supp. 1506, 1522 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997). In particular, the court rejected Noriega's "sweeping position" that "as the de facto ruler of Panama, his actions were acts of state" as a matter of law.[4] *Id.* The court questioned whether certain actions—such as drug trafficking—could ever "constitute public action *taken on behalf of the*

---

[3] The Iraqi High Tribunal that affirmed Hussein's conviction for crimes against Iraqi citizens stated that "it is not possible for any person to claim that he committed crimes and that his actions are outside the reach of the law," after noting that Hussein "had the legislative and executive powers in his hand." [Available at Library of Congress website: http://www.loc.gov/law/help/hussein/appellate.php, at ¶¶ 15, 2.

[4] The district court distinguishes this authority in part based on an unexplained distinction between "acts of state" and what the court calls "governmental action." *See* SPA-28-29. The Republic, however, believes that even if the two concepts are distinct, the basic attribution rule—whether conduct is for or against the principal's interests—applies.

21

*Panamanian state*." *Id.* (emphasis added). Diverting money designated for humanitarian aid is likewise inherently against the public interest.

A number of opinions deal with corruption by Ferdinand Marcos. One, in particular, mirrors many of the Republic's allegations: The Philippines sued corporations for paying kickbacks to Marcos on contracts he had the power to award. *The Republic of the Philippines v. Westinghouse*, 774 F.Supp. 1438 (D.N.J. 1991). The defense presented by the *Westinghouse* defendants has a familiar ring:

> Defendants contend that under then-existing Philippine law President Marcos owed the people of the Philippines *no* fiduciary duty. Their argument for this proposition is a deceptively simple one. As the absolute dictator of the Philippines, defendants argue, every action President Marcos took was lawful, because his acts were the law.
>
> Or, put differently, defendants argue that President Marcos was legally bound to respect no authority other than his own. Therefore, they reason, if President Marcos did take any bribes, such conduct was entirely lawful, and was not in breach of any fiduciary duty President Marcos could owe to the people of the Philippines. Thus, they conclude that they may not be held liable for the tortious interference with a fiduciary duty which did not exist.

*Id.* at 1452.

The *Westinghouse* court characterized the argument as "deceptively simple," but also as "manifestly not true," "cynical," and having "no place in a court of law." *Id.* at 1452, 1459, 1465. Even though Marcos possessed the absolute authority of martial law, he could still wield his absolute authority against the national interest:

22

Of course, it is true, as defendants point out, that President Marcos instituted martial law, that he arrogated expansive powers to himself, that he ruled undemocratically for many years, and that he often violated the civil liberties and rights of his fellow citizens. Nor, presumably, would the Republic deny that the Marcos regime was corrupt—indeed, this forms the basis of the Republic's claim. None of this means, however, that the Philippine legal system was completely swept away during the Marcos regime, that—as a matter of law— President Marcos operated completely outside any legal norms, or that, as a result, everything President Marcos did was "absolutely lawful."

*Id.* at 1454.

The lower court distinguishes this and similar authority as dealing with "personal acts," not governmental ones, SPA-29, but the purported distinction was expressly rejected in *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc). In this action, the Philippines alleged that Marcos had turned the entire Philippine government into a corrupt RICO "enterprise."

The original three judge panel of the Ninth Circuit employed the identical reasoning adopted by the lower court—that the Philippines' action was barred because it "challenges not merely individual misdeeds or indiscretions but the very way in which Mr. Marcos wielded governmental power, retained that power and ran the Philippine government," "activities that Marcos could only have undertaken pursuant to his powers as President of the Philippines." *Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1480, 1479 (9th Cir. 1987), *rev'd*, 862 F.2d 1355.

23

The *en banc* Ninth Circuit rejected that reasoning because Marcos "was not the state, but the head of the state, bound by the laws that applied to him. Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law." 862 F.2d at 1361.

The same reasoning was applied to Jean-Claude "Baby Doc" Duvalier and Marcos Perez Jimenez of Venezuela. *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 382 (1st Dept 1995); *Jimenez v. Aristeguieta*, 311 F.2d 547, 557 (5th Cir. 1962). In *Jimenez*, the Fifth Circuit noted that, "[e]ven though characterized as a dictator, appellant was not himself the Sovereign—government—of Venezuela within the Act of State Doctrine. He was chief executive, a public officer, of the sovereign nation of Venezuela…." 311 F.2d at 557. The court concluded that the alleged acts "constituted common crimes committed by the Chief of State done in violation of his position and not in pursuance of it." *Id.* at 558. In the same way, the Republic alleges that Hussein corrupted the Programme to serve "the personal aims of Saddam Hussein," not the nation's. A-274/¶1200.

The lower court distinguishes this authority based on its reading of the Republic's Complaint as alleging that Hussein merely reallocated governmental funds and did not deposit the diverted funds into "personal bank accounts in foreign countries." SPA-30. Even if that were factually true, a governmental official can breach his duties to the nation without putting funds in a personal bank

24

account. Application of the adverse interest exception is not an issue of damages, but of breach of duty. If, for example, a state governor authorized overpayments to a contractor that agreed to use school building funds to improve the governor's state-owned mansion, conceivably the state would not suffer pecuniary damage, since the state owns both the schools and the mansion. But, the contractor's overpayments would damage the state, even if the governor has authority to allocate state funds.

There is an abuse of authority even if some of the diverted funds went to items that benefited the Republic. Even a totally corrupt agent needs to perform some acts that benefit the principal if solely to maintain his agency position so he can keep stealing from his principal. The adverse interest exception applies even if "certain schemes inured to the benefit of the corporation but that others did not." *In re Bennett Funding Group, Inc*., 336 F.3d 94, 100 (2d Cir. 2003).

Finally, the lower court also held that "the examples of self-dealing highlighted by Iraq all relate, in one way or another, to Saddam Hussein's efforts to 'solidify' his own power," but a governmental official can breach his or her duties in an effort to stay in office. Per the lower court's analysis, rigging an election is governmental and therefore attributable to the sovereign, such that the sovereign could not sue a third-party election service that helps rig an election because the conduct was induced by the government official that stays in power

because of the election fraud. The fact that the Hussein Regime used its army and secret police, rather than a stuffed ballot box, to achieve the same end does not alter the equities.

> ### (3) The lower court's absolute attribution rule creates unjust results.

The district court's extraction of the adverse interest exception from general agency law in the context of sovereign entities is unworkable and unjust.

First, the district court's rule imputing all acts of government official under "color of authority" to the nation is a Catch-22 that nullifies the fiduciary duty imposed on agents to cause them to serve their principal's interests and the related duty not to aid and abet such a breach. As a matter of agency law, an agent's fiduciary duty is limited to the scope of the agency.[5] So, to breach the fiduciary duty, the agent has to act within the scope of the agency. But, according to the district court's attribution rule, if the agent acts within the scope of the agency, the agent's actions are attributed to the principal as a matter of law, so the principal cannot recover for the breaches of fiduciary duty.

The "catch" applies with particular force in a bribery action. There is no purpose in bribing a governmental official who lacks the authority to grant the contract in question. So, according to the district court's opinion, no sovereign can

---

[5] *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013) Restatement (Third) of Agency § 8.01.

26

ever recover for damage caused by the bribing of its governmental agent. Yet, this Court noted in *First Fidelity* that attribution of the conduct of a foreign governmental official is not absolute when the agent is corrupted. *Id.* And, under general agency law: "The clearest case for denying [imputation] is that in which there has been collusion between the other party for a transaction and the agent. One who bribes an agent to accept inferior goods cannot well claim that the plaintiff knew of the quality when he accepted them." W. Seavy, Hornbook On The Law of Agency § 102, at 186 (2d ed. 1964).

The lower court's holding is also perverse in its application—the more power a despot arrogates, the more difficult it is for the nation he abuses to recover for the despot's wrongs against the nation. Per the lower court's rule, all actions within the despot's authority are legally actions of the nation. A despot like Hussein, who can arrogate dictatorial power and thereby convert his personal whims into governmental programs, is vulnerable only to invasion, not the courts, because his actions—however deplorable or depraved—must be characterized as being accomplished "in the purported or apparent execution of official duties." SPA-27. On the other hand, in the court's view, dictators like Marcos and Jimenez lack sufficient power to convert their personal crimes into governmental conduct.

27

The same perversity is true of those, like the Defendants, that aid despots—they too are shielded by the lower court's rule that unquestionably attributes their co-conspirator's abuse of power to the nation he victimized.

The court's absolute attribution rule rewards the worst of government officials, those that arrogate the most power. The rule also contradicts the Supreme Court's statement that even an "Emperor … or other actual person … in power is no more than the mere agent of the nation." *The Sapphire,* 78 U.S. at 168. That is, an immensely powerful agent is still an agent bound to act in the principal's interest.

### C.    *Application of the in pari delicto defense raises fact questions.*

The district court's conclusion on the *in pari delicto* defense follows directly from its absolute attribution rule—because there are no exceptions to the rule of attribution, then the Republic must be found culpable along with the Defendants. If there are any exceptions to attribution, however, a fact issue is raised.

### (1)    *Whether the Hussein Regime abandoned the national interest is a fact question.*

If the adverse interest exception applies, then the Order must be reversed because the Republic plausibly alleges that Hussein utilized his Regime to corrupt the Programme to serve "the personal aims of Saddam Hussein, … to solidify his power and to maintain the trappings of his dictatorship." A-274/¶1200.

28

Whether Hussein acted for or against the national interest "clearly raises an issue of fact for the jury to decide." *Bank of China*, 359 F.3d at 179; *see also In re Lemington Home for the Aged*, 659 F.3d 282, 293 (3d Cir. 2011) ("Because the Committee has tendered sufficient evidence that the directors' and officers' alleged breaches of fiduciary duty did not benefit the Home but instead benefited their own self-interest, the applicability of the 'adverse interest' exception presents a genuine issue of material fact.").

More particularly, the Republic alleges that Hussein conspired with the Defendants to corrupt the Programme so he could stay in power, steal more of the nation's assets, and add to his personal wealth. These specific allegations raise a fact question on application of the adverse interest exception. *In re CBI Holding Co., Inc.*, 529 F.3d 432 (2d Cir. 2008). In *CBI Holding*, this Court affirmed a fact finding that CBI's President, Robert Castello, had totally abandoned the corporation's interest because his "fraud was perpetrated for the purpose of obtaining a bigger bonus for Castello, and to preserve Castello's personal control over the company'…." *Id*. at 449.

### (2)    Comparison of fault is question of fact.

Even if all of the Hussein Regime's actions are attributed to the Republic, application of the *in pari delicto* defense still raises a fact question. *In pari delicto* means equal fault, so even if the actions of the Hussein Regime are attributable to

29

the Republic, a fact question still exists as to whether the Republic's fault equals that of the Defendants.

Comparison of responsibility under the *in pari delicto* defense is a question of fact. *E.g., Pinter v. Dahl*, 486 U.S. 622, 639 (1988). "Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated." *Id.* at 636. *In pari delicto* is not an unqualified legal defense, applicable whenever the plaintiff has any fault. Its application requires "the free and just exercise of discretion" based on the particular facts of the case. *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387-88 (1944).

In this case, the equities are clear. The Republic suffered under the rule of a notoriously corrupt and vicious dictator. Hussein's wrongs toward the Republic and its neighbors were so notorious that from the Clinton Administration through the end of the Second Gulf War, the United States' official position was to support regime change. Public Law 105-235 (August 14, 1998). The UN imposed the most extensive and long-standing sanctions in its history to achieve the same end. A-112/¶292. When those sanctions caused suffering among the general Iraqi population, the UN created the Programme, which was carefully and expressly structured to avoid enriching Hussein and his Regime. Yet, knowing with whom

30

they dealt, the Defendants nonetheless decided to conspire with the Hussein Regime to divert humanitarian aid from the Iraqi people for their own profit.

In this context, it was error to apply the *in pari delicto* defense as a matter of law.

> ### D. *The lower court's denial of leave to amend focuses the legal inquiry.*

The lower court's opinion rests heavily on the Court's interpretation of the Republic's Complaint as alleging solely what the lower court characterizes as governmental, as opposed to personal, corruption. The Republic, however, draws no such distinction, and moreover expressly asserts that Saddam Hussein utilized his control over the Iraqi government to serve his personal goals.

The factual distinctions are sharpened by the Republic's request for leave to amend. By denying leave to amend, the lower court impliedly ruled that the Republic could assert no factual allegations that could plausibly support application of the adverse interest exception. Given that implied ruling, the legal question for this Court is stark—Are there any circumstances in which a dictator with entrenched control over the national government can be held civilly liable for his wrongs to the nation? Or, are the whims and dictates of a tyrant like Hussein inherently governmental action attributable to the nation because he has the power to impose his will regardless of the law or his duties to the nation?

31

These questions are not theoretical, and the Republic is not seeking leave to concoct factual assertions to avoid an untimely dismissal. The truth is that Saddam Hussein was a tyrant who wielded near total control over the nation, but he wielded that control to serve the ends of Hussein and his cabal, not the nation's.

> *(1)    The Republic of Iraq should have been granted leave to amend its complaint.*

The district did not address the Republic's request for leave to amend. *See* A-1442-43/A-3650.

"When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999). Rule 15(a) states that leave to amend "shall be freely given when justice so requires," and the Supreme Court instructs that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Generally, leave to amend is denied only for good reason, such as futility, bad faith, undue delay, or undue prejudice to the opposing party. *Id.* at 182.

"Outright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) (citation omitted).

32

(2)    *The Republic disagrees with the lower court's view of its factual allegations, and if granted leave to amend, would clarify its factual allegations.*

a.    *Hussein and his Regime stole money from the Programme for personal use.*

At the hearing on the motion to dismiss, the Republic specifically requested leave to address the lower court's assertion that the Republic "does not allege that the Hussein Regime committed acts of personal misconduct as distinct of governmental misconduct." SPA-29/A-3649-50. The Republic's Complaint alleged that Hussein corrupted the Programme to serve "the personal aims of Saddam Hussein," not the nation's, but could provide further specificity on this fact issue. A-274/¶1200.

It is the Republic's position that some of Hussein's corruption was personal in the sense of transfers to Swiss bank accounts, and that all of Hussein's corruption was personal in the sense that he used governmental authority to serve his personal goals against the national interest.

In fact, corruption was "raised to an art form by Saddam Hussein. Hussein not only plundered his country's coffers directly, but during the period of United Nations sanctions he also orchestrated and rigorously administered schemes by which he was able to steal directly, mandate kickbacks to himself, and extract and extort bribes from those who would do business with Iraq." A. Wrage, Bribery

33

And Extortion: Undermining Business, Governments, and Security at 13 (2007) ("Wrage").

Hussein's corruption was as personal and familial as the "misconduct in *Marcos*, *Jimenez*, and *Duvalier*," which the lower court described as being "undertaken by each ruler and his close associates or family," rather than a "regime." SPA-31. Like the Duvaliers and others, Hussein "transmuted governance into a lucrative family business." Wrage at 5. *See also id*. at 119; U.S. Department of State Bureau of Public Affairs, *National Strategy Against High-Level Corruption: Coordinating International Efforts to Combat Kleptocracy* at 2 (8/10/2006)[6] ("Hussein looted Iraq of billions of dollars…. He used these ill-gotten gains to maintain despotic power, develop and purchase weapons, *and enrich his family, cronies, and himself*.") (emphasis added).

Hussein's corruption was so notorious that one treatise utilizes it, along with that of Marcos and others, to exemplify the definition of kleptocracy:

> **kleptocracy**. Government by a clique of thieves. This is the most extreme form of corruption. It may reach such proportions that whole nations are robbed of their income by a tiny elite or even a single extended family. …. Spectacular individual or family examples characterized many developing countries, including the regimes of Ferdinand Marcos (Philippines), Saddam Hussein (Iraq), ….

---

[6] http://2001-2009.state.gov/documents/organization/70333.pdf.

B. Nolan, The Greenwood Encyclopedia of International Relations, vol. 2, at 907 (2002).

Ultimately, Hussein *personally* garnered a multi-billion dollar fortune *Forbes* estimated at four times that of the Queen England.[7]

To be clear, the Republic alleges (and if granted leave to amend would make eminently clear) that Saddam Hussein and his family stole a material portion of the funds paid illegally to the Hussein Regime by the Defendants.

> b.    *The Hussein Regime's "governmental" diversions*
> *from the Programme also damaged the nation.*

The Republic does not limit its claims to diversions to Hussein's own pocket. The Republic also asserts that the Regime's spending on "presidential" palaces and on maintaining Hussein's reign was against the national interest. In other words, even if the Hussein Regime initially deposited much of the diverted funds in "government" coffers, not Swiss bank accounts in Hussein's name, the Regime still used the proceeds for Hussein's purposes, not the nation's. *E.g.*, A-102-103/¶¶223-26/A-262-263/¶¶1115-20.

Hussein's "governmental" spending had a particularly personal nature. When sanctions limited Hussein's ability to spend abroad, Hussein focused increasingly on spending the Republic's money at home. Hussein's excesses were

---

[7] http://forbes.com/2003/02/24/0224kings.html.

such that General Tommy Franks commented that the Programme should have been called the "oil-for-palace program." NY Times, April 18, 2003. Following the Gulf War, Hussein began building palaces for himself at the rate of five a year, ending with a hundred palaces for his personal use.[8]

The corruption was not limited to palaces. Much as the lower court confuses Hussein with the nation, Hussein respected no difference between public and private funds or property. For example, when the Second Gulf War began, government officials reportedly allowed Hussein's sons to withdraw about $1 billion from the Central Bank of Iraq, because "When you get an order from Saddam Hussein, you do not discuss it."[9] When Hussein was captured, he was found with $750,000 in cash.[10]

The Republic alleges (and if granted leave to amend would make clear) that a material portion of the $1 billion Hussein's sons withdrew from the Central Bank of Iraq and of the $750,000 in cash found with Hussein are traceable to the Regime's main cash source during this period—the Defendants' conspiracy to

---

[8] www.nbcnews.com/id/3340771/t/saddams-palaces-triple-years/.

[9]    http://www.nytimes.com/2003/05/06/world/aftereffects-presidental-theft-bank-official-says-hussein-s-son-took-1-billion.html.

[10] CRS Report: *Foreign Regimes' Assets: The United States Faces Challenges in Recovering Assets, but Has Mechanisms That Could Guide Future Efforts* at 44 (Sept. 2004).

corrupt the Programme. The Republic also alleges that the diversions to personal palaces for Hussein and other conduct were against the national interest.

2.   *The Republic's RICO claims are territorial.*

A.   *A RICO claim is territorial if either (1) the enterprise or (2) pattern of racketeering activity is domestic.*

In *Norex*, this Court held that the RICO statute has no extraterritorial application. *Norex*, 631 F.3d at 32-33 (relying on *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)).

This Court, however, has not advised how to determine RICO territoriality. In *Morrison*, the Supreme Court instructed that, to determine whether domestic conduct is covered by a statute that does not apply extraterritorially, a court should consider the "focus" of the statute. 130 S. Ct. at 2883-84.

Following *Morrison*, courts have identified two distinct foci of RICO—(1) the enterprise and (2) the pattern of racketeering activity. The district court did not decide between the two lines of authority, holding instead that the Republic's RICO claim failed under either test.

One focus of RICO is on "enterprises." A "major purpose" of Congress's enactment of RICO was "to address the infiltration of legitimate business by organized crime." *United States v. Turkette*, 452 U.S. 576, 591 (1981). From this focus, a number of courts have indicated that a RICO claim is territorial if the enterprise is domestic. *E.g.*, *In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL

37

2112533, at *2 (W.D. Pa. May 26, 2011) ("[T]he principles of *Morrison* do not bar a RICO claim if a complaint avers a domestic enterprise."); *European Community v. RJR Nabisco, Inc.*, No 02-CV-5771(NGG)(VVP), 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 914 (C.D.Cal. 2011); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 939 (N.D. Cal. 2012).

Another identified focus of RICO is on the "pattern of racketeering." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 154 (1987) ("[T]he heart of any RICO complaint is the allegation of a pattern of racketeering"). Based on this focus, a number of courts have stated that a RICO claim is territorial if it is based on a domestic pattern of racketeering activity. *E.g.*, *United States v. Chao Fan Xu*, 706 F.3d 965, 978 (9th Cir. 2013); *CGC Holding Co., LLC v. Hutchens*, 824 F. Supp. 2d 1193, 1209 (D. Colo. 2011); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 244-45 (S.D.N.Y. 2012).

Rather than choosing between the two possible foci, the Executive Branch supports a third option—a RICO claim is territorial if there is *either* a domestic enterprise *or* a domestic pattern of racketeering activity. *See* A-2252-53. This approach is appropriate because a statute can have more than one focus, and in the case of RICO, there are at least two. *In re Le-Nature's, Inc.*, 2011 WL 2112533, at n.3. The alternative test is also in keeping with the Supreme Court's instruction

38

that "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985).

This Court need not reach this issue because the Republic's RICO claim is viable under either the enterprise or pattern test. The lower court's error does not lie in determining the proper test to be applied, but rather in excluding from either test activities associated with the United Nations and in ignoring the necessary fraud directed at the Treasury Department.

> B.    *The Programme and its activities were within the territorial jurisdiction of the United States.*

The RICO enterprise is the Programme, which operated from New York. Most of the predicate acts alleged in the Republic's Complaint relate to the Programme's activities in New York.

The lower court, however, ruled that the Programme "is not located in the United States," because the "Headquarters District is functionally distinct from the natural territory of the United States…." SPA-37. According to the lower court, describing the Programme and its activities as domestic because the Programme resided in Manhattan "elevates form over substance." SPA-37. That is, the district court did not factually reject the notion that the Programme and its activities were physically present in the territorial United States, but rather made a legal conclusion that "the UN, which operated the Programme, and its inner-workings are not 'places over which the United States has sovereignty or has some measure

39

of legislative control' and therefore are not United States territories." SPA-37 (citation omitted).

The issue is one of law. Title 18, section 5, defines the "United States" as including "all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone."

### (1)    *The UN headquarters is territorial.*

The district court's conclusion has been squarely rejected. The Restatement states: "The United Nations headquarters district is not 'extraterritorial,' and federal, State, and local law of the United States generally apply there." Restatement § 468, comment c (1987).

Prior to ratification of the UN Headquarters Treaty, Secretary of State Marshall, who signed the treaty for the United States, opined to President Truman that the "inviolability [of the headquarters district] is similar to that which is extended to diplomatic missions in Washington. *It does not transfer sovereignty over United States territory to the United Nations*." Reprinted in, Goodrich and Hambro, Charter of the United Nations: Commentary and Documents, at 44 (1946) (emphasis added).

The rule applied to embassy and consular premises noted by Secretary Marshall is equally clear. "That premises are inviolable does not mean that they are extraterritorial. Acts committed on those premises are within the territorial

40

jurisdiction of the receiving state, and the mission is required to observe local law, for example, fire and police codes." Restatement § 466, comment a.

On the other hand, the "United Nations has no sovereignty over the territory called the headquarters district." H. Kelsen, The Law of the United Nations: A Critical Analysis of Its Fundamental Problems 353 (London Institute of World Affairs 2000) ("Kelsen"). The "district remains under the law and judicial jurisdiction of the United States." *Id.* at 350. While the lower court's opinion places the UN outside the jurisdiction of the United States, it does not state what jurisdiction or law does govern the UN. The question is important because the UN itself is not a sovereign and has no law. Restatement Section 223; *id.* at Part IV, introductory note ("Unlike states, international organizations are not 'sovereign' and draw on no history of sovereignty."); *Reparation for Injuries Suffered in the Service of the United Nations*, 1949 I.C.J. 174, 179 (International Court of Justice 1949) (The UN "is an international legal person. That is not the same thing as saying it is a State, which it certainly is not, or that its legal personality and rights and duties are the same as those of a State."). Even the police force operating within the headquarters district is a US, not UN, force. Kelsen at 352.

> **(2)** *United States law applies to UN activities and within the headquarters district.*

In a related manner, it is unquestionable that United States law applies within the headquarters district and to UN activities.

41

The UN Headquarters Treaty expressly subjects the headquarters district and UN activities to US law and jurisdiction:

- "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local law of the United States shall apply within the headquarters district."

- "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws."

Headquarters Agreement of the United Nations, sections 7(b)-(c), 61 Stat. 756 (1947), reprinted following 22 U.S.C. § 287 note.

Recently, the Treasury Department stated that "an act of terrorism occurring on the property of the United Nations known as the headquarters district is subject to the laws of the United States," a conclusion that the Department notes "is consistent with general principals [sic] of international law regarding the status of diplomatic or consular premises of foreign nations in a receiving or host nation."[11]

"The applicability of United States law to acts committed on premises of foreign missions or consulates in the United States is beyond doubt." Restatement § 466, reporters' note 6 (relying *inter alia* on *United States v. Marcano Garcia*, 456 F.Supp. 1358 (D. Puerto Rico 1978) (kidnapping of a consul on consulate

---

[11] www.treasury.gov/resource-center/fin-mkts/Documents/marsh_response.pdf.

premises); Restatement § 468 (immunities of international organizations, including the UN)).[12]

The UN has no sovereignty and no laws, so if it truly exists outside United States jurisdiction, it would have no way to protect its interests. Fortunately: "The [UN headquarters] treaty in no way deprives the United Nations or its representatives of a forum for legal redress, whether it be civil or criminal in nature." *People v. Weiner*, 85 Misc. 2d 161, 166 (N.Y. Crim. Ct. 1976) (prosecuting vandalism at the UN headquarters).

Thus, stealing from the UN is subject to the jurisdiction of United States courts. *People v. Coumatos*, 224 N.Y.S.2d 504 (1961). Coumatos was a UN inventory clerk tried for theft by fraud from the UN. He objected to trial court's jurisdiction on the ground "that all of the alleged acts constituting a violation of our Penal Law took place on the United Nations premises, which the United States ceded to this International Organization by agreement in 1947." *Id.* The court,

---

[12] *See also El-Hadad v. Embassy of United Arab Emirates*, 69 F. Supp. 2d 69, 75 n.5 (D.D.C. 1999) ("[W]hile the premises of a foreign embassy are inviolable, they are also considered within the territorial jurisdiction of the United States."), *rev'd in part on other grounds*, 216 F.3d 29 (D.C. Cir. 2000); *Fatemi v. United States*, 192 A.2d 525 (D.C. 1963) ("a foreign embassy is not to be considered the territory of the sending state"); P. MALANCZUK, AKEHURST'S MODERN INTRODUCTION TO INTERNATIONAL LAW (7th ed. 1997) ("Thus, the premises of a diplomatic mission and the private residence of a diplomat are inviolable…. On the other hand, diplomatic premises are not extraterritorial; acts occurring there are regarded as taking place on the territory of the receiving state, not on that of the sending state….").

however, concluded that, pursuant to the Headquarters Treaty, United States law applies "within the headquarters district" and that "the courts of the appropriate American authorities shall have jurisdiction to try and determine issues between the parties." *Id.* at 511.

Notably: "The United Nations Secretariat has concurred with the above-mentioned construction of the Headquarters Agreement in the *Coumatos* case." P. Neumann, United Nations Procurement Regime, at 53 (2008).

This Court expressly held that corruption of a UN office is subject to United States federal law in *United States v. Bahel*, 662 F.3d 610, 632 (2d Cir. 2011). Bahel, a UN official, accepted payments to assist outsiders in obtaining UN contracts. He was convicted of using "the mail or wires in furtherance of fraud that deprived the United Nations, his former employer, of its intangible right to his honest services." *Id*. at 616. Bahel challenged his conviction on the ground that the mail and wire fraud statute does not apply to UN officials, trying to equate his UN-related fraud with the fraud involving Kazakhstan officials in *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004). This Court rejected the analogy, "because, unlike in *Giffen*, the conduct at issue in this case took place within the territorial United States, and the victim was—not a foreign government's citizens—but the United Nations, an organization headquartered in the United

44

States, entitled to defendant's honest services in the United States, and receiving its largest financial contributions from the United States." *Bahel*, 662 F.3d at 632.

Two opinions dealing with the prosecutions of Defendants Chalmers and Wyatt confirm that "a scheme to defraud the United Nations Oil-for-Food Program and the people of Iraq" is subject to United States jurisdiction. *United States v. Chalmers*, 410 F.Supp. 2d 278, 281 (S.D.N.Y. 2006); *United States v. Chalmers*, 474 F. Supp. 2d 555, 558 (S.D.N.Y. 2007).

In contrast to this direct authority, the lower court based its legal conclusion on a single quote from this Court that, properly interpreted, relates to immunity of UN activities, not to the territorial jurisdiction of the United States. *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991).[13] In *Klinghoffer,* this Court held that the PLO's UN-related activities did not support the exercise of general personal jurisdiction over the PLO as to torts committed outside the United States. This Court noted that "were the PLO not a permanent observer at the UN, it would not be entitled to enter New York at all." *Id*. at 51. While this Court used the word "jurisdiction" to make its point, in keeping with the uniform authority subjecting

---

[13] This Court stated in *Klinghoffer*: "The PLO "is allowed to come to New York only because the Headquarters Agreement effectively removes control over the UN Headquarters and related areas from the jurisdiction of the United States. In other words, the PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control." *Id*. at 51.

the UN to US jurisdiction, the opinion is better read to mean that UN-related activities that are immune from jurisdiction do not support jurisdiction over other conduct, not that the UN itself is extraterritorial. In fact, this Court was careful to keep the *Klinghoffer* rule narrow in *Kadic v. Karadzic*, 70 F.3d 232, 248 (2d Cir. 1995) ("Despite the considerations that guided *Klinghoffer* in its narrowing construction of the general terminology of New York's long-arm statute as applied to United Nations activities, we decline the invitation to create a federal common law immunity as an extension of the precise terms of a carefully crafted treaty that struck the balance between the interests of the United Nations and those of the United States.").

Thus, the lower court's opinion confuses jurisdiction with immunity. Immunity is not a sword to be used by private parties to defeat the jurisdiction of United States courts or the application of US law. UN immunity shields the UN from many claims against it, but United States courts can still exercise jurisdiction if the UN is robbed or its programs corrupted.

### C.    *The Republic alleges a domestic enterprise and a domestic pattern of racketeering activity.*

Stripped from the incorrect legal conclusion, both the enterprise and the pattern of racketeering activity alleged in the Republic's Complaint are domestic.

The Programme is clearly a domestic enterprise supporting territorial application of RICO. In *Bahel*, this Court held that the United Nations was a viable

46

victim of mail and wire fraud and qualified as a "federal program" receiving federal funds, within the meaning of 18 U.S.C. § 666. *Bahel*, 662 F.3d at 616. The Wyatt and Chalmers opinions confirm that the mail and wire fraud predicates apply to the Defendants corruption of the UN Programme. *Chalmers*, 474 F. Supp. 2d at 564.

The pattern of racketeering activity is also domestic and contrasts sharply with the pattern alleged in *Norex*. The district court in *Norex* concluded that the alleged racketeering activity in the United States was "merely incidental" to the alleged fraud. *Norex Petroleum Ltd. v. Access Industries, Inc.*, 540 F. Supp. 2d 438, 444 (S.D.N.Y. 2007). In fact, the *Norex* action was first dismissed under the forum non conveniens doctrine,[14] and then as failing to meet the conduct and effects tests,[15] and finally as extraterritorial.

There was nothing incidental about the Defendants' New York activities. The Republic's loss was not caused by the negotiation of the illegal side deals in Baghdad, but by the misrepresentations to the UN in New York and to the Treasury Department in Washington D.C., because that was what was necessary to

---

[14] *Norex Petroleum Ltd. v. Access Indust., Inc.*, 304 F. Supp. 2d 570 (S.D.N.Y. 2004), *rev'd*, 416 F.3d 146 (2d Cir. 2004).

[15] *Norex Petroleum Ltd. v. Access Indust., Inc.*, 540 F. Supp. 2d 438 (S.D.N.Y. 2004), *aff'd*, 631 F.3d 29 (2d Cir. 2010).

obtain the approval for the Programme contracts. Without that approval, Iraq's funds would have remained in New York or its oil in Iraq.

Since the predicate acts in New York were necessary parts of the Defendants' scheme, the Republic's RICO claim is territorial. *United States v. Chao Fan Xu*, 706 F.3d 965, 979 (9th Cir. 2013) ("Without the immigration fraud, the bank fraud would have been a dangerous failure."). As in *Chao Fan Xu*, the "Defendants' pattern of racketeering activity may have been conceived and planned overseas, but it was executed and perpetuated in the United States. Under *Morrison*, we look 'not upon the place where the deception originated,' but instead upon the connection of the challenged conduct to the proscription in the statute." *Id*. (citing *Morrison*, 130 S.Ct. at 2884).

Even if the Defendants' UN activities were outside US jurisdiction, there was still a domestic pattern of racketeering activity. Defrauding the UN was not enough to obtain Programme contracts at exorbitant profits. The Defendants (including BNP) also had to misrepresent their dealings with the Hussein Regime to the Treasury Department. These misrepresentations were predicate acts as violations of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et seq*. Transfers from the BNP account in New York also constituted money laundering as both movement through the US of criminal proceeds and as transfers in furtherance of the larger conspiracy.

48

The district court gave particular attention to the oil purchasing defendants, but their crimes too required United States conduct. SPA-38-39. While their surcharges did not pass through the BNP account, their contracts still required UN approval, which was obtained by fraud directed at the UN and the Treasury Department. In addition, all but one of the oil purchasing defendants is a US corporation or person. These Defendants violated the Travel Act when they conspired to pay illegal kickbacks to the Hussein Regime. Finally, all of the oil purchasing defendants have judicially admitted in plea agreements that they violated United States law. A-1456-2168. The sole foreign corporation sued for corrupting oil purchasing, Vitol, pleaded guilty before a New York court to stealing from the Programme. A-1470.

BNP's conduct is also clearly domestic. BNP's New York branch managed the Programme funds in New York and provided misleading information from its New York offices to the UN and to the Treasury Department, which had issued BNP's license to handle funds of a Terrorist State.

Finally, BNP and at least 6 other Defendants are United States entities or individuals and at least 17 are subsidiaries of US corporations, facts unmentioned by the district court in its analysis. A-83-99/¶¶69, 75, 83, 86, 92, 94, 98. 100-101. 110-12, 122-130, 131-35, 169, 171, 181-83, 198, 200.

49

D.    *In the alternative, the Republic's Complaint alleges predicate acts that are expressly extraterritorial.*

Although recognizing that this panel is bound by *Norex*'s holding, the Republic contends and reserves the argument that the RICO statute meets the requirement of a "clear indication of an extraterritorial application" pursuant to *Morrison*, 130 S. Ct. at 2878. Some of RICO's predicate crimes are violated only by extraterritorial conduct, indicating an express intent that the statute apply extraterritorially. *E.g.*, 18 U.S.C. §§ 2332(a) (killing a United States national "while such national is outside the United States"), 2332a(b) (using certain weapons "outside of the United States").

This Court's *Norex* ruling is also distinguishable. Unlike in *Norex*, the Republic alleges a RICO predicate act, the Travel Act, that expressly governs extraterritorial conduct. 18 U.S.C. § 1952. In *Norex*, this Court held that the Legislature's inclusion of some extraterritorial predicates in the RICO statute does not give the entire RICO statute extraterritorial application, but that is a different question from whether RICO applies extraterritorially in a particular case when a pattern of specifically identified extraterritorial RICO predicates is alleged.

In *Morrison*, the Supreme Court stated that the presumption against extraterritoriality does not apply if "a contrary intent appears" in the legislation. 130 S.Ct. at 2877. In the specific case of RICO, the Legislature identified certain instances in which the statute applies extraterritorially, including when there is a

50

pattern of violations of the Travel Act. While such specific instances of express extraterritorial application might not alter the scope of the RICO statute as a whole, the opposite is also true—the presumption against extraterritorial application cannot rewrite RICO's express terms. To hold otherwise, would mean that the judicially created "canon of construction" set forth in *Morrison* would effectively excise expressly extraterritorial predicates acts from RICO. The statute is to be applied as written, and in this case, that includes extraterritorial predicates.

3.    *The Republic pleaded proximate cause.*

A.    *The Republic was the direct victim of the Defendants' scheme.*

Ignoring the fact that the Defendants obtained the Republic's property through their scheme, the lower court incorrectly concludes that "the direct victim of defendants' racketeering activity is the UN." SPA-46. However, the Republic's property went into the Defendants' pockets, not the UN's. As the district court noted in a different section of its order, "the Republic of Iraq had a concrete, if not exclusive, interest in the funds contained within the UN escrow account." SPA-17. The same is true of the Republic's oil, purchased at below market prices in exchange for bribes.

The UN was merely the gatekeeper to the Republic's property, so the fraud targeted the Republic's property even though directed at the UN. If a bank officer is defrauded into allowing access to a customer's safe deposit box, the customer is

harmed. The Supreme Court addressed this issue in *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131 (2008). The *Bridge* plaintiffs' RICO action alleged their competitors defrauded Cook County, Illinois to win contracts. The Court held the plaintiffs' injury directly caused the fraud because "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id*. at 2139.

In fact, the Republic is not only *a* direct victim, it is the *only* direct victim. The UN lost nothing, as all Programme costs were paid from the Programme funds created by the sale of Iraqi oil. Even the costs of the Volcker Committee that investigated Programme corruption were paid out of funds owned by the Republic. Therefore, this action is distinct from the factual situation addressed in *Hemi Grp. LLC v. City of N.Y.*, 559 U.S. 1 (2010) (plurality). There were two victims of the scheme in *Hemi*, one more direct than the other. Here, if the Republic cannot sue, then there is no victim, more direct or not, that was damaged by the Defendants' scheme.

### B.    *The Defendants' conspiracy targeted the Republic's property.*

This Court has "repeatedly emphasized that the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the

racketeering enterprise." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 124 (2d Cir. 2003) (citations omitted).[16]

Here, the "preconceived purpose" of the Defendants' scheme was to obtain the Republic's property, either its oil or the proceeds from the sale of oil sitting in the BNP account. *See In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994). From the Defendants' perspective, the Hussein Regime's involvement was merely a necessary complication to their ultimate goal—obtaining the Republic's property. The Defendants did not conspire so they could pay bribes to the Hussein Regime; they paid bribes to the Hussein Regime to get more of the Republic's property. The bribes were simply part of the price they had to pay to get the Programme contracts that paid them their exorbitant profits.

The Defendants' RICO conspiracy targeted the Republic's property, so the Defendants' conspiracy necessarily caused the Republic's injury—the loss of its property. *Sedima, S.P.R.L.*, 473 U.S. at 497 ("[T]he compensable injury necessarily is the harm caused by predicate acts …, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.").

---

[16] This Second Circuit authority is not affected by the plurality opinion of the Supreme Court in *Hemi Grp.*, 559 U.S. 1. *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 188 (2d Cir. 2003) (plurality opinion not binding).

### C. The actions of the Hussein Regime and the UN were not intervening causes.

The lower court also questioned causation because there were a number of necessary components to the Defendants' scheme—including the Hussein Regime's approval of the contract, the Defendants' fraud against the UN and the Treasury Department, and the UN's induced contract approval. But, complexity is not the same thing as indirect.

In this regard, the lower court's proximate cause analysis suffers from the same error as its analysis of the *in pari delicto* defense—it equates the Hussein Regime with the nation. Thus, the lower court states that the Republic's causation analysis "omits its own conduct from the causal chain." SPA-45. The lower court appears to be granting the Defendants' argument that the Hussein Regime's "strong desire to obtain surcharges and kickbacks" is an "intervening discretionary act[]" defeating proximate cause. A-394-95. The court stated: "Thus, any injury caused by defendants' fraudulent wires and mailings—that is, the harm of the predicate acts—happens after being instigated by the Hussein Regime and then mediated through the UN, its bank, and the U.S. government. The causal chain's reliance on the actions of Iraq and third-parties indicates that it is too attenuated to support recovery." SPA-45.

The fact that the scheme also necessitated the assistance of the Republic's corrupt agents does not defeat causation—a complex scheme can still create

54

proximate cause. The individual participants in a conspiracy are liable precisely because their efforts were necessary to achieve the conspiracy's goals. Conspiracy law itself would be vitiated if one conspirator could avoid liability on the basis that the scheme required participation by other co-conspirators. Certainly, the fact that the corrupt government official eagerly desires his bribe does not erase the crime of bribery.

The lower court's ruling on this issue conflicts with Judge Lynch's similar ruling in *Mastafa v. Australian Wheat Board, Ltd.*, No. 07 Civ. 7955(GEL), 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008). The *Mastafa* plaintiffs "'were victims of torture, extrajudicial killings, disappearances, rape and/or murder' at the hands of the Hussein regime, between 1996 and March 2003." *Id.* at *2. The *Mastafa* plaintiffs sought to hold AWB and BNP—both Defendants here—"liable for these acts because they 'conspired [with] and aided and abetted the Saddam Hussein regime' in their commission by giving the regime 'substantial assistance'" through corruption of the Programme. *Id.*

AWB and BNP argued that the Hussein Regime's actions were a separate and independent cause of the plaintiffs' damages. The *Mastafa* court disagreed, stating, "the injuries are not 'the result of the independent action of some third

55

party not before the court' because the acts of the Hussein regime are not 'independent' of steps taken to aid and abet those acts." *Id.* at *2.[17]

Proximate cause is just as clear as to BNP, which voluntarily joined the conspiracy to divert funds. In exchange for commissions and other business from the oil purchasing defendants, BNP agreed to hide the involvement of third parties in the oil purchasing transactions from the UN and the Treasury Department. As with its co-conspirators, had BNP not misled the UN and the Treasury Department, Programme diversions would have been impossible.

4. *This Court should infer a private right of action under the FCPA.*

While a number of opinions have found no private right of action under the FCPA, that line of authority is in error, and in general, incorrectly follows one of the first opinions addressing the issue, *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1028-30 (6th Cir. 1990). The *Lamb* opinion has been criticized as incorrectly decided and as based on the individual bias of the writing Judge who wrote, "Speaking only for myself, if writing on a clean slate, I would never infer a private right of action where the legislation itself is silent in that regard." *Id.* at 1029 n.13; Note, *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024: *The Sixth Circuit Gets Sheepish*

---

[17] Ultimately, the court held that the *Mastafa* plaintiffs did not allege direct damage because "aiding the Hussein regime is not the same thing as aiding and abetting its alleged human rights abuses." *Id*. at *4. In this case, the Republic alleges the Defendants aided the Hussein Regime in diverting Programme funds.

*on Foreign Corrupt Practices Act Enforcement*, 5 Transnat'l Law. 533, 554 (1992) ("Note, *Lamb*"); G. Mark, *Private FCPA Enforcement*, 49 Am. Bus.L.J. 419, 457 (2012).

The Republic respectfully suggests that if this Court analyzes the issue from a fresh perspective, it will reach a different conclusion.

In deciding whether a statute creates a private remedy "the central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979). Significantly, Congressional intent is analyzed in the legal context when the statute is passed, not under current law. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979).

In the case of the FCPA, Congressional intent is clear. The FCPA was adopted in 1977 as an amendment to the Securities and Exchange Act (the "SEA"), not long after the Supreme Court first recognized implied private remedies under the SEA.[18]

An early FCPA draft contained a provision expressly establishing a private remedy, but the provision was removed. In the usual case, that removal would unequivocally indicate an intent not to create a private remedy, but not this time.

---

[18] The Supreme Court first addressed implied remedies under the SEA in 1971. *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9 (1971).

"By deleting the express provision for private remedies, Congress did not intend to eliminate such a right of action. On the contrary, the deletion by Congress was done to ensure that such a right was available under all applicable SEA statutes." Note, *Lamb*, 5 Transnat'l Law at 554.

"During Senate committee hearings on Senate Bill 3379, the SEC submitted a report which posited that private actions should be eliminated from the language of the statute because such a provision under one Securities Exchange Act (SEA) statute (in this case, the FCPA) would create a negative inference with respect to all other SEA statutes." *Id.* at 537. Based on the SEC's statements, the Senate Banking Committee believed that an express provision for a private remedy "would have duplicated and possibly confused existing remedies available to shareholders." S. REP. NO. 1031, 94th Cong., 2d Sess. 12, 12-13 (1976).

The House Report expressly stated that Congress intended the courts to recognize a private right of action in favor of persons experiencing injury caused by prohibited corporate bribery. H.R. REP. No. 640, 95th Cong., 1st Sess. 10 (1977).[19]

---

[19] Two Committee members, Senator John Tower and Congressman Samuel Devine, stated there was no intent to imply a private remedy. Note, *Lamb*, 5 Transnat'l Law. at 555. The persuasiveness of these statements, however, "is severely limited by the rules of statutory construction. Remarks made by persons not involved with the drafting of the bill, as well as comments by opponents of the bill, are entitled to little weight in determining legislative intent." *Id*.

58

In contrast, the *Lamb* opinion incorrectly applied then-current legal norms, but by 1990, courts had turned increasingly wary of implied remedies compared to 1977 when the FCPA was adopted. Note, *Lamb*, 5 Transnat'l Law. at 548 n.122. Finally, the *Lamb* court placed undue reliance on the early FCPA draft that contained an express private remedy, without mentioning the SEC's and Congress' reasons for removal—that they did not wish to cause any doubt about the SEA's existing implied remedies. *Lamb*, 915 F.2d at 1029.

This Court should perform its own analysis and reverse the judgment of the district court.

5.    *The Republic's non-statutory claims are governed by federal common law.*

In 1965, when the Republic of Iraq sued to recover assets held in the name of its former King, this Court stated that federal common law governed the claims because the nation must "speak with a united voice" on such questions to avoid "needlessly complicat[ing] the handling of . . . foreign relations." *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 50 (2d Cir. 1965). This Court reached a similar conclusion in *Republic of the Philippines v. Marcos*, 806 F.2d 344, 354 (2d Cir. 1986) ("an action brought by a foreign government against its former head of state arises under federal common law because of the necessary implications of such an action for United States foreign relations"). In reaching this conclusion, this Court noted, "The Supreme Court has declared that a question concerning the

59

effect of an act of state 'must be treated exclusively as an aspect of federal law.'" *Republic of Iraq*, 353 F.2d at 50. In contrast, in *First Fidelity*, this Court stated that the federal common law was inapplicable, but on the basis that the FSIA requires application of state law. *First Fidelity*, 877 F.2d at 194-195. The FSIA, however, has no application here.

While this action is not directed against the Republic's former ruler, it is leveled against co-conspirators of the Republic's former ruler, and therefore the same considerations call for application of federal common law.

This, in turn, means that the district court erred in dismissing the Republic's claims for lack of supplemental jurisdiction.

Alternatively, with reversal of the dismissal of the Republic's RICO claims, this Court should also reverse dismissal of the Republic's common law claims. The Republic's common law claims arise from the same case and controversy as the Republic's RICO claims, and therefore, supplemental jurisdiction is mandatory. 28 U.S.C. § 1367(c); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447-48 (2d Cir. 1998).

*Conclusion*

For these reasons, the Republic requests that the lower court's order and judgment be reversed and this cause remanded so that the Republic and its citizens may have their day in court.

DATED: June 4, 2013

**BERNSTEIN LIEBHARD LLP**

By:    */s/ Stanley D. Bernstein*_____
     Stanley D. Bernstein
     Christian Siebott
10 East 40th Street
New York, New York 10016
Tel: 212-779-1414
Fax: 212-779-3218

**MANEY & GONZÁLEZ-FÉLIX PC**
Mark Maney
700 Louisiana, Suite 4545
Houston, Texas 77002
Tel: 713-806-2500
Fax: 713-893-6016

Roliff Purrington
700 Louisiana, Suite 4545
Houston, Texas 77002
U.S. Mobile: 713 834 5773
Baghdad, Iraq:+964 (0) 7710910600 (mob.)
Amman, Jordan:+962 (0) 796613896 (mob.)
Email: rpurr@purrlegal.com

*Counsel for Plaintiff/Appellant*
*The Republic of Iraq*

**Certificate of Compliance Pursuant to F.R.A.P.32(a)**
**Certificate of Compliance With Type Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) in that it contains 13,354 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     The attached opening brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) in that it is proportionately spaced typeface Times New Roman using 14 point type by the Microsoft Word program.

*/s/ Stanley D. Bernstein*
Stanley D. Bernstein

*Attorney For Plaintiff-Appellant*

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Sidney H. Stein, dated February 6, 2013 ................................. SPA-1

Judgment, dated February 14, 2013 .......................... SPA-50

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE REPUBLIC OF IRAQ, including as PARENS PATRIAE on behalf of the CITIZENS of the REPUBLIC OF IRAQ, | 08 Civ. 5951 (SHS) |
| Plaintiff, | OPINION & ORDER |
| -against- | |
| ABB AG, et al., | |
| Defendants. | |

1

Contents

I.   Background...................................................................................5
    A.  The Iraqi sanctions..............................................................5
    B.  The Oil-for-Food Programme in Design ..............................6
        1.   The UN escrow account...............................................7
        2.   Oil sales......................................................................8
        3.   Goods purchases..........................................................8
    C.  The Oil-for-Food Programme in practice.............................8
        1.   Oil sales......................................................................9
        2.   Purchases from vendor-defendants.............................11
        3.   BNP maintained the UN Escrow Account..................13
        4.   The Programme's end.................................................13
    D.  This action..........................................................................13
II.  Legal Standard for Motion to Dismiss.......................................14
III. Justiciability ...............................................................................15
    A.  Article III standing............................................................15
        1.   Iraq has standing to recover for an injury to its proprietary
             interests. ....................................................................16
        2.   Iraq has no standing to pursue its quasi-sovereign interests as
             parens patriae.............................................................18
    B.  Act of state doctrine .........................................................19
    C.  Political question doctrine.................................................21
IV. The Relationship Between the Current Government of Iraq and the
    Hussein Regime ..........................................................................23
    A.  Sovereigns may be held to account for the wrongful governmental
        conduct of their governments............................................24
    B.  Governmental conduct is conduct taken under color of authority. 26
    C.  The Complaint alleges that the Hussein Regime's Programme
        misconduct was governmental..........................................27
    D.  The nature of the Hussein Regime's conduct does not absolve Iraq
        of responsibility for that conduct. .....................................29

1.  The Complaint does not allege that the Hussein Regime
    committed acts of personal misconduct as distinct from
    governmental misconduct..........................................................29

2.  The legitimacy of the Hussein Regime does not determine
    Iraq's responsibility for the Regime's conduct........................31

3.  The legality of the Hussein Regime's acts does not determine
    Iraq's responsibility for the Regime's conduct........................32

V.  Racketeer Influenced and Corrupt Organizations Act...........................34

    A.  Iraq alleges that defendants violated RICO by corrupting the
        Programme. .......................................................................34

    B.  Iraq impermissibly attempts to apply the RICO statutes
        extraterritorially...............................................................35

        1.  RICO claims that focus on an extraterritorial enterprise or
            concern extraterritorial patterns of racketeering activity are
            not actionable. ..............................................................35

        2.  Iraq's Complaint demonstrates that its claim is
            extraterritorial. .............................................................36

        3.  Under either test, Iraq calls for an impermissible
            extraterritorial application of the RICO statute. ......................40

    C.  In pari delicto bars Iraq's RICO claims..................................40

        1.  Iraq's allegations bring it within the in pari delicto doctrine.40

        2.  Iraq's purported exceptions to in pari delicto do not apply. .43

    D.  Iraq has failed to allege proximate cause. ...........................45

VI.  Foreign Corrupt Practices Act...................................................47

VII.Common Law Claims ................................................................47

VIII.Conclusion.................................................................................48

SIDNEY H. STEIN, U.S. District Judge.

This action brings to a United States district court a foreign nation's claims concerning the suffering of its people.

The Republic of Iraq has alleged that defendants—numerous business entities that transacted with the Government of Iraq during the rule of Saddam Hussein—conspired with the Hussein Regime to frustrate the United Nation's Oil-for-Food Programme. The conspirators allegedly perverted the Programme into an engine of self-enrichment: the defendants seized tremendous profits and the Hussein Regime solidified its hold on power. All the while, the Iraqi people bore the brunt of the scheme. Their natural resources were plundered and sold at fire-sale prices. Food and medicines the Iraqi people had paid for arrived spoiled, if at all. The international regime designed to protect them utterly failed.

Iraq has attempted to fit this wrongdoing into the mold of a civil action. At its heart, Iraq says, its case amounts to a principal seeking to recover for the harms caused to it by a wayward agent—Saddam Hussein—and his co-conspirators the defendants in this action. Iraq alleges that the defendants have violated the Racketeer Influenced and Corrupt Organizations Act and the Foreign Corrupt Practices Act, and committing numerous torts, including fraud, breach of contract, and aiding and abetting breach of fiduciary duty.

Defendants have now moved to dismiss Iraq's First Amended Complaint ("Complaint") on a variety of theories, almost all of which touch on the relationship of Iraq to the wrongs for which it seeks relief. The parties agree that the injustices alleged were instigated and directed by Hussein and his Regime. But the parties dispute whether the Republic of Iraq must bear responsibility for the acts of the Hussein Regime and, if so, what that responsibility means for this action.

The Court concludes that the Complaint alleges conduct by the Hussein Regime that, as a matter of law, is attributable to plaintiff itself, the Republic of Iraq. The alleged misconduct has a governmental character. Therefore, the conduct comes within the default rule that a regime's governmental conduct redounds to the sovereign. The Court rejects Iraq's view that it may sidestep responsibility because the conduct

4

was illegal or the actors held power illegitimately. Sovereigns, however, cannot escape the consequences of their representatives' governmental misconduct. Questions of attribution are distinct from questions of lawfulness or legitimacy.

The legal relationship between Iraq and Hussein frames the case, but does not decide it. The issues that do are more commonplace. For example, the core claims of the action—RICO and RICO conspiracy—focus on extraterritorial conduct. And even if those claims were not extraterritorial, they would founder on the defense of in pari delicto or absence of allegations of proximate causation. Having engineered the wrongdoing alleged in the Complaint, and having alleged that the wrongdoing directly harmed the Programme, Iraq cannot recover from that wrongdoing. Further, the only other federal claim, brought under the Foreign Corrupt Practices Act, does not afford private plaintiffs a right of action. Finally, the Court declines to exercise supplemental jurisdiction over the remaining state law claims; they are dismissed as well.

## I.    BACKGROUND

The facts below are as set forth in the Complaint and are accepted as true for purposes of this motion.

### A.    The Iraqi sanctions

In 1979, Saddam Hussein seized power in Iraq via a military coup. (Compl. ¶ 216.) The administration he put in place, referred to in the Complaint as the "Hussein Regime"[1] (*id*. ¶ 2), wielded absolute control over Iraq and violently suppressed all opposition (*id*. ¶¶ 217-23).

On August 2, 1990, Iraq invaded the neighboring state of Kuwait. (*Id.* ¶ 239.) The United Nations Security Council responded to the invasion by adopting sanctions against Iraq that were designed "to place the Hussein Regime under complete economic isolation." (*Id*. ¶ 243.) Security Council

---

[1]    The government of Iraq during the period of time in which Saddam Hussein was in control will be referred to as the Hussein Regime, the Hussein government, or the Government of Iraq.

Resolution 661 required member states to freeze Iraqi assets and
prohibited trade with Iraq. (*Id.* ¶ 242.) Nine days after the invasion,
President George H. W. Bush issued an executive order that "align[ed] the
sanctions imposed by the United States with Security Council Resolution
661." (*Id.* ¶ 251.) The UN sanctions remained in effect from 1990 until 2003.
(*Id.* ¶ 292.)

From the outset, the Security Council sought to "protect the [Iraqi]
population from adverse effects of the sanctions policies and from the
Hussein Regime itself." (*Id.* ¶¶ 255, 56-64.) The Hussein Regime initially
resisted these efforts. It "used the suffering of the innocent as a negotiating
tool in an attempt to end the Iraq Sanctions Program." (*Id.* ¶ 265.) The
Regime rejected two attempts by the Security Council to authorize the sale
of oil in exchange for food and medicine. (*Id.* ¶ 267.) The Hussein Regime
eventually shifted course, however, and in 1996 it agreed to participate in
the Oil-for-Food Programme that the UN had designed and implemented.
(*Id.* ¶ 277.)

### B. The Oil-for-Food Programme in Design

The UN Oil-for-Food Programme was designed to permit Iraq to sell
its oil to third parties, as long as the proceeds were used to purchase food
and medical supplies for the Iraqi population. It was an attempt to
continue Iraq's economic isolation at the same time as attempting to
relieve the suffering of the Iraqi people caused, at least in part, by those
sanctions. (*Id.* ¶¶ 274, 296.)

Two documents outlined the core Programme guidelines: UN Security
Council Resolution 986 and the Memorandum of Understanding on the
Implementation of Security Council Resolution 986 between Iraq and the
UN, signed May 20, 1996 ("MOU").

Resolution 986 directly authorized UN member states to import Iraqi
oil on condition that the sales be approved by a UN committee created by
an earlier regulatory resolution, Resolution 661, and that the purchase
price be placed into an escrow account established by the UN Secretary-
General. (UN SCOR Res. 986 ¶¶ 1, 6 (adopted Apr. 14, 1995), Ex. 3 to Decl.
of Brant W. Bishop dated Jan. 15, 2010.) The Security Council directed the

SPA-7

Resolution 661 Committee to verify that the oil sold for a price "reasonable in light of prevailing market conditions." (UN SCOR Res. 986 ¶ 6.) Resolution 986 further provided for escrowed monies to be spent, at "the request of the Government of Iraq," on "medicine, health supplies, foodstuffs," and other materials, such as those "for essential civilian needs." (UN SCOR Res. 986 ¶ 8(a).) The resolution required that Iraq submit to the Secretary-General a plan of distribution and that the Secretary-General receive confirmation that the humanitarian goods arrived in Iraq. (*Id*.)

The MOU, which was signed by a representative of the United Nations and a representative of the Government of Iraq, articulated the Secretary-General's role in negotiating the terms of an escrow account with a "major international bank" (MOU ¶ 12), elaborated the mechanics of exporting oil from Iraq using the pipeline from Kirkuk, Iraq to Yumurtalik, Turkey as well as the Mina al-Bakr oil terminal (MOU ¶ 16), created a mechanism for Iraq to request letters of credit be given to its vendors (MOU ¶ 24), and established a process for observing the distribution of humanitarian aid (MOU ¶¶ 34-36).

### 1.    *The UN escrow account*

The Programme "required that *all* financial transactions related to the Programme pass through an [escrow] account established by the UN" (Compl. ¶ 284) to "be used to meet the humanitarian needs of the Iraqi population." (UN SCOR Res. 986 ¶ 8.)

The United Nations created, "controlled[,] and monitored" the escrow account at a New York branch of BNP Paribas, a major international bank. (Compl. ¶¶ 285-87, 975.) BNP and the UN executed an "Agreement for Banking Services" on September 12, 1996. (*Id*. ¶ 976.) BNP promised "not to take any instructions from any person in or acting on behalf of the Government of Iraq, or representing persons or entities in Iraq." (*Id*. ¶ 990 (quotation marks omitted).) In its role as escrow bank, BNP also "confirm[ed] letters of credit issued by banks retained by buyers of oil" and "issu[ed] letters of credit for the purchase of humanitarian goods." (*Id*. ¶¶ 979-81.)

### 2. Oil sales

Companies seeking to buy Iraqi oil under the Programme had to enter into a contract directly with the Iraqi State Oil Marketing Organization ("SOMO"). (Compl. ¶ 323.) The standard contract provided that the sale terms were subject to UN approval and relevant Security Council resolutions. (*Id.* ¶ 324.) It also provided that any assignment of rights under the contract was subject to UN approval. (*Id.*) The sale price, known as the Official Selling Price ("OSP") was determined by a UN committee based on available market data and on what participating purchasers were willing to pay. (*Id.* ¶ 321.)

The contracts required the purchasers to deposit the full amount of each purchase into the escrow account. (*Id.* ¶ 325.) To effectuate this, oil purchasers would provide a letter of credit "in favor of the UN Escrow Account" in the amount of the entire purchase price under the contract. (*Id.* ¶ 326.)

### 3. Goods purchases

Pursuant to the Memorandum of Understanding, the Government of Iraq retained the right to choose the parties from which it would purchase goods. (MOU ¶ 22; Compl. ¶ 522.)

Companies wishing to sell goods to Iraq under the Programme negotiated contracts directly with the appropriate Iraqi ministry or state-owned enterprise. (*Id.* ¶ 329; MOU ¶ 22.) These contracts required UN approval and conformance with the Programme's regulations. (Compl. ¶¶ 331, 333.)

After the Programme administrators approved a contract, BNP, at the UN's direction, would execute a letter of credit in favor of the supplier of the goods. (*Id.* ¶ 337.) Once the UN verified the goods' arrival in Iraq, it would inform BNP of that fact, and BNP in turn would wire payment from the escrow account to the supplier of the goods. (*Id.* ¶ 338.)

### C. The Oil-for-Food Programme in practice

The Complaint alleges that the Hussein Regime was hostile to the Oil-for-Food Programme because it considered the Programme to be

8

"economic occupation" (Compl. ¶ 302) as well as a political threat, since it "reduc[ed] the suffering of the Iraqi people," thereby "reduc[ing] the political pressure to remove the Iraq Sanctions Program." (*Id.* ¶ 300.)

With the active assistance of defendants, the Government of Iraq used the Programme to generate hundreds of millions of dollars of cash for itself from both its sales of oil as well as its purchases of food and medicine. The alleged fraud was both intricate and simple: the Hussein Regime priced its oil below the market price in order to facilitate kickback payments from buyers, and it overpaid for food and medicine in order to facilitate side payments to it from sellers in the form of surcharges.[2] The three groups of defendants in this action are alleged to be active participants in Hussein's scheme: (1) The entities that purchased, directly or indirectly, Iraqi crude oil; (2) the vendors that sold humanitarian goods and supplies to Iraq through the Programme; and (3) the BNP entities that administered the UN escrow account. Together, according to the Complaint, the Regime and defendants corrupted the sale of oil, the purchase of goods, and the administration of the UN escrow account.

### 1.   *Oil sales*

By pricing its oil below market value, the Hussein Regime created a differential between the market price and the price it received for the oil. This differential constituted extra profit to the purchasers and was used by Hussein to reward its political allies and to negotiate kickbacks from the oil purchasers to the Regime. Simplicity itself.

---

[2]    The intricacies of the Hussein Regime's efforts are catalogued in the UN post-mortem, entitled Manipulation of the Oil-for-Food Programme by the Iraqi Regime, reported by the UN Independent Inquiry Committee into the United Nations Oil-for-Food Programme on October 27, 2005 ("IIC Report"). (Ex. 7 to Bishop Decl.) Many of the Complaint's allegations come directly from the IIC report; the Court therefore deems the IIC Report integral to the Complaint and considers it on this motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Pechinski v. Astoria Fed. Sav. & Loan Ass'n*, 238 F. Supp. 2d 640, 642 (S.D.N.Y. 2003).

### a.   Oil vouchers as political influence

From the Programme's earliest stages the Hussein Regime allocated Iraqi oil to entities viewed as friendly to the regime and that opposed the sanctions in order to curry and solidify political support. (Compl. ¶ 356-57.) Iraq sold this oil below market price in order to ensure that its allies made an easy profit. (*Id.* ¶ 358.)  As a result, "the primary decision-making criteria for allocating vouchers to purchase oil was to gain favor" rather than "to secure the best price to increase the amount of humanitarian aid to the Iraq people." (*Id.* ¶ 357.)

In addition, according to the Complaint, the recipients of Iraqi oil allocations did not have the "financial or business wherewithal" to engage in major crude oil purchases. (*Id.* ¶ 359.) The oil-purchasing defendants and BNP ameliorated that deficit by financing and coordinating the transactions. (*Id.*) Iraq would allocate oil to a particular individual or entity at a below-market contract price unwittingly approved by the UN. That individual or entity, however, was only an intermediary. The ultimate purchaser of the oil would be one of the oil-purchasing defendants. They would pay the intermediary a price greater than that provided for in the intermediary's contract of sale with Iraq. (*Id.* ¶¶ 1017, 1022, 1024.)

For example, Chevron allegedly purchased 78 million barrels of Iraqi crude through intermediaries. (*Id.* ¶ 421.) One of those intermediates was Bulf Drilling and Oil Services, which had been awarded an Iraqi oil allocation in May 2001. (*Id.* ¶ 1029.)  Bulf agreed to let Chevron purchase the oil from it, and Chevron agreed to finance Bulf's purchase from Iraq. (*Id.* ¶¶ 1030-31.) To prevent the UN from discovering Chevron's role in the transaction, Chevron and BNP had letters of credit issued for the purchase of Iraqi oil on behalf of Bulf. (*Id.* ¶¶ 1033-34.) In reality, though, those letters of credit were backed by Chevron. (*Id.* ¶ 1034.)

### b.   Surcharges on oil sales

A few years into the Programme, the Hussein Regime decided to generate income on oil sales outside of the proper channels. To do so, "the Hussein Regime simply demanded that anyone who wanted to purchase oil under the Programme make payments (surcharges) to bank accounts

10

owned or controlled by the Hussein Regime." (Compl. ¶ 363.) The amount of the surcharges varied over the life of the Programme, ranging from 10 cents to 50 cents per barrel of oil. (*Id.* ¶ 364.)

In the Chevron example, Chevron would pay its intermediaries a premium above the official selling price. (*Id.* ¶ 422.) In turn, the intermediaries would pay a portion of those premiums as surcharges to the Hussein Regime. (*Id.* ¶¶ 422-23.)  In this way, Chevron paid out approximately $20 million in indirect surcharge payments in connection with its oil purchases. (*Id.* ¶ 423.)

Defendants made surcharge payments to Hussein Regime-controlled bank accounts in Jordan and Syria. (*Id.* ¶ 473.) In some instances, the surcharges were transferred to accounts of the Central Bank of Iraq, from which Central Bank employees made cash withdrawals and physically transported the cash to Iraq. (*Id.* ¶ 474.) The Hussein Regime ultimately received a total of $228.8 million in oil surcharges. (*Id.* ¶ 1101.)

### 2.  *Purchases from vendor-defendants*

As it did for the sale of oil, the Hussein Regime manipulated the prices of the goods it purchased through the Programme. It agreed to overpay for goods in order to create a differential between the market price of a good and the amount of Programme funds expended on the good. The Regime used this differential to obtain unauthorized side-payments from the vendor-defendants.

#### a.  *Inland transportation fees*

The Hussein Regime demanded that companies selling goods within the Programme pay a transportation fee on all shipments of humanitarian goods to Iraq. (Compl. ¶ 526.) The Hussein Regime formalized its demand in a June 1999 directive to its ministries. The Regime's Economic and Affairs Committee assigned the fees and the Ministry of Transportation oversaw their collection. (*Id.* ¶ 527.)

The vendors of humanitarian supplies financed the transportation fees by surreptitiously charging them to Iraq's Programme account: vendors negotiated a delivery contract with the Hussein Regime; the Hussein

Regime set a transportation fee; and the vendors and the Hussein Regime consummated a finalized contract that accommodated the transportation fee in the official purchase price. (*Id.* ¶¶ 531, 533-34.) The Hussein Regime generally required vendors to pay the transportation fees directly to it—thus avoiding the UN-controlled escrow account—by demanding the fee before submitting a delivery contract to the UN. (*Id.* ¶¶ 528, 535.) Vendors accomplished this by raising the contract price they had previously negotiated with the Hussein Regime by the value of the fee and submitting to the UN a contract reflecting the above-market price.

### b.   After-sales-service-fees

The Hussein Regime directed "Iraqi ministries and agencies" (Compl. ¶ 562) to collect additional kickbacks from vendors in the form of an "after-sales-service-fee" (*id.* ¶ 557). As with the transportation fee, the service fee represented money funneled to Iraq by vendors hidden within inflated contract prices. (*Id.* ¶ 573.) The surcharge ranged from 2% to 30%, though "most contracts carried a 10% surcharge." (*Id.* ¶¶ 561-63.)

The service fees were "paid directly to the Hussein Regime." (*Id.* ¶ 571.) Vendors paid the surcharge in cash, by transfer to "Regime-controlled accounts," or by payments to "front companies controlled by individuals or companies loyal to the Hussein Regime." (*Id.* ¶ 565.) "Generally, accumulated payments were transferred to Iraq in cash, usually by diplomatic pouch." (*Id.*) An internal government memorandum mandated that all funds collected from the surcharge scheme be transferred to the "general treasury." (*Id.* ¶ 568.)

### c.   Consequences

As a result of these fees, over the course of the Programme Iraq substantially overpaid for the goods it received relative to their market price. (Compl. ¶¶ 650-651, 653.) "[B]y the Programme's end, prices were more than double the expected norms." (*Id.* ¶ 652.) The Republic of Iraq estimates that "the Iraqi people lost more than $7 billion worth of humanitarian goods to overpricing." (*Id.* ¶ 655.) Additionally, the vendors shipped Iraq "substandard" goods, including substandard "wheat, medicine, animal feed, chemicals, and vehicles." (*Id.* ¶¶ 641-43.)

### 3. *BNP maintained the UN escrow account*

Although the banking agreement prohibited BNP from contravening Programme rules, BNP is alleged to have done so. "BNP knew misleading disclosures were being made to the UN" in order to obtain approval for certain transactions and did not warn the UN (*id*. ¶ 1037), but instead, "in at least 403 instances BNP made payments from the UN Escrow Account to entities other than the named beneficiaries" of the letters of credit. (*Id*. ¶ 1038.) It "agreed with many of its customers to hide the fact that they were financing the purchase of oil . . . by others." (*Id*. ¶ 1022.) BNP's misconduct was motivated by the "financial opportunities from issuing letters of credit to oil purchasers," specifically that it made money by issuing letters of credit and misused its letters of credit authority "to solidify business relationships with the oil purchasers." (*Id*. ¶ 1014.)

### 4. *The Programme's end*

Resolution 661 remained in effect until the spring of 2003. UN SCOR Res. 1483 ¶ 10 (May 22, 2003). The Programme—and the alleged conspiracy to undermine and circumvent it—ended when the United States and its allies invaded Iraq and ousted the Hussein Regime by force. (Compl. ¶ 1077.)

### D. This action

Iraq commenced this action by filing a complaint in the Southern District of New York on June 27, 2008. (Dkt. No. 1.) It filed its First Amended Complaint on July 31, 2009. (Dkt. No. 112.) Iraq channels its charges into nine claims:[3]

1) The Racketeer Influenced and Corrupt Organization Act ("RICO"), § 1962(c)

2) RICO § 1962(d)

3) Foreign Corrupt Practices Act

---

[3] The Republic of Iraq withdrew its tenth claim, brought pursuant to the Robinson Patman Act § 2(c), 15 U.S.C. § 13. (Dkt. No. 519; Tr. of Oct. 26, 2012 Hr'g on Motion to Dismiss ("Hr'g Tr.") at 4.)

SPA-14

4)    Fraud

5)    Civil Conspiracy

6)    Breach of Fiduciary Duty

7)    Inducement of Breach of Fiduciary Duty

8)    Breach of Contract

9)    Unjust Enrichment

Defendants subsequently moved to dismiss the Amended Complaint on the basis of standing; act of state doctrine; political question doctrine; statute of limitations; in pari delicto; as well as on the merits of each claim. BNP filed a supplemental motion identifying defenses unique to it.

While the motion to dismiss was pending, Iraq moved to compel arbitration against the BNP Paribas affiliates (Dkt. No. 396) and BNP Paribas moved to enjoin any arbitration. (Dkt. No. 413.) This Court denied Iraq's motion to compel arbitration and granted BNP Paribas's motion to enjoin arbitration. *The Republic of Iraq v. ABB AG, et al.*, 769 F. Supp. 2d 605 (S.D.N.Y. 2011). Iraq appealed and the U.S. Court of Appeals for the Second Circuit affirmed this Court's Order on April 30, 2012. *The Republic of Iraq v. BNP Paribas USA,* 472 F. App'x 11 (2d Cir. 2012).

## II.  LEGAL STANDARD FOR MOTION TO DISMISS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 128 (2d Cir. 2011*). A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 376 (S.D.N.Y. 2011). A complaint demonstrates "facial plausibility" when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

### III. JUSTICIABILITY

Defendants urge the Court to dismiss this action as non-justiciable on the grounds that (1) Iraq lacks standing to seek relief; (2) the act of state doctrine bars adjudication; and (3) the issues are political questions beyond the Court's competence. The Court disagrees. Although Iraq does not have standing to proceed parens patriae, it has alleged an injury to its proprietary interests. And Iraq's claims present legal questions, particularly about attribution, causation, and territoriality, that are neither political nor inappropriate to consider under the act of state doctrine.

#### A. Article III standing

Defendants contend that Iraq lacks standing to seek relief. The Court must determine standing at the outset because it is a "threshold question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). Because "standing is challenged on the basis of the pleadings," the Court "'accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (citations and quotation marks omitted). "It bears emphasis that under federal pleading rules, complaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (alterations and quotation marks omitted).

"Article III of the Constitution limits the jurisdiction of federal courts to the resolution of 'cases' and 'controversies.'" *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (quoting U.S. Const. art. III, § 2). "In order to ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (alterations and quotation marks omitted). The burden is on Iraq as the party invoking federal jurisdiction, to satisfy the three elements of Article III standing, which are as follows:

(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly

traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief.

*Id.* (emphasis omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). If a plaintiff lacks Article III standing, a court has no subject matter jurisdiction to hear its claims. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

In the context of the U.S. federal system, the U.S. Supreme Court has broadly grouped the interests that might support a sovereign's standing into four classes. First, a state may seek to invoke "the power to create and enforce a legal code" or to demand recognition from other sovereigns. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Second, a state is also "bound to have a variety of proprietary interests" that it can protect in the manner of a private litigant. *Id.* Third, a state may "attempt to pursue the interests of a private party" on behalf of that private party. *Id.* at 602; *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Fourth, and finally, a state may pursue "quasi-sovereign" interests that "consist of a set of interests that the State has in the well-being of its populace." *Alfred L. Snapp*, 458 U.S. at 602.

Iraq invokes the second and fourth interests. It "brings this action in its own right" to redress injury to its proprietary interests. (Compl. ¶ 17.) Iraq also brings this action "parens patriae, for the benefit of the Iraqi people" to redress injury to its quasi-sovereign interests. (*Id.*)

### 1. Iraq has standing to recover for an injury to its proprietary interests.

Iraq alleges that defendants harmed its proprietary interests in the Programme account by directing bribes and kickbacks to the Hussein Regime (Compl. ¶¶ 1101-05) and by taking "undue profits" from oil sales in exchange for facilitating the Hussein Regime's schemes (*Id.* ¶¶ 1107-08). Iraq also alleges that defendants "directly deprived the Iraqi people of about $10 billion in essential food, medicine, and other humanitarian goods" through the surcharge-bribe scheme. (*Id.* ¶¶ 1111, 1114.)

Defendants compounded the damage by delivering Iraq substandard or overpriced goods. (*Id*. ¶ 1112.)

Iraq had a proprietary interest in the UN escrow account funds. The account was funded "with the proceeds of the sale of Iraqi petroleum and petroleum products." (MOU ¶ 5.) With narrow exception, those funds could be spent only at Iraq's request. (MOU ¶ 22.) And Iraq ultimately received the balance of the UN escrow account. (UN SCOR Res. 1483 ¶ 17; Hr'g Tr. at 45.)

Wrongful depletion of the UN escrow account could cause both particular and personal harm to Iraq. As compared to individual Iraqi citizens, the Republic of Iraq had a concrete, if not exclusive, interest in the funds contained within the UN escrow account. This distinguishes the Republic of Iraq's interest in the account from the interests of the Kurdish Iraqis who sued for relief in *Karim v. AWB Ltd*., No. 06 Civ. 15400, 2008 WL 4450265, at *4 (S.D.N.Y. Sept. 30, 2008), *aff'd* 347 F. App'x 714, 715-16 (2d Cir. 2009). The Court cannot say that an injury to the UN escrow account would harm Iraq "in some indefinite way in common" with others, as was the circumstance for the plaintiffs in *Karim*. *See* 2008 WL 4450265, at *4. To the contrary, wrongful depletion of the UN escrow account diminished the value of an account held in Iraq's name and for its proprietary benefit. Therefore, an invasion of the UN escrow account supports standing. *See Alfred L. Snapp*, 458 U.S. at 601-02.

Defendant's separate challenge to the causal component of standing reaches into the merits of Iraq's claims. Iraq has alleged that defendants' fraudulent conduct contributed to the diminution of its Programme account. Defendants caused this harm, for standing purposes, by convincing Iraq to sign contracts containing abusive prices and by having a "determinative or coercive effect" on the UN, which approved them. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Carver v. City of N.Y.*, 621 F.3d 221, 226 (2d Cir. 2010). Thus, Iraq's injury may be fairly traced to defendants within the meaning of Article III. True, defendants' dissection of the causal chain—for example, noting its complexity and the Hussein Regime's prominent role in the sequence—threatens Iraq's ability to recover. But

17

defendants' attack amounts to an analysis of the merits. *See Carver*, 621 F.3d at 226.

The Court need not consider Iraq's other alleged proprietary injuries for the purpose of Constitutional standing. The injury to the UN escrow account supports each claim alleged by Iraq.

### 2. *Iraq has no standing to pursue its quasi-sovereign interests as parens patriae.*

The Republic of Iraq also seeks redress for harms to its quasi-sovereign interests as parens patriae of the Iraqi people. While not a separate cause of action, this theory of recovery rests on injury distinct from that incurred by Iraq's proprietary interests. Specifically, Iraq alleges that "defendants forced the Iraqi people to fund the payments of bribes designed to extend the reign of the tyrannical Regime that subjected them." (Compl. ¶ 1119.) Further, defendants, who "siphoned off" Programme funds, contributed to "shortages of food and medicine" that exacerbated the suffering of the Iraqi people. (*Id*. ¶¶ 1127, 1130.) Lastly, defendants' conduct "eviscerated the effectiveness of the Iraq Sanctions Program and allowed the Hussein Regime to stay in power until Hussein was ousted by military action." (*Id*. ¶ 1132.)

The U.S. Supreme Court has recognized that "a [U.S.] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp*, 458 U.S. at 607-08; *see generally Purdue Pharma L.P. v. Kentucky*, --- F.3d ---, 2013 WL 85918, *4 (2d Cir. Jan. 9, 2013) (discussing various interests of a U.S. state that can be pursued parens patriae). On this basis, the Supreme Court has endorsed parens patriae standing for states of the Union and for Puerto Rico. *Id*. at 607. But "[t]here is no direct precedent allowing for [foreign states to sue as parens patriae] and the federalism concerns that animate recognition of parens patriae status in the States are simply absent." *Estados Unidos Mexicanos v. Decoster*, 229 F.3d 332, 341 (1st Cir. 2000). Indeed, the U.S. Supreme Court has never recognized a foreign sovereign's standing solely on parens patriae grounds. *Id*. at 336.

Iraq responds that "in appropriate cases" foreign nations may proceed as parens patriae. (Iraq's Opp. 24.) Iraq rests on *DeCoster*, in which the U.S. Court of Appeals for the First Circuit rejected Mexico's efforts to gain parens patriae standing: "parens patriae standing should not be recognized in a foreign nation unless there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government." 229 F.3d at 336. Iraq seizes on that court's use of the word "unless." But whether or not parens patriae would be appropriate after executive or legislative action, this case features no such "clear indication of intent." Therefore, the Court declines to allow the Republic of Iraq to proceed parens patriae.

Anticipating this outcome, Iraq urges the Court to delay reaching this issue, asserting that U.S. State Department representatives have not responded to plaintiff's counsel's request to comment on the parens patriae issue and have told Iraq's counsel that "as a matter of internal policy" the U.S. State Department does not make a Statement of Interest "this early in any litigation." (Decl. of Mark Maney dated April 30, 2010 at 1.) Accordingly, Iraq contends that it is "also too early for this Court to decide there is a conflict under the *DeCoster* rule." (Iraq's Opp. 25.) Of course, the State Department's silence most certainly does not amount to "a clear indication of intent to grant [parens patriae] standing," and the Court will not delay its assessment of standing on the chance that the Executive branch at some point in the future takes a position and that position favors Iraq. *Decoster*, 229 F.3d at 336.

Because the Court has concluded that the Republic of Iraq does not have parens patriae standing, it may not pursue claims in this action for harms to its quasi-sovereign interests or general harm inflicted on the people of Iraq.

### B.   Act of state doctrine

Defendants next contend that the act of state doctrine bars this Court from considering Iraq's claims. The act of state doctrine traditionally precludes courts of the United States from examining the validity of public acts committed by a foreign sovereign government within its own territory. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964);

*Konowaloff v. Metropolitan Museum of Art*, 702 F.3d 140, 145-46 (2d Cir.
2012). "Act of state issues only arise when a court *must decide*—that is,
when the outcome of the case turns upon—the effect of official action by a
foreign sovereign." *W.S. Kirkpatrick v. Envtl. Tectonics*, 493 U.S. 400, 406
(1990) (emphasis original). As a result, in every case in which the U.S.
Supreme Court has applied the doctrine, "the relief sought or the defense
interposed would have required a court in the United States to declare
invalid the official act of a foreign sovereign performed within its own
territory." *Id.* at 405.

Whether or not the issues in this case come within the act of state
doctrine, the policy reasons for the doctrine counsel against its application
here. The doctrine serves domestic separation of powers by restraining the
judiciary from interfering with the Executive Branch's conduct of foreign
affairs. *Konowaloff*, 702 F.3d at 145-46. Accordingly, "its proper application
requires a balancing of interests" and it "should not be invoked if the
policies underlying the doctrine do not justify its application." *Bigio v.
Coca-Cola Co.*, 239 F.3d 440, 452 (2d Cir. 2000) (citations omitted).

The policies justifying the act of state doctrine do not favor its
application here. In this action, the current government of Iraq itself has
sought out United States courts. The acts at the center of this dispute
occurred under a prior government led by a now-deposed ruler. And, to
the extent that any party has called into question the validity of the prior
government's acts, it is the current government of Iraq that has done so.
These factors all tilt against the doctrine's application. *See Bigio*, 239 F.3d at
452-53; *Republic of Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986).
Indeed, the circumstances here resemble those in *Bigio*. There the Second
Circuit declined to invoke the act of state doctrine and instead reviewed
certain acts taken by a prior government of Egypt, now "long gone," when
the current government had "repudiated the acts in question." 239 F.3d at
453. Those same features distinguish this case from *Konowaloff*, where the
contemporary Russian government had not renounced a predecessor's
acts. 702 F.3d at 147. Because the Republic of Iraq attempts to repudiate the
acts of the Hussein Regime, the Court finds no basis to invoke the act of
state doctrine.

20

### C.  Political question doctrine

Defendants' next challenge to justiciability rests on the political question doctrine. "In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quotation marks omitted). The political question doctrine excepts from this rule certain cases that transgress the separation of powers and fall beyond the court's competence:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). When a case turns on the answer to a political question, a "court lacks the authority to decide the dispute before it." *Zivotofsky*, 132 S. Ct. at 1427.

Defendants contend that Iraq's claims present a non-justiciable political question because the Complaint "calls into question the former Iraqi government's legitimacy." (Defs.' Reply Mem. in Support of Motion to Dismiss ("Defs.' Reply") at 25.) True, the Complaint alleges that the Hussein Regime "was not a de jure or legitimate government." (Compl. ¶ 220.) And the conduct of foreign affairs—including whether to recognize diplomatically a foreign government—rests with the Executive. *See* U.S. Const. art. II, §§ 2, 3; *United States v. Pink*, 315 U.S. 203, 229 (1942). But "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211.

21

This action does not require the Court to decide questions that have been deemed political. For example, the Court does not need to decide whether or not to recognize the Republic of Iraq as a sovereign state. *See Can v. United States*, 14 F.3d 160, 162-63 (2d Cir. 1994) ("[O]fficial recognition of a foreign sovereign is solely for the President to determine . . . .") Indeed, the Executive already has recognized the Republic of Iraq. Nor is the Court called to apportion property rights in the aftermath of state succession. *Cf. 767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F. 3d 152, 160-61 (2d Cir. 2000) ("[T]he federal courts do not have the authority or the means to determine the equitable distribution of the public debt of a foreign state among several successor states.") The Republic of Iraq is not a successor state. Most of the issues here—causation, territoriality, private rights of action—fall squarely within the Court's competence but happen to involve international and political actors.

Analyzing whether the Hussein Regime's acts may be attributed to Iraq does not raise political questions, either. First, accepting that the Hussein Regime governed Iraq during the Programme period raises no political question because the Complaint alleges that the Hussein Regime controlled Iraq (Compl. ¶¶ 216, 219; *see also* Hr'g Tr. 17 ("We agree his regime was the president of Iraq, the government of Iraq, the agent of Iraq.")) and defendants do not dispute that fact. (*E.g.*, Defs.' Mem. 12; Defs.' Reply 25-26.) Moreover, the U.S. Government treated the Hussein Regime as the effective government during the relevant time period. A U.S. law, the Iraqi Liberation Act of 1998, stated that "[i]t should be the policy of the United States to support efforts to remove the regime headed by Saddam Hussein from power in Iraq and to promote the emergence of a democratic government to replace that regime." Pub. L. No. 105-338 § 3, 112 Stat. 3178. The United Nations also treated the Hussein Regime as the effective Iraqi government. *See* UN SCOR Res. 661 & 986 (referring to the Hussein Regime as the "Government of Iraq.") Thus, the Court confronts no controversy—political or otherwise—regarding which government controlled Iraq during the Programme.

Second, analyzing whether or not a former government's conduct can be attributed to its sovereign is a legal question. It turns on the manageable

principles discussed below, and is necessarily decided in some form in any case applying the Foreign Sovereign Immunities Act ("FSIA") or the act of state doctrine, and many that do not. *See, e.g.*, *Konowaloff*, 702 F.3d at 147 (recognizing government's seizure of painting as act of state); *Marcos*, 806 F.2d at 358-59 (discussing acts of governmental character). The predicate question to FSIA and the act of state doctrine—whether conduct can be attributed to a government—cannot sensibly be labeled non-justiciable.

* * *

The Court concludes that this action is justiciable. Although Iraq has not demonstrated that it should be allowed to proceed parens patriae, Iraq has alleged an injury to its proprietary interest in the UN escrow account. Additionally, whether or not an act of state issue must be decided in this case, the policy rationale underlying the act of state doctrine does not support applying the doctrine to this suit. Additionally, the central questions of this case are not political. Rather, they are legal questions that involve political actors.

## IV.  THE RELATIONSHIP BETWEEN THE CURRENT GOVERNMENT OF IRAQ AND THE HUSSEIN REGIME

The legal relationship between the sovereign Republic of Iraq, the Hussein Regime, and the Iraqi people frames this litigation. That relationship rests on time-tested principles:

- The change in governments—from the Hussein Regime; to the Coalition Provisional Authority that governed subsequent to the fall of Saddam Hussein; to the contemporary Republic—did not create an entirely new state. Rather, those changes altered the leadership and government of a continuously existing state. Therefore, the Republic of Iraq is the same sovereign entity as the one controlled by the Hussein Regime. (Iraq's Mem. in Opposition to Motion to Dismiss ("Iraq's Opp.") at 9; *see* Defs.' Mem. in Support of Motion to Dismiss ("Defs.' Mem.") at 12 (same).)

- "[T]he rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it." *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938). That is, Hussein, the Hussein Regime, and the Republic of Iraq are not one

and the same; they are different governments over time that represent the same sovereign state. (Iraq's Opp. 9; Defs.' Mem. 12-13.)

- Notwithstanding the distinction between a state and its government, a government may bind the sovereign it represents. *See, e.g.*, *The Sapphire*, 78 U.S. (11 Wall) 164, 168 (1870); *Lehigh Valley R.R. Co. v. Russia*, 21 F.2d 396, 401 (2d Cir. 1927).

These lines of agreement encircle the root conflict of this motion to dismiss: whether, as a matter of law, the Republic of Iraq bears responsibility in this action for the Hussein Regime's corruption of the Programme. This Court concludes that it does.

### A. Sovereigns may be held to account for the wrongful governmental conduct of their governments.

Because sovereigns operate through their governments, both domestic and international law ordinarily impute to a sovereign the acts of its government. For example, governments set policy, hold property, and conduct foreign affairs. The consequences of these governmental acts trace back to the sovereign. *E.g.*, *The Sapphire*, 78 U.S. (11 Wall) at 167; *Guar. Trust Co.*, 304 U.S. at 137; *Lehigh Valley*, 21 F.2d at 401. So do wrongful acts by those governments. "A state is responsible for any violation of its obligations under international law resulting from action or inaction by [] the government of the state . . . ." Restatement (Third) of Foreign Relations Law of the United States § 207 (1987); *accord* Articles of Responsibility for States for Internationally Wrongful Acts, art. 4 § 1, annexed to UN GAOR Res. 56/83 (2001), *available at* http://www.un.org/law/ilc ("The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.").

Moreover, the consequences of one government's acts may redound to the sovereign even after that government has been replaced.

**SPA-25**

> Changes in the government or the internal policy of a state do not as a rule affect its position in international law. A monarchy may be transformed into a republic, or a republic into a monarchy; absolute principles may be substituted for constitutional, or the reverse; but, though the government changes, the nation remains, with rights and obligations unimpaired.

*Lehigh Valley*, 21 F.2d at 401 (quoting 1 Moore's Digest of Int'l Law 249). Thus, a change in government will not ordinarily relieve a sovereign of responsibility for its former government's acts.[4]

Of course, it is possible for the persons who comprise the government to act without acting as the government. How to identify that circumstance divides the parties to this litigation. The Court follows the rule that a sovereign may be held to account for the *governmental* conduct of the persons serving as its government.

This rule is not new. Sovereigns usually have immunity in U.S. courts for "sovereign" or "public" conduct, as opposed to "commercial" or "private" conduct. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993); *Themis Capital, LLC v. Democratic Republic of Congo*, --- F. Supp. 2d ---, No. 09 Civ. 1652, 2012 WL 3114732, at *14 (S.D.N.Y. July 26, 2012) (reviewing FSIA consequences for public and private acts of governmental agents). Similarly, "public" acts of a government, as distinguished from "private" acts, trace to a sovereign and may justify the application of the act of state doctrine. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703-706 (1976). Additionally, when determining whether an Alien Tort

---

[4]    *See, e.g., Guar. Trust Co.*, 304 U.S. at 137 (Soviet Russia's claim time-barred notwithstanding Imperial Russia's failure to act); *The Sapphire*, 78 U.S. (11 Wall) at 167 (concluding that France maintained rights and obligations concerning a maritime lawsuit filed by its former government); *Socialist Republic of Romania v. Wildenstein & Co.*, 147 F.R.D. 62, 65 (S.D.N.Y. 1993) (prior government's default binding on successor); *Trans-Orient Marine Corp. v. Star Trading Marine, Inc.*, 731 F. Supp. 619, 622-23 (S.D.N.Y. 1990), *aff'd in pertinent part*, 925 F.2d 566 (2d Cir. 1991) (Republic of Sudan liable for former government's contractual obligations); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 633 (1983) ("Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities.").

25

Claims Act defendant has engaged in state action, a relevant guide is whether he or she acted under "color of law" in the foreign state. *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995). These categories of cases rest implicitly on the idea that *governmental* conduct is attributed to the sovereign.

### B.  Governmental conduct is conduct taken under color of authority.

The U.S. Court of Appeals for the Second Circuit has held that a "governmental act" is an act "physically taken by persons capable of exercising the sovereign authority of the foreign nation," as long as the persons "purported to act in their official capacity." *Banco de Espana v. Fed. Reserve Bank of N.Y.*, 114 F.2d 438, 444 (2d Cir. 1940). That understanding comports with the International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts. Those Articles state that when "a person acts in an apparently official capacity, or under colour of authority, the actions in question will be attributable to the State." Articles on Responsibility, art. 4 cmt. 13. Similarly, the Restatement (Third) of Foreign Relations Law of the United States has identified several indicia of attribution:

> In determining whether an act was within the authority of an official or an official body, or was done under color of such authority . . . , one must consider all of the circumstances, including whether the affected parties reasonably considered the action to be official, whether the action was for public purpose or for private gain, and whether the persons acting wore official uniforms or used official equipment.

Restatement (Third) of Foreign Relations Law § 207 cmt. d (1987).

In the context of an ambassador whose actions injured his or her government, the Second Circuit has concluded that an ambassador binds his or her government when he or she possesses the actual or apparent authority to do so. *First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 192-94 (2d Cir. 1989) (distinguishing the Restatement (Third) of U.S. Foreign Relations Law). In the context of FSIA, however, courts have interpreted that rule to permit apparent authority to

26

bind a sovereign engaged in private conduct but to demand actual authority to bind a sovereign engaged in public conduct. *See Themis Capital*, 2012 WL 3114732, at *13 (reviewing authorities).

Neither the *First Fidelity* rule nor its permutations ought to obtain here. Unlike the Hussein Regime, the ambassador in *First Fidelity* was but one person in a larger government. By contrast, there is no entity to answer for Iraq but its government, which necessarily has certain inherent authority to conduct Iraq's affairs. *Cf. First Fid. Bank*, 877 F.2d at 198 (discussing ambassador's inherent agency power in dissent). If a government is alleged to act pursuant to its official duties or for an official purpose, those acts should be attributed to the sovereign.

Accordingly, the Court decides that the Hussein Regime's conduct was "governmental" if it was undertaken in the purported or apparent execution of official duties.

### C.   The Complaint alleges that the Hussein Regime's Programme misconduct was governmental.

The Complaint alleges conduct by the Hussein Regime done under the color of its authority as the government of Iraq. Therefore, the Programme conduct of the Hussein Regime should be attributed to Iraq for the purposes of this action.

First, the Complaint alleges that the Hussein Regime's "main goal" was to "undermine UN sanctions and the US law prohibiting transactions with State Sponsors of Terrorism." (Compl. ¶ 7.) Hussein declared the Iraq Sanctions Program to be a form of "economic occupation" implemented by the "enemy." (*Id*. ¶ 302.) Thus, the alleged misconduct represents choices made by the Regime in the conduct of its foreign affairs. *See* IIC Rep. 9 ("Two overriding factors determined Iraq's choice of oil recipients. The first factor was influencing foreign policy and international public opinion in favor of ending sanctions against Iraq. Later . . . Iraq sought to generate illicit income outside of the United Nation's oversight.").

Second, the Complaint alleges that the Hussein Regime implemented its scheme by using its powers to engage with the UN. The Hussein Regime made the corruption possible, not just because it was in a position

to corrupt the Programme, but because it agreed to the creation of the Programme in the first place: it did so in its capacity as the Government of Iraq. (*See* MOU § 10 (signature of Abdul Amir Al-Anbari "for Government of Iraq").) Additionally, the Complaint alleges that the Hussein Regime (and defendants) effectuated their scheme by submitting false contracts to the UN. The Hussein Regime could negotiate those contracts only by virtue of its status as the effective government of Iraq. Thus, the Regime engaged in international transactions of an official character.

Third, the Complaint alleges that the Hussein Regime acted through government offices and officers to pursue its goal of frustrating the Iraq Sanctions Program:

- Hussein ordered government agencies to effectuate the scheme. "[O]n October 25, 2000, all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10% in order to subvert the policies of the UN and the United States government." (Compl. ¶ 302.)

- Government agencies negotiated the transactions. "The Iraqi State Oil Marketing Organization (SOMO) was the legal entity that entered into the contracts with companies purchasing oil under the Programme." (*Id*. ¶ 323.) On the goods side of the Programme, "a company wishing to sell humanitarian goods under the Programme contracted with the appropriate Iraqi Ministry or State-Owned Enterprise . . . ." (*Id*. ¶ 329.)

- Government agents and agencies received the illicit funds. The Hussein Regime collected surcharges in accounts held "under the names of two SOMO employees" and then transferred the funds to "accounts of the Central Bank of Iraq." (*Id*. ¶¶ 473-74.) It alleges that the Iraqi vice president directed that the after-sales-service fee revenue "be transferred to general treasury." (*Id*. ¶ 568.) It also alleges that various governmental units or government-owned businesses collected fees and bribes. (*E.g.*, *id*. ¶ 546 (Iraqi Ministry of Transportation); ¶ 550 (payments "going back to the Iraq Government"); ¶ 565 ("payments were transferred to Iraq in cash").)

In sum, Iraq alleges that its injuries resulted from the Hussein Regime's prosecution of its foreign affairs policy. The Complaint alleges a public goal, undertaken with public resources, pursued for political purposes, and using means available only to state actors. These features lead the Court to conclude the Hussein Regime acted under the color of its authority as the government of Iraq for the purposes of this motion.

**D.   The nature of the Hussein Regime's conduct does not absolve Iraq of responsibility for that conduct.**

Iraq contends that it does not bear responsibility for the conduct of the Hussein Regime because the Hussein Regime did not act in a way that benefitted the Iraqi people. Rather than ask whether the conduct of the Hussein Regime was governmental, Iraq would have the court ask "Was [Hussein] acting for or against the interests of the Iraqi nation?" (Hr'g Tr. at 22.) Iraq offers three permutations of this argument: (1) Hussein's conduct was private, self-serving conduct and thus not governmental conduct that can be attributed to Iraq; (2) the Hussein Regime was not the legitimate government of Iraq and therefore its actions cannot be imputed to Iraq; and (3) the Hussein Regime committed unlawful conduct that, because it is unlawful, cannot be attributed to Iraq. The Court rejects each of these arguments because none demonstrates that the alleged conduct of the Hussein Regime is non-governmental.

### 1.   The Complaint does not allege that the Hussein Regime committed acts of personal misconduct as distinct from governmental misconduct.

Iraq urges the Court to accept that the Hussein Regime's Programme misdeeds were "personal acts" taken "against the public interest" and thus, in its view, not attributable to Iraq. Iraq rests its theory on five cases that comment on the private nature of a former governmental leader's corrupt conduct.[5] Those cases analyze whether certain misconduct was

---

[5]   *The Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1358 (9th Cir. 1988); *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962); *The Republic of the Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438 (D.N.J. 1991); *United States v. Noriega*, 746 F.

"private" or "public" within the rubric of the act of state doctrine or the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*

But a state's responsibility for the acts of its government does not coincide with the application of the act of state doctrine or the FSIA. To the contrary, often it is when neither apply—and thus when a civil action against a sovereign may proceed—that a state will face liability for its acts. For example, the act of state doctrine does not bar adjudication of the consequences of a foreign act. *See United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 248 (S.D.N.Y. 2009). And the FSIA does not allow foreign states to avoid the legal repercussions of their official, but commercial, activities. *See NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 260 (2d Cir. 2012). Therefore, while relevant, the application or non-application of FSIA or the act of state doctrine does not determine legal responsibility.

In any event, none of the authorities plaintiff proffers suggest that the alleged misconduct here amounts to private action. In *The Republic of the Philippines v. Marcos*, the Ninth Circuit, sitting en banc, reasoned that the former leader of the government of the Philippines had been accused of committing private misconduct because the complaint stated that he used "his position of power and authority to convert . . . to his use and that of his friends, family, and associates, money, funds, and property belonging to the Philippines and its people." 862 F.2d 1355, 1359 (9th Cir. 1988) (quoting complaint). Similarly, in *Jimenez v. Aristeguieta*, a sovereign accused its former leader of embezzlement and fraud for his private financial benefit. 311 F.2d 547, 557-58 (5th Cir. 1962). And so, too, in *Republic of Haiti v. Duvalier*, where Haiti sought to recover public funds deposited by its former dictator into a personal account. 211 A.D.2d 379, 380-81 (1st Dep't 1995). By contrast, Iraq has not alleged that Hussein funneled money into personal bank accounts in foreign countries, as the Philippines did of the Marcoses, Venezuela did of Jimenez, or Haiti did of Duvalier. Rather, Iraq has alleged that the Hussein Regime directed the kickbacks and bribes into government accounts.

---

Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379 (1st Dep't 1995).

The personal bank account fact pattern merely points to the bigger difference: the misconduct in *Marcos*, *Jimenez*, and *Duvalier* was undertaken by each ruler and his close associates or family; the scheme alleged by Iraq was directed by the entire Hussein *Regime*. Iraq's argument founders on this fact because it defies reason to label conduct allegedly undertaken by the whole of the public apparatus as "private."

Iraq's other authorities have little relevance. In *The Republic of the Philippines v. Westinghouse Electric Corp.*, the court considered a foreign state's suit against a third party for bribing the state's former government. 774 F. Supp. 1438 (D.N.J. 1991). While similar in posture to this action, *Westinghouse* considered whether the Philippines had stated a claim pursuant to Philippine law. *Id.* at 1464. Iraq has not similarly suggested that it may recover here for defendants' violations of Iraqi law. Last, in *United States v. Noriega*, the defendant failed to persuade the court that the cocaine he trafficked into the United States for his "personal financial enrichment" came within the act of state doctrine. 746 F. Supp. 1506, 1522 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997). Unlike the indictment in the *Noriega* case, the Complaint here does allege that the Hussein Regime pursued wrongful conduct "in furtherance of [] state policy or to serve some overriding national interest." *Compare id. with* Compl. ¶¶ 2, 7.

### 2.    *The legitimacy of the Hussein Regime does not determine Iraq's responsibility for the Regime's conduct.*

The legitimacy or illegitimacy of the Hussein Regime's rule does not affect whether the Regime's acts may be attributed to the Republic of Iraq. Indeed, Courts have attributed conduct of allegedly unlawful regimes to the states they purported to represent. *E.g.*, *The Sapphire*, 78 U.S. (11 Wall) 164, 167 (1870) (Napoleonic France); *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938) (Provisional Government of Russia). And attribution operates independently of diplomatic recognition. "[A] state is responsible for the conduct of its effective government, whether or not that government was recognized by other states." Restatement (Third) of Foreign Relations Law of the United States § 207 cmt. b. What matters is control.

Here, Iraq has alleged that the Hussein Regime was "in *de facto* control of the nation" and that control can hardly be disputed. (*See* Compl. ¶ 220 (emphasis original).) This control had legal significance. The parties do not dispute that the Hussein Regime could create rights and obligations within the Programme that reach the Republic of Iraq today. For example, the UN Security Council decided that, "in connection with the dissolution of the Coalition Provisional Authority, the Interim Government of Iraq and its successors shall assume the rights, responsibilities and obligations relating to the Oil-for-Food-Programme that were transferred to the Authority . . . ." (UN SCOR Res. 1546 (June 8, 2004), Ex. 10 to Bishop Decl.) The Republic of Iraq has entered into a treaty with the United States of America to settle "certain claims of United States nationals arising from actions of the former Iraqi regime." Claims Settlement Agreement Between the Government of the United States and the Government of the Republic of Iraq (September 2, 2010). The Republic of Iraq has invoked sovereign immunity in response to suits concerning certain Hussein Regime conduct related to the Programme corruption. *E.g.*, *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1139 (9th Cir. 2012) (sovereign immunity from breach of contract claims concerning contracts canceled due to plaintiff's refusal to pay a bribe); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 865-66 (2009) (invoking sovereign immunity for abuse and mistreatment of American nationals during or after the 1991 Gulf War). And the Republic of Iraq now, by this action, seeks to recover for harms stemming from oil sales and goods purchases made by the Hussein Regime.

### 3.  *The legality of the Hussein Regime's acts does not determine Iraq's responsibility for the Regime's conduct.*

Iraq next distinguishes the Programme corruption from other Regime acts on the grounds that the challenged conduct was unlawful or against UN regulation. For example, Iraq attempts to exclude from the definition of "official governmental purposes" any activity or purpose that violated the MOU. (*See* Compl. § 1200.) But "[t]o show that conduct is attributable to the State says nothing, as such, about the legality or otherwise of that conduct . . . ." Articles on Responsibility of States for Internationally Wrongful Acts, art. II cmt. 4.

32

Indeed, if states only bore responsibility for lawful acts they would, perversely, bear no responsibility for unlawful acts. The law is otherwise. A state cannot ordinarily escape liability "for acts of officials and official bodies, national or local, even if the acts were not authorized by or known to the responsible national authorities," or acts "expressly forbidden by law, decree, or instruction." Restatement (Third) of Foreign Relations Law of the United States § 207 cmt. d (1987). Nor can a state avoid responsibility for acts that violate its own laws. *Banco de Espana v. Fed. Reserve Bank of New York*, 114 F.2d 438, 444 (2d Cir. 1940) ("It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal."); *see also Westfield v. Fed. Republic of Germany*, 633 F.3d 409, 418 (6th Cir. 2011) (seizure of property by Nazi regime "governmental" within the meaning of FSIA even though the seizures were voided by subsequent government). Moreover, if courts had to examine whether a government's act was lawful in order to decide whether it was attributable to the state, they would often run afoul of the act of state doctrine; the "lawfulness" of a foreign government's internal acts "is precisely what the act of state doctrine bars United States courts from determining." *Konowaloff*, 702 F.3d at 147; *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 431 (1964) ("[T]he act of state doctrine is applicable even if international law has been violated.").

Iraq elsewhere has acknowledged and settled claims against United States nationals for wrongful conduct during the Hussein Regime. *See* U.S.-Iraq Claims Settlement Agreement; Hr'g Tr. 20 ("We as a nation, the Republic of Iraq, as a nation, have been held responsible for the wrongs of Saddam Hussein just like principals are every day."). Thus, as the Republic of Iraq has itself recognized, it may not avoid responsibility for the Hussein Regime's acts on the basis of their illegality.

One final note: To say that Iraq may not avoid responsibility in this action for the Hussein Regime's unlawful conduct is not to deny that the Regime's conduct was unlawful. Unlike Judge Debevoise in *Republic of the Philippines v. Westinghouse Electric Corp.*, 774 F. Supp. 1438, 1452 (D.N.J. 1991), cited by Iraq, the Court does not consider that question, or need to. Nor does holding Iraq responsible for the Hussein Regime's acts imply

33

that Saddam Hussein was the law. It simply accepts what the Complaint alleges—that the Hussein Regime acted as the Iraqi government.

* * *

The Court concludes that the Programme-related misdeeds of the Hussein Regime alleged in the Complaint may be attributed to the Republic of Iraq. The Complaint alleges that the misconduct occurred pursuant to official policy and in apparent pursuit of political goals. The ethicality, illegitimacy, or illegality of the acts does not immunize the Republic of Iraq from responsibility. Instead, the Republic of Iraq bears responsibility for the Hussein Regime's conduct alleged here because that conduct was governmental.

## V.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

Iraq seeks relief principally for defendants' alleged violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S. §§ 1961-1968. The focus of its allegations is on a foreign enterprise and a pattern of racketeering and corruption that occurred most meaningfully abroad. Because civil RICO does not provide a cause of action for extraterritorial offenses, the Court dismisses plaintiff's civil RICO claims. The Court also dismisses the RICO claims on the grounds that Iraq is barred from recovery by the doctrine of in pari delicto and also has not alleged proximate causation.

### A.    Iraq alleges that defendants violated RICO by corrupting the Programme.

Iraq alleges that defendants used the Programme's structure to maintain its fraud, bribery, and money-laundering scheme. (Compl. ¶¶ 1136, 1140-50.) Although the Complaint alleges that defendants' "conduct had a central purpose of diverting funds from their intended humanitarian purposes to the Hussein Regime and to the Defendants" (id. ¶ 1151), Iraq has since explained that its "RICO claims are based on diversions of its oil wealth, not reductions in the humanitarian aid received by its citizens." (Iraq's Opp. 50.) The diversions injured Iraq by, among other things,

facilitating defendants' "excessive profits." (*Id.*; Compl. ¶ 1107.) Plaintiff alleges that this conduct violates subsections 1962(c) and 1962(d) of the RICO statute. (Compl. ¶¶ 1135-58.)

Pursuant to 18 U.S.C. § 1962(c), it is unlawful for a person to "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." In the civil context, "the compensable injury flowing from a violation of that provision necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321 (2d Cir. 2011) (quotation marks omitted).

Pursuant to 18 U.S.C. § 1962(d), a person may not "conspire to violate" any of the substantive provisions of RICO, including section 1962(c). In the civil context, "a RICO conspiracy plaintiff [must] allege injury from an act that is analogous to an act of a tortious character, meaning an act that is independently wrongful under RICO." *Beck v. Prupis*, 529 U.S. 494, 505-06 (2000) (citations and quotation marks omitted).

**B.   Iraq impermissibly attempts to apply the RICO statutes extraterritorially.**

The scheme described by Iraq is primarily foreign, focused on a multinational organization, engineered by a foreign government, and concerned with Iraqi oil, goods, and contracts. Applying the RICO statute to these allegations would be applying the statute to extraterritorial conduct, which is not permitted under the case law.

**1.   *RICO claims that focus on an extraterritorial enterprise or concern extraterritorial patterns of racketeering activity are not actionable.***

The RICO statutes do not apply extraterritorially. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (per curiam); *see Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). "[S]imply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Norex*, 631 F.3d at 33. Accordingly, peripheral contacts with the United States—up to and including the use of a domestic bank account—do not bring an otherwise foreign scheme within the reach

of the RICO statutes. *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010), *aff'd sub nom.*, *Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012).

To determine whether a plaintiff has alleged an extraterritorial claim, the Supreme Court has examined the locus of the actions that are the "objects of the statute's solicitude." *Morrison*, 130 S. Ct. at 2884 (analyzing the Exchange Act). The U.S. Court of Appeals for the Second Circuit has not yet determined the objects of the RICO statute's solicitude. *E.g.*, *Cedeño*, 457 F. App'x at 37 ("[I]t is unnecessary for us to decide what constitutes the object of RICO's solicitude.") (quotation marks and brackets omitted). The district judges in this circuit have not reached agreement on the issue, either. Certain district judges have concluded that the statute "seeks to regulate 'enterprises' by protecting them from being victimized by or conducted through racketeering activity." *European Cmty. v. RJR Nabisco, Inc.*, No. 02 Civ. 5771, 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011); *Cedeño*, 733 F. Supp. 2d at 473 ("[I]t is plain on the face of the statute that the statute is focused on how a pattern of racketeering affects an enterprise."). Another district judge has concluded that "the focus properly is on the pattern of racketeering activity and its consequences," not on the enterprise. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012).

### 2. *Iraq's Complaint demonstrates that its claim is extraterritorial.*

Whether assessed by the enterprise or the pattern of racketeering activity, the RICO allegations of the Complaint most certainly describe a foreign scheme, not a domestic one.

#### a. *The alleged enterprise is not domestic.*

The enterprise here is not located in the United States. Iraq asserts that "[t]he Enterprise was the Programme" (Compl. ¶ 1136) and that the "Oil for Food Programme itself [was] centered and located in New York" (Iraq's Response to Defs.' 6th Notice of Auth., Dkt. No. 501, at 2). In the alternative, Iraq alleges as the Enterprise an association-in-fact of various UN committees and defendants. (Compl. ¶ 1137.) This view of

territoriality elevates form over substance. The Programme was "in New York" inasmuch as it operated through UN committees and agencies that worked in the UN Headquarters District, a physical area located within New York City. The United Nations is, however, a united group of sovereign nations, not the United States. And the Programme is not United States territory, but an administrative creature of the UN, conceived, maintained, and staffed by a multinational intergovernmental organization.

Iraq responds that, in certain circumstances, United States courts have jurisdiction over actions taken within the United Nations Headquarters District. (Iraq's Opp. 54-56.) That certain crimes committed within the Headquarters District may be prosecuted by United States authorities subject to UN approval, however, does not transform the United Nations, or its subgroups, into a domestic RICO enterprise. The Headquarters District is functionally distinct from the natural territory of the United States because the United States has ceded control and primacy of the Headquarters District to the UN. *See* Agreement respecting the headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, T.I.A.S. No. 1676 (entered into force Nov. 21, 1947). Indeed, the UN Headquarters Agreement "effectively removes control over the UN Headquarters and related areas from the jurisdiction of the United States." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 51 (2d Cir. 1991).

In any event, the territoriality of the Headquarters District is beside the point: the UN, which operated the Programme, and its inner-workings are not "places over which the United States has sovereignty or has some measure of legislative control" and therefore are not United States territories. *See E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Classifying UN organs as U.S. domestic entities risks the very sort of international discord that the rule against extraterritorial application aims to avoid.

       b.   *The alleged pattern of racketeering is concentrated abroad.*

Moreover, key aspects of the alleged scheme were focused abroad. The oil was clearly located in Iraq. (*See* Compl. ¶¶ 350-351; MOU ¶ 16.)

The Hussein Regime, in Iraq, negotiated directly with defendants for the sale of the oil and the receipt of bribes. (Compl. ¶¶ 323, 363, 379, 384.) Defendants sent bribes and kickbacks directly to the Hussein Regime or its agents, in Iraq and abroad, and defendants received Iraqi oil in return. (*Id.* ¶¶ 351, 356, 363, 365.) Similarly, vendor defendants paid surcharges and fees directly to the Hussein Regime and its agents. (*Id.* ¶¶ 522, 528, 535, 538, 511.)

Certain aspects of the alleged scheme were focused at the UN. Defendants and the Hussein Regime submitted the oil and vending contracts to the UN for approval. (*Id.* ¶¶ 325, 333; MOU ¶¶ 17, 21-25.) Those negotiated contracts contained the under- or over-pricing that facilitated the bribery and kickback scheme. (Compl. ¶¶ 383, 387, 528, 574.) Payments by defendants for oil were made into a UN escrow account (*id.* ¶¶ 284-85; UN SCOR Res. 986 ¶ 1(b)), and payments to vendors were made from that account (Compl. ¶ 338; UN SCOR Res. 986 ¶ 8) and BNP maintained the escrow account at its Manhattan branch (Compl. ¶ 286).

From this universe of allegations, Iraq highlights particular elements as the core of its RICO claims. Iraq contends that defendants' racketeering activities sought "to obtain the Republic of Iraq's property held by the UN in New York." (Iraq's Opp. 49.) Defendants accomplished this scheme by diverting money away from the Programme and into defendants' pockets in the form of "excessive profits." (Iraq's Opp. 50.) Iraq lodges that scheme in the New York area by alleging that "the Programme was administered in New York, all of the funds of the Programme were supposed to pass through an escrow account in New York, and all contracts under the Programme were approved by the United Nations in New York." (Compl. ¶ 16.) At heart, Iraq writes, "[d]efendants and their co-conspirators decided to rob the bank" in New York. (Iraq's Opp. 53.)

Iraq's analogy falls short for at least two reasons:

First, the scheme alleged in the Complaint sought to divert money around the Programme, not out of it. According to the Complaint, the kickbacks paid in connection with the sale of oil circumvented the UN escrow account. (*E.g.*, Compl. ¶¶ 363, 380, 382.) Indeed, Iraq alleges that the full purchase price for oil was not being paid into the escrow account:

"direct financial transfers were being made to the Hussein Regime outside the UN Escrow Account" (*id.* ¶¶ 380, 382), and the Hussein Regime coordinated the fraud directly with defendants (*id.* ¶ 382). To borrow Iraq's analogy, defendants' heist occurred well before the money made it to the bank. Accordingly, the bank account's presence in the United States is an insufficient contact to make the scheme territorial. *See Cedeño*, 733 F. Supp. 2d at 472.

Second, Iraq has not, by virtue of alleging predicate acts in the United States, alleged a domestic RICO claim. Iraq contends that "all of the RICO predicate acts alleged in the complaint occurred in New York," so it has alleged a domestic pattern of racketeering activity. (Iraq's Response to Defs.' 6th Notice of Auth. at 2.) But the presence of domestic predicate acts does not necessarily mean a given application of the RICO statute is territorial. *Norex* rejected a RICO claim premised on "numerous acts in the United States . . . including mail and wire fraud, money laundering, Hobbs Act violations, Travel Act violations[,] and bribery." *Norex*, 631 F.3d at 31.

As in *Norex*, it is implausible to accept that the thrust of the pattern of racketeering activity was directed at New York, as Iraq urges in its papers. (*See* Dkt. No. 501.) For example, the Complaint alleges racketeering activity of money laundering and bribery. (Compl. ¶¶ 1144-49.) The money laundering alleged took the form of kickbacks paid to Iraq from payments defendants received from Iraq through the UN escrow account. (*Id.* ¶ 1144.) The bribery included the kickbacks, surcharges, and oil allocations exchanged between Hussein's allies and defendants. (*Id.* ¶ 1150.) The scheme subverted an international sanctions regime and inflicted suffering on a foreign people. (*E.g.*, *id.* ¶¶ 1099-1110, 1119-20, 1122.) That activity focused on the Hussein Regime in Iraq, not the United States.

The foreign focus of this case distinguishes it from *GCG Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193 (D. Colo. 2011). There, the district court concluded that a scheme orchestrated by foreign defendants nevertheless constituted a domestic offense. *Id.* at 1209-10. In particular, the fact that defendants aimed to "extract monies from victims in the United States" and engaged in conduct in the United States—including dispatching an

agent of the scheme to Colorado and perhaps Florida and Illinois—brought the Canadian defendants' offense within the domestic reach of the RICO statute. *Id.* at 1197, 1210. Here, the victims and victimizers are foreign, and the means of the offense involve false representations to a multinational organization. This is not the domestic offense of *GCG Holding*.

### 3.  Under either test, Iraq calls for an impermissible extraterritorial application of the RICO statute.

At bottom, the application of the RICO statute to the alleged facts would be extraterritorial. The Complaint describes a scheme directed by a foreign government, involving international conduct, and exacting a toll on a foreign plaintiff, which is itself a foreign state. The most domestic feature of the claim is that it involved a multinational organization headquartered in New York, connected to this case by dint of the fact that the organization enforced an internationally mandated sanctions regime abroad. When foreign actors were the primary operators, victims, and structure of a RICO claim, courts in this Circuit have properly concluded that the claims were extraterritorial. *Norex Petroleum Ltd.*, 631 F.3d at 32; *Cedeño*, 733 F. Supp. 2d at 472. *Cf. Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 253 (S.D.N.Y. 2008) (finding Oil-for-Food RICO claim to be extraterritorial under conduct-and- effects test). By contrast, when a scheme is conceived and orchestrated by United States persons, directed at United States corporations, and involving United States conduct, the claim is domestic, notwithstanding the presence of foreign conduct. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d at 245-46; *see also GCG Holding Co.*, 824 F. Supp. 2d at 1209-10.

### C.  In pari delicto bars Iraq's RICO claims.

#### 1.  Iraq's allegations bring it within the in pari delicto doctrine.

The doctrine of in pari delicto is an equitable defense reflecting the idea that "'[i]n a case of equal or mutual fault the position of the defending party is the better one.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (alterations omitted) (quoting Black's Law Dictionary 711 (5th ed. 1979)); *Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche*

*USA LLP*, No. 06 Civ. 3291, 2007 WL 1491403, at *5 (S.D.N.Y. May 22, 2007). Therefore, the defense should not be allowed "[u]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater." *Pinter v. Dahl*, 486 U.S. 622, 636 (1988). When it applies, "the plaintiff should not [] recover, and the parties should be left where they are." *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990).

The in pari delicto doctrine may compel the dismissal of a complaint when the plaintiff's culpability appears on the face of the complaint. *E.g.*, *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP*, 322 F.3d 147, 157, 164 (2d Cir. 2003) (applying Texas law). Courts may only apply in pari delicto to federal claims where (1) "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress" and (2) the application of the doctrine does not offend public policy by interfering with the enforcement of a federal statute. *Bateman Eichler*, 472 U.S. at 306. Iraq's Complaint satisfies both criteria.

>   a.   *The Complaint alleges that the Hussein Regime bears equal or greater responsibility for the alleged racketeering activity than defendants.*

The allegations in the Complaint include that "as a direct result of [its] own actions, the [Republic of Iraq] bears at least substantially equal responsibility for the violations [it] seeks to redress." *Bateman Eichler*, 472 U.S. at 306. For example:

- "[T]he corruption was designed and instigated by the Hussein Regime." (Compl. ¶ 4.)

- "The Hussein Regime could choose to whom it sold oil." (*Id.* ¶ 351.)

- "The Hussein Regime began directing oil allocations to particular countries and individuals it viewed as supportive of the Regime, and particularly of the Regime's desire to eliminate UN sanctions." (*Id.* ¶ 356.)

- "To generate . . . illicit income, the Hussein Regime simply demanded that anyone who wanted to purchase oil under the

Programme make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime." (*Id.* ¶ 363.)

- "[T]he Hussein Regime demanded that additional "transportation fees" be paid directly to the Hussein Regime on all shipments of humanitarian goods to Iraq." (*Id.* ¶ 526.)

- "[T]he Hussein Regime decided to impose what it called an 'after-sales-service-fee' or ASSF on all Programme contracts." (*Id.* ¶ 558.)

In sum, the Complaint affirmatively—and emphatically—alleges that the Hussein Regime orchestrated the wrongful conduct with defendants' assistance. Defendants certainly do not cavil with the allegations that the Hussein Regime committed wrongful conduct and the Court accepts the Complaint's allegations for the purposes of this motion. Because this Court has concluded as a legal matter that the Hussein Regime's acts are attributable to plaintiff, the Republic of Iraq, the Complaint's allegations bring the Complaint within the scope of the in pari delicto doctrine. *Bateman Eichler*, 472 U.S. at 306.

> b.  *Application of the in pari delicto doctrine does not offend public policy.*

"[T]he application of the doctrine does not offend public policy by interfering with the enforcement of [the RICO] statute." *See id.* Other courts have already determined that in pari delicto may bar recovery pursuant to the RICO statutes without hindering the statutes' enforcement. *See Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008) (*"[I]n pari delicto* is a cognizable defense to a civil RICO claim."); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1153-56 (11th Cir. 2006); *Acme Am. Repairs, Inc. v. Katzenberg*, No. 03 Civ. 4740, 2012 WL 3307426, at *1 (E.D.N.Y. Aug. 13, 2012). This Court joins them. The scheme alleged here involved both defendants and Iraq, acting together to frustrate an international sanctions regime. "It would be anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute." *Edwards*, 437 F.3d at 1155.

42

### 2. *Iraq's purported exceptions to in pari delicto do not apply.*

The Republic of Iraq attempts to forestall the application of the defense of in pari delicto by invoking various exceptions. None saves its claims.

#### a. *The adverse interest exception does not allow Iraq to sever itself from Hussein's acts.*

Iraq contends that the Complaint contains allegations that, if read in Iraq's favor, would suffice to reach the discovery stage because of the "adverse interest exception." (Iraq's Opp. 29.) The adverse interest exception shields a corporation from the consequences of its agent's acts in narrow circumstances: "the agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes. It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) (quoting *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985)).

Even if this rule were available to sovereigns, and there is no case law that suggests it is, it would not aid the plaintiff. The Complaint does not allege the type of abandonment contemplated by the exception. For instance, Iraq analogizes its position to that of the trustee in *Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche USA LLP*, 2007 WL 1491403. In that decision, this Court allowed the trustee's claim to proceed despite indications in the complaint that the company shared blame for the harms it attributed to its auditors. *Id.* at *1. But Iraq's Complaint here does not allege that its agent's actions were taken for the exclusive benefit of the agent, as did the complaint in *Buckley*. To the contrary, the Complaint indicates that Hussein Regime pursued the corruption as an official policy. (*E.g.*, Compl. ¶ 7.) Further, the examples of self-dealing highlighted by Iraq all relate, in one way or another, to Saddam Hussein's efforts to "solidify" his own power. (Iraq's Opp. 30 (citing Compl. ¶¶ 7, 1178, 1200).) But "[t]o allow a corporation to avoid the consequences of corporate acts simply because an employee performed them with his personal profit in mind would enable the corporation to disclaim, at its convenience, virtually every act its officers undertake." *Kirschner*, 15 N.Y.3d at 467. Accordingly,

the Hussein Regime's actions are not "adverse" within the meaning of this doctrine simply because the actions solidified the Regime's power.

Finally, Iraq urges that sovereigns are permitted to remedy the harm caused by bribes paid to their agents. Yet the presence of bribery allegations in this action does not change the result. For example, in *City of New York v. Corwen*, relied on by Iraq, the Appellate Division, First Department rejected the argument that the municipality was in pari delicto with a defendant who bribed a city official. Iraq contends that it similarly cannot be barred by in pari delicto. 164 A.D.2d 212, 218 (1st Dep't 1990), *abrogated on other grounds by City of N.Y. v. Keene Corp.*, 304 A.D.2d 119 (1st Dep't 2003). But the court in *Corwen* concluded that there were no allegations of "any fault on the city's part equal to the alleged fault of defendants" and that the bribed official had "totally abandoned" the City's interests. *Corwen*, 164 A.D.2d at 218. The court made no special exception for cases involving governments and bribery. Accordingly, Iraq's allegations—which demonstrate the equal fault of Iraq by virtue of the acts of its government—do not fall beyond the scope of in pari delicto simply because they concern bribery.

> b.    *In pari delicto may be asserted against foreign states that litigate as plaintiffs in United States courts.*

Iraq next contends that "the *in pari delicto* defense is inapplicable when the government is acting in its sovereign capacity to exercise public rights to protect the public interest." (Iraq's Opp. 30 (quotation marks omitted).) Iraq attributes this proposition to *United States v. Philip Morris*, where the U.S. District Court for the District of Columbia wrote that "when, as here, the Government acts in the public interest the unclean hands doctrine is unavailable as a matter of law." 300 F. Supp. 2d 61, 75 (D.D.C. 2004).

The court's observation does not aid Iraq. First, the "Government" the district court was referring to was the government of the United States of America, not a foreign government. Iraq points the Court to no rule of law that exempts *foreign* governments from equitable defenses when they purport to act on behalf of their people. Second, the statement did not concern in pari delicto, but unclean hands. As to in pari delicto, the court concluded that "there is no claim that the Government has violated the

law in cooperation with the defendants." *Id.* at 76 (quotation marks omitted). By contrast, Iraq has alleged that its former government did conspire with the defendants to violate numerous domestic, international, and UN regulations.

### D.  Iraq has failed to allege proximate cause.

To state a claim for civil RICO, "the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp. v. City of N.Y.*, 559 U.S. 1, 130 S. Ct. 983, 989 (2010) (quotation marks omitted). The Complaint lacks these allegations. Therefore, even if Iraq's application of the RICO statute were not extraterritorial, it would nevertheless fail for want of proximate causation.

Iraq's alleged injury is the diversion of its oil wealth. But to connect that injury to the predicate acts here, Iraq traces defendants' conduct into the Programme, through the Programme apparatus, and then out again. It also omits its own conduct from the causal chain. This creates two grounds for concern:

First, Iraq's injury results from Iraq's and defendants' representations to the UN, the UN's approval of the contracts, the UN's directing BNP to accept or release escrow funds, and defendants' capturing or diverting profit from Iraq pursuant to an illicit agreement with the Hussein Regime. All told, the UN approval and letter of credit process required at least eleven different steps by five different entities: the UN, the U.S. Treasury Department, BNP, Iraq, and a defendant. (Compl. ¶ 340.) Thus, any injury caused by defendants' fraudulent wires and mailings—that is, the harm of the predicate acts—happens after being instigated by the Hussein Regime and then mediated through the UN, its bank, and the U.S. government. The causal chain's reliance on the actions of Iraq and third-parties indicates that it is too attenuated to support recovery. *See Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 271 (1992).

Second, and most significantly, the Complaint alleges that defendants' racketeering activity harmed plaintiff indirectly. In an effort to cast its RICO claim as not extraterritorial, plaintiff only focuses on racketeering

45

activity directed at the Programme to obtain unwarranted contract approval and fund transfers. This racketeering activity caused "[d]iversions of payments from the Escrow Account [that] deprived the Programme of needed funds" (Compl. ¶ 390) and "severely damaged the UN's ability to use economic sanctions as a nonviolent means of inducing change in tyrannical and terrorist regimes" (*id*. ¶1132). Put this way, the direct victim of defendants' racketeering activity is the UN. Because defendants' predicate acts were only an indirect cause of Iraq's injury, the Republic of Iraq may not recover pursuant to RICO. *See Hemi*, 130 S. Ct. at 990; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

True for all defendants, this causal remoteness even more significantly alienates BNP from liability. Iraq does not allege that BNP purchased oil or sold goods. It does not allege that BNP approved the contracts for oil or goods negotiated between the other defendants and Iraq. Rather, it alleges that BNP maintained the UN escrow account and, in doing so, violated mail fraud, wire fraud, and travel act prohibitions. Because BNP released and accepted funds into the UN escrow account at the UN's direction, however, BNP's servicing of that account cannot have been the proximate cause of Iraq's injury; the harmfulness of BNP's actions is contingent on whether the UN's directions were premised on a fraudulent submission by others. Contingent relationships of this sort are too indirect to support RICO recovery. *Holmes*, 503 U.S. at 271.

* * *

In sum, Iraq's two RICO claims fail for three reasons. First, application of the RICO statute would be extraterritorial and thus impermissible. The Complaint alleges a scheme directed by a foreign government, conducted through and around a multinational organization, exacting a toll on a foreign plaintiff. Second, the Complaint alleges that the Hussein Regime conceived and orchestrated the wrongful conduct with defendants' assistance and thus it cannot proceed due to the defense of in pari delicto. Third, the Complaint fails to allege that the pattern of racketeering activity was the proximate cause of Iraq's injury.

The Court thus need not reach the other asserted bases for dismissal of Iraq's RICO claims, including statute of limitations, the adequacy of Iraq's

allegations with respect to the "operating" of the enterprise, and the sufficiency of its allegations with respect to each defendant's role in the conspiracy.

## VI. FOREIGN CORRUPT PRACTICES ACT

Iraq alleges that defendants violated the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq*. Numerous authorities have concluded that the FCPA offers no private right of action. *E.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 412 (S.D.N.Y. 2009); *J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*, 937 F. Supp. 216, 226-27 (S.D.N.Y. 1996); *Citicorp Int'l. Trading Co. v. W. Oil & Ref. Co.*, 771 F. Supp. 600, 607 (S.D.N.Y. 1991). In fact, Iraq points to no jurist—of any court—who has concluded otherwise. This Court agrees with the weight of authority. Accordingly, Iraq's FCPA claim is dismissed pursuant to Rule 12(b)(6).

## VII.    COMMON LAW CLAIMS

Having dismissed Iraq's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining common law claims pursuant to 28 U.S.C. § 1367(c)(3). *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F. 3d 1182, 1187 (2d Cir. 1996).

To the extent that Iraq contends that its fraud claim rests on federal common law, rather than New York common law, the Court disagrees. Iraq purports to invoke federal common law because of "this case's relation to the United Nations and international relations." (Iraq's Opp. 84.) But relation to international entities does not mandate the application of federal common law. If it did, all cases with foreign sovereigns would apply federal common law. Moreover, Iraq has sued corporations, not current or former officials. A foreign government's dispute with a private enterprise over corruption in their relationship does not implicate "uniquely federal interests," nor does New York's common law of fraud conflict in this circumstance with any federal policy. *See, e.g.*, *Boyle v. United Tech. Corp.*, 487 U.S. 500, 504, 507 (1988). Thus, this is "not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 89 (1994).

Nor do the remaining state law claims contain a "question qualified as substantial," the resolution of which would be "dispositive of the case and would be controlling in numerous other cases" sufficient to create an independent basis of federal jurisdiction pursuant to 28 U.S.C. § 1331. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006) (quotation marks omitted). That was the circumstance in *Republic of the Philippines v. Marcos*, which sought to uniformly resolve a foreign state's action to seize property located in the United States. 806 F.2d 344, 354 (2d Cir. 1986). It is not so here.

Accordingly, the Court declines to exercise jurisdiction over the state law claims. If those claims did arise under federal law, the Court would dismiss them on the grounds that Iraq has failed to allege causation and is barred by the in pari delicto doctrine.

## VIII.  CONCLUSION

The grave allegations of the Complaint paint a picture of a people oppressed and of a repressive government resolved to frustrate the international community's efforts to intervene to assist the Iraqi people. While the Court has concluded that the Republic of Iraq does not have standing to recover as parens patriae for injuries to its people, Iraq does have standing to recover for harms to its proprietary interests in the UN escrow account. Additionally, adjudication of Iraq's claims does not run afoul of the act of state or political question doctrines. The issues decided here are legal, not political, notwithstanding the international political context of the action.

The first issue concerns attribution. The Complaint alleges injustices instigated and in large measure directed by Saddam Hussein and his Regime. But the Complaint unmistakably alleges that the wrongful conduct of the Hussein Regime was of a governmental character, pursued for purportedly public purposes, and undertaken by the governmental authorities in Iraq. As a result, that government, however deplorable it may have been, represented Iraq and its acts, however allegedly depraved, are attributable to the sovereign.

48

The second issue concerns territoriality. The RICO and RICO conspiracy claims focus on a multinational enterprise—the UN Oil-for-Food Programme—and concern, in large part, activity occurring in Iraq. As a result, these claims are dismissed as impermissible extraterritorial applications of the RICO statute. In the alternative, these claims would fail on the basis of the in pari delicto doctrine and the absence of allegations of proximate causation.

The third issue is the existence vel non of a private right of action pursuant to the Foreign Corrupt Practices Act. That claim fails because the statute does not afford a private remedy.

The final issue is supplemental jurisdiction. The remaining claims arise under state law and the Court has declined to exercise supplemental jurisdiction over them.

These holdings—on attribution, territoriality, private remedies, and supplemental jurisdiction—resolve the action. Accordingly, the Complaint is dismissed with prejudice. In reaching this result, the Court does not reach the various issues raised by defendants as to whether the claims are otherwise pled adequately or whether the statute of limitations bars recovery on any or all causes of action.

Dated:  New York, New York
        February 6, 2013

SO ORDERED:

_Sidney H. Stein_

Sidney H. Stein, U.S.D.J.

49

SPA-50

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE REPUBLIC OF IRAQ, including as PARENS
PATRIAE on behalf of the CITIZENS of the
REPUBLIC OF IRAQ,

                   Plaintiff,

        -against-

ABB AG, et al.,

                  Defendants.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/13

08 **CIVIL** 5951 (SHS)

**JUDGMENT**

       Defendants having moved to dismiss Iraq's First Amended Complaint, and the matter having

come before the Honorable Sidney H. Stein, United States District Judge, and the Court, on February

6, 2013, having rendered its Opinion and Order dismissing the complaint with prejudice, it is,

       **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated February 6, 2013, the complaint is dismissed with prejudice.

**Dated:** New York, New York
       February 14, 2013

                           **RUBY J. KRAJICK**

                           **Clerk of Court**

          **BY:**

                           **Deputy Clerk**

               **THIS DOCUMENT WAS ENTERED**
               ON THE DOCKET ON _____

| | | | |
|---|---|---|---|
| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
| | ) | ss.: | **BY OVERNIGHT EXPRESS** |
| COUNTY OF NEW YORK | ) | | **MAIL** |

I, Elias Melendez, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

**On June 4, 2013**

deponent served the within**: Brief and Special Appendix for Plaintiff-Appellant**

**upon:**

**SEE ATTACHED SERVICE LIST**

the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

**Sworn to before me on June 4, 2013**

**s/Maria Maisonet**                              **s/Elias Melendez**
   **MARIA MAISONET**
  Notary Public State of New York
    No. 01MA6204360
   Qualified in Queens County
Commission Expires Apr. 20, 2017                 **Job # 247659**

**SERVICE LIST:**

SCHIFF HARDIN LLP
666 Fifth Avenue, 17th Floor
New York, New York 10103
(212) 753-5000
*Attorneys for Defendant-Appellee Fiatavio*

FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, New York 10103
(212) 318-3000
*Attorneys for Defendant-Appellee El Paso Corp. Successor to Coastal Corp.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
*Attorneys for Defendant-Appellee Ingersoll Rand Benelux N.V. Paul*

PEPPER HAMILTON LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 808-2700
*Attorneys for Defendants-Appellees Glaxo Smithkline Egypt SAE, SmithKline Beecham International, Glaxo Wellcome SA South Africa PRY Ltd., GlaxoSmithKline Walls House and Glaxo Wellcome Export Ltd.*

CANALES & SIMONSON, P.C.
2601 Morgan Avenue
P.O. Box 5624
Corpus Christi, Texas 78405
(361) 883-0601
*Attorneys for Defendant-Appellee Oscar S. Wyatt, Jr.*

HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 783-0800
*Attorneys for Defendant-Appellee Solar Turbines Europe*

STATE OF NEW YORK    )
                                  )      ss.:        **AFFIDAVIT OF**
COUNTY OF NEW YORK  )                       **CM/ECF SERVICE**

        I, Mariana Braylovskiy, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

        **On June 4, 2013**

deponent served the within:  **Brief and Special Appendix for Plaintiff-Appellant**

        **upon:**

**See Attached Service List**

via the CM/ECF Case Filing System. All counsel listed on the attached service list are registered CM/ECF users. Filing and service were performed by direction of counsel.

**Sworn to before me on June 4, 2013**

**s/Maria Maisonet**                       **s/Mariana Braylovskiy**
   **MARIA MAISONET**
Notary Public State of New York
No. 01MA6204360
Qualified in Queens County
Commission Expires Apr. 20, 2017       **Job # 247659**

**SERVICE LIST:**

HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600

    – and –

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7000

*Attorneys for Defendants-Appellees*
   *BNP Paribas USA, BNP Paribus*
   *London Branch, BNP Paribas*
   *Paris, BNP Paribas Hong Kong,*
   *BNP Paribas Suisse SA, BNP*
   *Paribas UK Holdings Limited and*
   *BNP Paribas Suisse SA*

TROUTMAN SANDERS LLP
405 Lexington Avenue
New York, New York 10174
(212) 704-6000

*Attorneys for Defendants-Appellees*
   *AGCO Denmark AS, AGCO S.A.*
   *and Valtra do Brazil*

BAKER & MCKENZIE LLP
452 Fifth Avenue
New York, New York 10018
(212) 626-4100

*Attorneys for Defendants-Appellees*
   *Air Liquide Engineering, Ingersoll*
   *Rand Benelux N.V. Paul and Sulzer*
   *Buckhardt Engineering Works Ltd.*

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005
(202) 434-5000

*Attorneys for Defendants-Appellees*
   *David Brown Guinard Pumps S.A.S.,*
   *FKA Brown David Guinard Pumps*
   *S.A.S., David Brown Transmissions*
   *France S.A.,Union Pump S.A.S.,*
   *FKA David Brown Guinard Pump*
   *S.A.S. and Textron Inc. and Movant*

LEADER & BERKON, LLP
630 Third Avenue, 17th Floor
New York, New York 10017
(212) 486-2400

*Attorneys for Defendant-Appellee*
   *ABB Solyvent Ventec*

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

*Attorneys for Defendants-Appellees*
   *Akzo Nobel N.V., N.V. Organon*
   *Organon, Intervet International B.V.*
   *Intervet, Cilag AG International,*
   *Janssen Pharmaceutical, Merial and*
   *Astra Zeneca AB*

CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Defendant-Appellee*
   *AWB Ltd.*

ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, New York 10016
(212) 210-9400

*Attorneys for Defendants-Appellees
B. Braun Medical France, B. Braun
Melsungen A.G., B. Braun Medical
Industries SDN BHD Malaysia,
Aesculap AG and KG, Aesculap
Motric S.A. and Aesculap Surgical
Instruments SDN*

SPAGNOLETTI & CO.
401 Louisiana Avenue, 8th Floor
Houston, Texas 77002
(713) 653-5600

*Attorneys for Defendant-Appellee
David B. Chalmers, Jr.*

JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendants-Appellees
Chevron Corporation, including
as successor to Texaco Corp.,
and The Weir Group*

CALIHAN LAW PLLC
16 West Main Street, Suite 736
Rochester, New York 14614
(585) 232-5291

*Attorneys for Defendant-Appellee
Eastman Kodak S.A.*

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800

*Attorneys for Defendants-Appellees
Avio Flowserve Corp., Flowserve
Corp., Flowserve Pompes*

PARK & JENSEN LLP
630 Third Avenue, 7th Floor
New York, New York 10017
(646) 200-6300

*Attorneys for Defendant-Appellee
Boston Scientific S.A.*

SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 508-8000

*Attorneys for Defendants-Appellees
Buhler Ltd., Daimler Chrysler AG,
Sulzer Buckhardt Engineering Works
Ltd., Sulzer Pumpen Deutschland
GMBH, Sulzer Turbo Ltd., Renault
Trucks SAS, Renault V.I, Volvo
Construction Equipment AB, a
successor company to Volvo
Construction Equipment
International, and ABG Allgemeine
Baumaschinen GesellschaftmbH*

GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Defendants-Appellees
Daewoo International Corp. and
Kia Motors*

BOWIE & JENSEN LLC
10 East 40th Street, 25th Floor
New York, New York 10016
(212) 725-7500

*Attorneys for Defendants-Appellees
Evapco Europe S.R.L. and Evapco
(Austria)*

*formerly Ingersoll Dresser Pompes and Flowserve B.V.*

SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

*Attorneys for Defendants-Appellees Ingersoll Rand Italiana SPA, Thermo King Ireland Limited, Ingersoll Rand World Trade Ltd., Novo Nordisk and Eli Lilly Export S.A.*

NIXON PEABODY LLP
50 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 832-7500

*Attorneys for Defendant-Appellee Serono Pharma International*

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

*Attorneys for Defendant-Appellee Railtech International*

HARKINS CUNNINGHAM LLP
4000 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
(215) 851-6700

*Attorneys for Defendant-Appellee Rohm and Haas France S.A.*

CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, New York 10005
(212) 732-3200

*Attorneys for Defendant-Appellee St. Jude Medical Export GMBH*

KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
(202) 879-5000

*Attorneys for Defendants-Appellees ABB Automation, ABB AG, Siemens S.A.A. of France, Siemens Sanayi ve Ticaret A.S. of Turkey and Osram Middle East FZE*

LANDMAN CORSI BALLAINE
   & FORD P.C.
120 Broadway, 27th Floor
New York, New York 10271
(212) 238-4800

   – and –

WILLCOX & SAVAGE, P.C.
Wells Fargo Center
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
(757) 628-5500

*Attorneys for Defendants-Appellees Liebherr Export AG and Liebher France SA*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendants-Appellees F. Hoffman La Roche and Roche Diagnostics GMBH*

DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 988-2700

*Attorneys for Defendant-Appellee Renault Agriculture and Sonalika International*

K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900

*Attorneys for Defendant-Appellee*
  *Woodhouse International*

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000

*Attorneys for Defendant-Appellee*
  *Ebewe Pharma GES M.B.H.*

PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for Defendants-Appellees*
  *Atlas Copco CMT Sweden AB and*
  *Atlas Copco Airpower N.V.*

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendant-Appellee*
  *Vitol S.A.*

REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, New York 10022
(212) 521-5400

*Attorneys for Defendant-Appellee*
  *York Air Conditioning and*
  *Refrigeration FZE*

CADWALADER, WICKERSHAM
  & TAFT LLP
One World Financial Center
New York, New York 10281
(212) 504-6000

*Attorneys for Defendants-Appellees*
  *Dow AgroSciences S.A.S. and*
  *Dow Agrosciences LLC*

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street, 22nd Floor
New York, New York 10036
(212) 728-2200

*Attorneys for Defendant-Appellee*
  *Secalt S.A.*