# 13-618-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

THE REPUBLIC OF IRAQ, including as Parens Patriae in behalf of the Citizens of the Republic of Iraq,

*Plaintiff-Appellant,*

— v.—

SECALT S.A., BNP PARIBAS USA, BNP PARIBUS LONDON BRANCH, BNP PARIBAS PARIS, BNP PARIBAS HONG KONG, DRESSER INTERNATIONAL, DAVID BROWN GUINARD PUMPS S.A.S., FKA BROWN DAVID GUINARD PUMPS S.A.S., ATLAS COPCO CMT SWEDEN AB, ABB INDUSTRIE CHAMPAGNE,

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

Thomas D. Yannucci, P.C.
Brant W. Bishop, P.C.
John R. Bolton
Robert B. Gilmore
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

*Counsel for Defendants-Appellees
Siemens S.A.S. France, Siemens
Sanayi ve Ticaret A.Ş., and
OSRAM Middle East FZE*

September 10, 2013

(*Counsel continued on inside covers*)

ABB Near East Trading Ltd., ABB Solyvent Ventec, AGCO Denmark AS, AGCO S.A., Valtra do Brazil, Air Liquide Engineering, Akzo Nobel N.V., N.V. Organon Organon, Intervet International B.V. Intervet, Mais Co. for Medical Products, Atlas Copco CMT, AWB Ltd., B. Braun Medical France, B. Braun Melsungen A.G., B. Braun Medical Industries SDN BHD Malaysia, Aesculap AG and KG, Aesculap Motric S.A., Aesculap Sugical Instruments SDN, Boston Scientific S.A., Fiatavio, BNP Paribas Suisse SA, Glaxo Wellcome Export Ltd., ABB Industrie AC Machines, BNP Paribas UK Holdings Limited, ABB Elektric Sanayi AS, BNP Paribas Suisse SA, Buhler Ltd., David B. Chalmers, Jr., Chevron Corporation, including as successor to Texaco Corp., Daewoo International Corp., Daimler Chrysler AG, Dow Agrosciences, Eastman Kodak S.A., El Paso Corp. successor to Coastal Corp., Evapco Europe S.R.L., Avio Flowserve Corp., Flowserve Corp., Flowserve Pompes Formely Ingersoll Dresser Pompes, Flowserve B.V., GlaxoSmithKline Walls House, Glaxo Smithkline Egypt SAE, SmithKline Beecham International, ABB Automation, ABB AG, Ingersoll Rand Italiana SPA, Rand Italiana, SPA, Glaxo Wellcome SA South Africa PRY Ltd., Thermo King Ireland Limited, Ingersoll Rand Benelux N.V. Paul, Ingersoll Rand World Trade Ltd., Cilag AG International, Janssen Pharmaceutical, Kia Motors, Liebherr Export AG, Liebherr France SA, Serono Pharma International, Merial, Novo Nordisk, Pauwels, Railtech International, F. Hoffman La Roche, Roche Diagnostics GMBH, Rohm and Haas France S.A., Siemens S.A.A. of France, Siemens Sanayi ve Ticaret A.S. of Turkey, Osram Middle East FZE, Solar Turbines Europe, St. Jude Medical Export GMBH, Sulzer Buckhardt Engineering Works Ltd., Sulzer Pumpen Deutschland GMBH, Sulzer turbo Ltd., Textron Inc., Evapco (Austria), David Brown Transmissions France S.A., Renault Trucks SAS, Renault Agriculture and Sonalika International, Renault V.I, Volvo Construction Equiptment AB, a successsor company to Volvo Construction Equiptment International, The Weir Group, Oscar S. Wyatt, Jr., Vital S.A., Woodhouse International, York Air Conditioning and Refrigeration FZE, Union Pump S.A.S., FKA David Brown Guinard Pump S.A.S., Atlas Copco Airpower n.v., Eli Lilly Export S.A, Astra Zeneca AB, Ebewe Pharma GES M.B.H., Dow AgroSciences S.A.S., Dow Agrosciences LLC, ABG Allgemeine Baumaschinen GesellschaftmbH, Clyde Union S.A.S., FKA Union Pumps S.A.S., FKA David Brown Guinard Pumps S.A.S.,

*Defendants-Appellees.*

## ADDITIONAL COUNSEL

John D. Harkrider
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2210

Gail L. Gottehrer
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8195

*Counsel for Defendant-Appellee Tractel Secalt S.A. (formerly Secalt S.A.)*

Robert S. Bennett
Christopher T. Handman
Ellen S. Kennedy
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Jennifer L. Spaziano
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

*Counsel for Defendants-Appellees BNP Paribas USA, BNP Paribas London Branch, BNP Paribas Paris, BNP Paribas Hong Kong, BNP Paribas U.K. Holdings, and BNP Paribas (Suisse) SA*

Robert A. Van Kirk
Katherine M. Turner
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Counsel for Defendants-Appellees Clyde Union S.A.S., David Brown Transmissions France, S.A., and Textron, Inc.*

John F. Pritchard
Edward Flanders
Ranah L. Esmaili
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036
(212) 858-1000

*Counsel for Defendants-Appellees Atlas Copco CMT Sweden AB and Atlas Copco Airpower N.V.*

James P. Gillespie, P.C.
Karen McCartan DeSantis
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

*Counsel for Defendants-Appellees ABB
AG, ABB Electrik Sanayi A.Ş., ABB
France SAS (successor in interest to
ABB Automation SAS and to ABB
Industrie Champagne by way of its
merger into ABB Automation SAS),
ABB Industrie AC Machines (now ABB
Industrie, AG/ABB Schweiz AG), and
ABB Near East Trading Ltd.*

Michael J. Tiffany
LEADER & BERKON LLP
630 Third Avenue
New York, NY  10017
(212) 486-2400

Christopher S. Riley
BARNES & THORNBURG LLP
121 W. Franklin Street, Suite 200
Elkhart, IN  46516
(574) 293-0681

*Counsel for Defendant-Appellee ABB
Solvent Ventec*

Elliot Cohen
TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0700
(212) 704-6000

*Counsel for Defendants-Appellees
AGCO Danmark A/S (erroneously
named as AGCO Denmark A/S), AGCO
S.A., and Valtra do Brasil Ltda.
(erroneously named as Valtra do
Brazil)*

Darrell Prescott
BAKER & MCKENZIE LLP
452 Fifth Avenue
New York, NY  10018
(212) 626-4476

*Counsel for Defendant-Appellee Air
Liquide Engineering*

Nancy Kestenbaum
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018-1405
(212) 841-1000

Mark H. Lynch
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000

*Counsel for Defendants-Appellees Akzo
Nobel N.V., AstraZeneca AB, CILAG
AG International, Intervet
International B.V., Janssen
Pharmaceutical, Merial SAS, and N.V.
Organon*

Karl Geercken
ALSTON & BIRD LLP
90 Park Avenue
New York, NY  10016
(212) 210-9400

*Counsel for Defendants-Appellees
Aesculap AG (improperly named as
Aesculap AG & KG), Metec Motric
S.A. Medizintechnik (improperly named
as Aesculap Motric S.A.), Aesculap
Surgical Instruments SDN BHD
(improperly named as Aesculap
Surgical Instruments SDN), B. Braun
Medical S.A.S. (improperly named as
B. Braun Medical France), B. Braun
Melsungen A.G., and B. Braun Medical
Industries SDN BHD*

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY  10019
(212) 474-1000

*Counsel for Defendant-Appellee AWB
Limited (now known as Agrium Asia
Pacific Limited)*

Tai H. Park
PARK & JENSEN LLP
630 Third Avenue
New York, NY  10017
(646) 200-6310

*Counsel for Defendant-Appellee
Boston Scientific S.A.S.*

Robert L. Hickok
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Kenneth J. King
PEPPER HAMILTON LLP
New York Times Building
37th Floor
620 Eighth Avenue
New York, NY  10018-1405
(212) 808-2700

*Counsel for Defendants-Appellees
GlaxoSmithKline International Ltd.,
GlaxoSmithKline Export Ltd.,
GlaxoSmithKline S.A.E., and
GlaxoSmithKline South Africa (Pty)
Ltd.*

Philip E. Urofsky
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C.  20005
(202) 508-8060

Danforth Newcomb
H. Miriam Farber
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022
(212) 848-4000

*Counsel for Defendants-Appellees
Renault Trucks S.A.S. (formerly
known as Renault V.I.), ABG
Allgemeine Baumaschinen-
Gesellschaft mbH, Volvo Construction
Equipment AB (a successor company
to Volvo Construction Equipment
International), Sulzer Pumpen
(Deutschland) GmbH, Sulzer Turbo
Ltd. (now known as Sulzer Markets
and Technology AG), Bühler AG
(incorrectly named as Buhler Ltd.),
and Daimler Chrysler AG (now known
as Daimler AG)*

Francis I. Spagnoletti
David S. Toy
SPAGNOLETTI & CO.
401 Louisiana Street, 8th Floor
Houston, TX  77002
(713) 653-5600

*Counsel for Defendant-Appellee David
B. Chalmers, Jr.*

Meir Feder
Thomas E. Lynch
JONES DAY
222 East 41st Street
New York, NY  10017
(212) 326-3939

*Counsel for Defendant-Appellee
Chevron Corporation*

Thomas R. Valen
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500

*Counsel for Defendants-Appellees
Daewoo International Corp. and Kia
Motors Corporation (erroneously
named as Kia Motors)*

Jason Jurgens
Nathan M. Bull
CADWALADER, WICKERSHAM &
  TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000

*Counsel for Defendants-Appellees
Dow AgroSciences LLC and Dow
AgroSciences S.A.S.*

Mark A. Robertson
FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, NY 10103-3198
(212) 318-3304

*Counsel for Defendant-Appellee El
Paso LLC (named as El Paso Corp.)*

R. Michael Smith
BOWIE & JENSEN, LLC
29 W. Susquehanna Ave., Suite 600
Towson, MD 21204
(410) 583-2400

*Counsel for Defendant-Appellee
Evapco Europe S.r.l.*

Thomas B. Kinzler
David Zalman
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800

*Counsel for Defendants-Appellees*
*Flowserve Corporation, Flowserve*
*Pompes S.A.S., and Flowserve B.V*

Richard D. Klingler
Steven J. Horowitz
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Dorothy J. Spenner
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

*Counsel for Defendants-Appellees Eli*
*Lilly Export S.A., Novo Nordisk A/S,*
*Ingersoll-Rand Italiana S.p.A.,*
*Ingersoll-Rand World Trade Ltd., and*
*Thermo King Ireland Ltd.*

Robert P. Parker
ROTHWELL, FIGG, ERNST &
    MANBECK, P.C.
607 14th Street, N.W.
Washington, D.C. 20005
(202) 783-6040

*Counsel for Defendant-Appellee*
*Doosan Infracore Benelux SA (as*
*successor to Ingersoll Rand Benelux*
*N.V.)*

Brett A. Spain
WILLCOX & SAVAGE P.C.
440 Monticello Avenue
Wells Fargo Center, Ste. 2200
Norfolk, VA 23510
(757) 628-5500

*Counsel for Defendants-Appellees*
*Liebherr Expert AG and Liebherr*
*France, SA*

Michael S. Cohen
NIXON PEABODY LLP
Suite 300
50 Jericho Quadrangle
Jericho, NY  11753
(516) 832-7500

*Counsel for Defendant-Appellee*
*Serono Pharma International*

Peter L. Altieri
David J. Clark
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY  10177
(212) 351-4500

*Counsel for Defendant-Appellee*
*Railtech International SA*

John G. Harkins, Jr.
HARKINS CUNNINGHAM LLP
4000 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103-7044
(215) 851-6700

*Counsel for Defendant-Appellee Rohm*
*and Haas France, S.A.S.*

John P. Doherty
ALSTON & BIRD LLP
90 Park Avenue
New York, NY  10016
(212) 210-9400

*Counsel for Defendant-Appellee CG*
*Holdings Belgium N.V. (f/k/a Pauwels*
*International N.V.)*

Brian S. Weinstein
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY  10017
(212) 450-4000

Jason McCullough
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, D.C.  20005
(202) 962-7000

*Counsel for Defendants-Appellees F.*
*Hoffmann-La Roche Ltd and Roche*
*Diagnostics GmbH*

Gregory L. Baker
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 861-1696

*Counsel for Defendant-Appellee Solar*
*Turbines Europe S.A.*

Judith A. Lockhart, Esq.
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
(212) 238-8603

*Counsel for Defendant-Appellee St. Jude Medical Export GmbH*

Lawrence Walker Newman
BAKER & McKENZIE LLP
452 Fifth Avenue
New York, NY 10018
(212) 891 3970

*Counsel for Defendant-Appellee Burckhardt Compression AG (named as Sulzer Buckhardt Engineering Works Ltd.)*

Clay J. Pierce
DRINKER BIDDLE & REATH, LLP
1177 Avenue of the Americas,
    41st Floor
New York, NY 10036-2714
(212) 248-3140

*Counsel for Defendant-Appellee Renault Agriculture & Sonalika International*

Michael H. Ginsberg
JONES DAY
500 Grant Street
Suite 4500
Pittsburgh, PA 15219
(412) 391-3939

*Counsel for Defendant-Appellee The Weir Group PLC*

J. A. Canales
CANALES & SIMONSON, P.C.
Attorneys at Law
2601 Morgan Avenue - P.O. Box 5624
Corpus Christi, TX 78465-5624
(361) 883-0601

*Counsel for Defendant-Appellee Oscar S. Wyatt, Jr.*

Penny Shane
Andrew P. Giering
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4837

*Counsel for Defendant-Appellee Vitol S.A.*

Walter P. Loughlin
K&L GATES
599 Lexington Avenue
New York, NY  10022-6030
(212) 536-4065

Andrew Siegel
Christopher A. Payne
SANDLER SIEGEL, PLLC
6600 LBJ Freeway
Suite 183
Dallas, TX  75240
(972) 284-0731

*Counsel for Defendant-Appellee
Woodhouse International, LLC*

Casey D. Laffey, Esq.
REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, NY  10022
(212) 549-0389

*Counsel for Defendant-Appellee
Johnson Controls Air Conditioning
and Refrigeration FZE (f/k/a York
Airconditioning & Refrigeration FZE)*

## DEFENDANTS-APPELLEES'
## RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

### ABB AG

ABB AG (also known as ABB Austria), by and through its undersigned counsel, hereby certifies that it is 99.9% owned by ABB Holding B.V.; that ABB Holding B.V. is a wholly-owned subsidiary of ABB Ltd., a publicly-held corporation organized under the laws of the Swiss Confederation; and that no other publicly-held corporation owns 10% or more of ABB AG's stock.

### ABB Elektrik Sanayi, A.Ş.

ABB Elektrik Sanayi, A.Ş., by and through its undersigned counsel, hereby certifies that it is 99.99% owned by ABB Holding A.S. Turkey; that ABB Holding A.S. Turkey is a wholly-owned subsidiary of ABB Ltd., a publicly-held corporation organized under the laws of the Swiss Confederation; and that no other publicly-held corporation owns 10% or more of ABB Elektrik Sanayi, A.Ş.'s stock.

### ABB France SAS

ABB France SAS (successor to ABB Automation SAS and ABB Industrie Champagne), by and through its undersigned counsel, hereby certifies that it is successor to ABB Entrelec SAS; that ABB Entrelec SAS is successor to ABB Automation SAS and ABB Industrie Champagne; that ABB France SAS is 99.83% owned by ABB S.A. France; that ABB S.A. France is a wholly-owned subsidiary of ABB Ltd., a publicly-held corporation organized under the laws of the Swiss Confederation; and that no other publicly-held corporation owns 10% or more of ABB France SAS's stock.

### ABB Near East Trading Ltd.

ABB Near East Trading Ltd., by and through its undersigned counsel, hereby certifies that it is 95% owned by ABB Ltd. Jordan LLC and 5% owned by Mr. Musalam Wajeeh Bseiso; that ABB Ltd. Jordan LLC is a wholly-owned subsidiary of ABB Ltd., a publicly-held corporation organized under the laws of the Swiss Confederation; and that no other publicly-held corporation owns 10% or more of ABB Near East Trading Ltd.'s stock.

i

## ABB Schweiz AG

ABB Schweiz AG (successor to ABB Industrie AG, incorrectly named as ABB Industrie AC Machines in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a wholly-owned subsidiary of ABB Ltd., a publicly-held corporation organized under the laws of the Swiss Confederation; and that no other publicly-held corporation owns 10% or more of ABB Schweiz AG's stock.

## ABB Solyvent Ventec

ABB Solyvent Ventec (named as ABB Solyvent-Ventec in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a wholly-owned subsidiary of Ventilation Holding France SAS and that no other publicly-held corporation owns 10% or more of its stock.

## ABG Allgemeine Baumaschinen-Gesellschaft mbH

ABG Allgemeine Baumaschinen-Gesellschaft mbH ("ABG"), by and through its undersigned counsel, hereby certifies that it is a wholly-owned, indirect subsidiary of AB Volvo. No other publicly-held corporation owns 10% or more of ABG.

## Aesculap AG

Aesculap AG (named as Aesculap AG & Co. KG in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Germany. Aesculap AG's direct corporate parent is B. Braun Surgical GmbH and its indirect corporate parent is B. Braun Melsungen AG. There are no publicly-held corporations owning 10% or more of its stock.

## Aesculap Surgical Instruments SDN BHD

Aesculap Surgical Instruments SDN BHD (alternately named as Aesculap Surgical Instruments SDN in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Malaysia. Aesculap Surgical Instruments SDN BHD's direct corporate parent is B. Braun Medical Industries SDN BHD and its indirect corporate parent is B. Braun Melsungen AG. There are no publicly-held corporations owning 10% or more of its stock.

### AGCO Danmark A/S

AGCO Danmark A/S (erroneously named as AGCO Denmark A/S in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a direct subsidiary of AGCO A/S and is an indirect subsidiary of AGCO Corporation.  AGCO Corporation is a publicly-held company, which indirectly owns 10% or more of AGCO Danmark A/S's stock.  No publicly-held company other than AGCO Corporation owns 10% or more of AGCO Danmark A/S's stock.

### AGCO S.A.

AGCO S.A., by and through its undersigned counsel, hereby certifies that it is a direct subsidiary of AGCO France S.A. and is an indirect subsidiary of AGCO Corporation.  AGCO Corporation is a publicly-held company, which indirectly owns 10% or more of AGCO S.A.'s stock.  No publicly-held company other than AGCO Corporation owns 10% or more of AGCO S.A.'s stock.

### Air Liquide Engineering

Air Liquide Engineering, by and through its undersigned counsel, hereby certifies that its parent company is L'Air Liquide S.A. and no other company owns 10% or more of Air Liquide Engineering's stock.

### Akzo Nobel N.V.

Akzo Nobel N.V., by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of The Netherlands.  Akzo Nobel N.V. has no parent corporation, and no publicly-held corporation holds 10% or more of Akzo Nobel N.V.'s stock.

### AstraZeneca AB

AstraZeneca AB, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Sweden.  AstraZeneca AB is an indirect subsidiary of AstraZeneca PLC, a publicly-held corporation that holds more than 10% of AstraZeneca AB's stock.  No other publicly-held corporation owns 10% or more of AstraZeneca AB's stock, and no publicly-held corporation owns 10% or more of AstraZeneca PLC.

## Atlas Copco Airpower N.V.

Atlas Copco Airpower N.V., a corporation organized under the laws of the Kingdom of Belgium, hereby certifies by and through its undersigned counsel that it is a wholly-owned subsidiary of its ultimate parent Atlas Copco AB, a corporation organized under the laws of the Kingdom of Sweden with its principal place of business in Nacka, Sweden, which is a publicly-traded company, and that no other publicly-held corporation owns 10% or more of Atlas Copco Airpower N.V.'s stock.

## Atlas Copco CMT Sweden AB

Atlas Copco CMT Sweden AB, a corporation organized under the laws of the Kingdom of Sweden, hereby certifies by and through its undersigned counsel that it is a wholly-owned subsidiary of its ultimate parent Atlas Copco AB, a corporation organized under the laws of the Kingdom of Sweden with its principal place of business in Nacka, Sweden, which is a publicly-traded company, and that no other publicly-held corporation owns 10% or more of Atlas Copco CMT Sweden AB's stock.

## Agrium Asia Pacific Limited

Agrium Asia Pacific Limited (named as AWB, Ltd. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a registered public company incorporated under the Australian Corporations Act of 2001. Agrium Asia Pacific Limited is a wholly-owned subsidiary of its ultimate corporate parent, Agrium Inc. Agrium Inc. is a publicly-traded company (NYSE: AGU; TSX: AGU) organized under the laws of Canada with its principal place of business in Calgary, Canada. No publicly-held corporation owns 10% or more of Agrium Inc.'s stock.

## B. Braun Medical Industries SDN BHD

B. Braun Medical Industries SDN BHD (named as B. Braun Medical Industries SDN BHD (Malaysia) in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Malaysia. B. Braun Medical Industries SDN BHD's direct corporate parent is B. Braun Melsungen AG. There are no publicly-held corporations owning 10% or more of its stock.

## B. Braun Medical S.A.S.

B. Braun Medical S.A.S. (alternately named as B. Braun Medical France in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France.  B. Braun Medical S.A.S.'s direct corporate parent is B. Braun Melsungen AG.  There are no publicly-held corporations owning 10% or more of its stock.

## B. Braun Melsungen AG

B. Braun Melsungen AG (named as B. Braun Melsungen A.G. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Germany.  B. Braun Melsungen AG has no corporate parent.  There are no publicly-held corporations owning 10% or more of its stock.

## BNP Paribas

BNP Paribas (whose branches were named as BNP Paribas Paris, BNP Paribas Hong Kong, BNP Paribas London Branch, and BNP Paribas USA in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France.  BNP Paribas is a French Public Limited Company, or "société anonyme," and has no corporate parent.  No publicly-held corporation owns 10% or more of BNP Paribas.

## BNP Paribas (Suisse) SA

BNP Paribas (Suisse) SA (named twice in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Switzerland.  BNP Paribas (Suisse) SA is owned by BNP Paribas and BNP Paribas International BV, Netherlands.  BNP Paribas International BV, Netherlands is wholly-owned by BNP Paribas.  BNP Paribas is the only publicly-held corporation owning 10% or more of BNP Paribas (Suisse) SA.

## BNP Paribas U.K. Holdings Limited

BNP Paribas U.K. Holdings Limited, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of the United Kingdom.  BNP Paribas U.K. Holdings Limited is a wholly-owned subsidiary of BNP Paribas.  BNP Paribas is the only publicly-held corporation owning 10% or more of BNP Paribas U.K. Holdings Limited.

## Boston Scientific S.A.S.

Boston Scientific S.A.S. (named as Boston Scientific S.A. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a stock corporation organized under the laws of France. Boston Scientific S.A.S. is a wholly-owned, indirect subsidiary of Boston Scientific Corporation, a publicly-held corporation traded on the New York Stock Exchange. No other corporation that is not a Boston Scientific entity owns 10% or more of Boston Scientific S.A.S.

## Bühler AG

Bühler AG (incorrectly named as Buhler Ltd. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a wholly-owned subsidiary of Bühler Holding AG. No publicly-held corporation owns 10% or more of Bühler AG.

## Burckhardt Compression AG

Burckhardt Compression AG (named as Sulzer Burckhardt Engineering Works Ltd. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Switzerland. Burckhardt Compression AG is 100% owned by Burckhardt Compression Holding AG, a corporation organized under the laws of Switzerland, which is listed on the SIX Swiss Stock Exchange. No other publicly-held corporation owns 10% or more of Burckhardt Compression AG.

## CG Holdings Belgium N.V.

CG Holdings Belgium N.V. (formerly known as Pauwels International N.V. and named as Pauwels in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a Belgian limited liability company which is wholly-owned by its parent company, Crompton Greaves Ltd. ("CG"). CG is a publicly listed Indian company whose shares are traded on the two National Stock Exchanges of India. Other than CG, no publicly-held corporation owns 10% or more of CG Holdings Belgium N.V.

## Chevron Corporation

Chevron Corporation, by and through its undersigned counsel, hereby certifies that it is a publicly-held corporation that has no parent corporation and in which no publicly-held corporation owns 10% or more of its stock.

vi

## **Cilag AG International**

Cilag AG International, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Switzerland. Cilag AG International is a wholly-owned subsidiary of Cilag AG. Cilag AG is a wholly-owned subsidiary of Cilag Holding AG. Cilag Holding AG is a wholly-owned subsidiary of Cordis Financing Corporation. Cordis Financing Corporation is owned by Johnson & Johnson International and DePuy Synthes, Inc. DePuy Synthes, Inc. is a wholly-owned subsidiary of Johnson & Johnson International. Johnson & Johnson International is a wholly-owned subsidiary of Johnson & Johnson. Johnson & Johnson is a publicly-held corporation, and no other publicly-held corporation owns 10% or more of its stock.

## **Clyde Union S.A.S.**

Clyde Union S.A.S. (successor to David Brown Guinard Pumps S.A.S. and Union Pumps S.A.S., which were also named defendants in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a limited liability company organized under the laws of France. Clyde Union S.A.S. is a wholly-owned subsidiary of Clyde Union (France) S.A.S., a French company. Clyde Union (France) S.A.S. is in turn a wholly-owned subsidiary of SPX France Holdings S.A.S., a French company. SPX France Holdings S.A.S. is in turn a wholly-owned subsidiary of SPX Clyde UK Limited, a U.K. company. SPX Clyde UK Limited is in turn a wholly-owned subsidiary of SPX Clyde Luxembourg S.à.r.l., a Luxembourg company. SPX Clyde Luxembourg S.à.r.l. is in turn a wholly-owned subsidiary of Johnston Ballantyne Holdings Limited, a U.K. company. Johnston Ballantyne Holdings Limited is in turn a wholly-owned subsidiary of Ballantyne Holding Company, a Cayman company. Ballantyne Holding Company is in turn 90% owned by Kayex China Holdings, Inc., a Delaware company. (The other 10% of Ballantyne Holding Company is held by Delaney Holdings Co., a privately-held corporation.) Kayex China Holdings, Inc. is in turn a wholly-owned subsidiary of SPX Corporation, a publicly-held corporation organized under the laws of the State of Delaware. SPX Corporation has no corporate parent. No publicly held corporation owns 10% or more of the stock of SPX Corporation.

## **Daewoo International Corporation**

Daewoo International Corporation (erroneously named as Daewoo International Corp. in the First Amended Complaint), by and through its

undersigned counsel, hereby certifies that POSCO is the only company that owns 10% or more of Daewoo International Corporation's stock.

### Daimler AG

Daimler AG (formerly known as Daimler Chrysler AG and named as Daimler-Chrysler AG in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a publicly-held corporation and does not have a parent corporation.  No publicly-held corporation owns 10% or more of Daimler AG.

### David Brown Transmissions France, S.A.

David Brown Transmissions France, S.A. ("DBTF"), by and through its undersigned counsel, hereby certifies that it is an inactive French subsidiary of David Brown Group Limited, a U.K. company.  David Brown Group Limited is in turn a subsidiary of David Brown Systems UK Limited, a Scottish company.  David Brown Systems UK Limited is in turn a subsidiary of David Brown Systems S.à.r.l., a Luxembourg company.   David Brown Systems S.à.r.l. is in turn a subsidiary of David Brown Systems (Holdings) S.à.r.l., a Luxembourg holding company.   There is no publicly-held corporation that owns 10% or more of DBTF's stock.

### Doosan Infracore Benelux SA

Doosan Infracore Benelux SA ("Doosan Benelux") (as successor to Ingersoll-Rand Benelux, N.V., a named defendant in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Belgium.  Doosan Benelux is a wholly-owned subsidiary of Doosan Holdings International Limited ("DHIL"), which, in turn, is wholly-owned by Doosan Holdings Europe Limited ("DHEL").   Both DHIL and DHEL are based in Ireland.  Doosan Infracore Co., Ltd. ("Doosan Infracore") and Doosan Engine Co., Ltd. ("Doosan Engine") have an ownership interest in DHEL.  Shares of Doosan Infracore and Doosan Engine are sold to the public on stock exchanges in the Republic of Korea.  No other publicly-held corporation owns 10% or more of Doosan Benelux.

### Dow AgroSciences LLC

Dow AgroSciences LLC, by and through its undersigned counsel, hereby certifies that it is a limited liability company organized under the laws of the State of Delaware, United States of America.  Dow AgroSciences LLC is a wholly-

owned, indirect subsidiary of The Dow Chemical Company, a publicly-held corporation traded on the New York Stock Exchange. No other corporation owns 10% or more of Dow AgroSciences LLC or The Dow Chemical Company.

### Dow AgroSciences S.A.S.

Dow AgroSciences S.A.S., by and through its undersigned counsel, hereby certifies that it is a simplified limited liability company organized under the laws of France. Dow AgroSciences S.A.S. is a wholly-owned, indirect subsidiary of The Dow Chemical Company, a publicly-held corporation traded on the New York Stock Exchange. No other publicly-held corporation owns 10% or more of Dow AgroSciences S.A.S. or The Dow Chemical Company.

### El Paso LLC

El Paso LLC (named as El Paso Energy Corporation in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a limited liability company organized under the laws of Delaware. El Paso LLC is a wholly-owned, indirect subsidiary of Kinder Morgan, Inc. Kinder Morgan, Inc. is a publicly-held corporation the common stock of which trades on the New York Stock Exchange under the symbol "KMI". No other corporation owns 10% or more of Kinder Morgan, Inc.

### Eli Lilly Export S.A.

Eli Lilly Export S.A. (named as Eli-Lilly Export S.A. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Switzerland. Eli Lilly Export S.A. is an indirect, wholly-owned subsidiary of Eli Lilly and Company. No other publicly-held corporation owns 10% or more of Eli Lilly Export S.A.

### Evapco Europe, S.r.l.

Evapco Europe, S.r.l. (named as Evapco Europe S.R.L. in the First Amended Complaint) is a corporation organized under the laws of Italy. Evapco Europe, S.r.l. is a wholly-owned, indirect subsidiary of Evapco, Inc., which is privately-held. There is no public corporation that owns 10% or more of Evapco Europe, S.r.l. or its parent companies.

## F. Hoffmann-La Roche Ltd

F. Hoffmann-La Roche Ltd, by and through its undersigned counsel, hereby certifies that it is a Swiss corporation organized and existing under the laws of Switzerland.  F. Hoffmann-La Roche Ltd is a wholly-owned subsidiary of Roche Holding Ltd, a publicly-traded Swiss corporation.  Upon information and belief, more than 10% of Roche Holding Ltd's voting shares are held either directly or indirectly by Novartis AG, a publicly-held Swiss corporation.

## Flowserve B.V.

Flowserve B.V., by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of the Netherlands.  It is a wholly-owned, indirect subsidiary of Flowserve Corporation.  No other corporation owns 10% or more of the stock of Flowserve B.V.

## Flowserve Corporation

Flowserve Corporation, by and through its undersigned counsel, hereby certifies that it is a publicly-traded corporation incorporated under the laws of New York.  No corporation owns 10% or more of the stock of Flowserve Corporation.

## Flowserve Pompes S.A.S.

Flowserve Pompes S.A.S. (named as Flowserve Pompes in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France.  It is a wholly-owned, indirect subsidiary of Flowserve Corporation.  No other corporation owns 10% or more of the stock of Flowserve Pompes S.A.S.

## GlaxoSmithKline Export Ltd.

GlaxoSmithKline Export Ltd. (named as Glaxo Wellcome Export Ltd. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of the United Kingdom. GlaxoSmithKline Export Ltd. is owned through several levels of subsidiaries by GlaxoSmithKline plc, a publicly-held English limited company.  To the knowledge of GlaxoSmithKline Export Ltd., none of the shareholders of GlaxoSmithKline plc owns beneficially 10% or more of its outstanding shares.

x

### GlaxoSmithKline International Ltd.

GlaxoSmithKline International Ltd. (named as SmithKline Beecham International in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of the United Kingdom.  GlaxoSmithKline International Ltd. is owned through several levels of subsidiaries by GlaxoSmithKline plc, a publicly-held English limited company.  To the knowledge of GlaxoSmithKline International Ltd., none of the shareholders of GlaxoSmithKline plc owns beneficially 10% or more of its outstanding shares.

### GlaxoSmithKline S.A.E.

GlaxoSmithKline S.A.E. (named as GlaxoSmithKline Egypt S.A.E. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Egypt. GlaxoSmithKline S.A.E. is owned through several levels of subsidiaries by GlaxoSmithKline plc, a publicly-held English limited company.  To the knowledge of GlaxoSmithKline S.A.E., none of the shareholders of GlaxoSmithKline plc owns beneficially 10% or more of its outstanding shares.

### GlaxoSmithKline South Africa (Pty) Ltd.

GlaxoSmithKline South Africa (Pty) Ltd. (named as Glaxo Wellcome SA (South Africa) (PRY) Ltd. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of South Africa.  GlaxoSmithKline South Africa (Pty) Ltd. is owned through several levels of subsidiaries by GlaxoSmithKline plc, a publicly-held English limited company.  To the knowledge of GlaxoSmithKline South Africa (Pty) Ltd., none of the shareholders of GlaxoSmithKline plc owns beneficially 10% or more of its outstanding shares.

### Ingersoll-Rand Italiana S.p.A.

Ingersoll-Rand Italiana S.p.A. (named as Ingersoll-Rand Italiana, SPA in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Italy.  Ingersoll-Rand Italiana S.p.A. is an indirect, wholly-owned subsidiary of Ingersoll-Rand plc.  No other publicly-held corporation owns 10% or more of Ingersoll-Rand Italiana S.p.A.

## Ingersoll-Rand World Trade Ltd.

Ingersoll-Rand World Trade Ltd., by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Bermuda. Ingersoll-Rand World Trade Ltd. is an indirect, wholly-owned subsidiary of Ingersoll-Rand plc.  No other publicly-held corporation owns 10% or more of Ingersoll-Rand World Trade Ltd.

## Intervet International B.V.

Intervet International B.V., by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of The Netherlands. Intervet International B.V. is a wholly-owned, indirect subsidiary of Merck & Co., Inc., a publicly-held corporation established under the laws of New Jersey.  None of the shareholders of Merck & Co., Inc. owns beneficially 10% or more of its outstanding shares.

## Janssen Pharmaceutical

Janssen Pharmaceutical, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Ireland.  Janssen Pharmaceutical is a wholly-owned subsidiary of JNJ International Investment LLC.  JNJ International Investment LLC is a wholly-owned subsidiary of Synthes, Inc.  Synthes, Inc. is a wholly-owned subsidiary of DePuy Synthes, Inc.  DePuy Synthes, Inc. is a wholly-owned subsidiary of Johnson & Johnson International. Johnson & Johnson International is a wholly-owned subsidiary of Johnson & Johnson.  Johnson & Johnson is a publicly-held corporation, and no other publicly-held corporation owns 10% or more of its stock.

## Johnson Controls Air Conditioning and Refrigeration FZE

Johnson Controls Air Conditioning and Refrigeration FZE ("FZE") (formerly known as York Airconditioning & Refrigeration FZE and named as York Air Conditioning and Refrigeration FZE in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of the United Arab Emirates.  FZE is a wholly-owned subsidiary of Johnson Controls Air Conditioning and Refrigeration, Inc., which is a wholly-owned subsidiary of York International Corporation, which is a wholly-owned subsidiary of Johnson Controls, Inc., a publicly-traded company.  No other publicly-held corporation owns 10% or more of FZE.

## Kia Motors Corporation

Kia Motors Corporation (erroneously named as Kia Motors in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that Hyundai Motor Company is the only company that owns 10% or more of Kia Motors Corporation's stock.

## Liebherr Export AG

Liebherr Export AG, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Switzerland. Liebherr Export AG is a wholly-owned subsidiary of Liebherr-International AG, a privately-owned company. No other corporation owns 10% or more of Liebherr Export AG.

## Liebherr-France SAS

Liebherr-France SAS (named as Liebher France, SA in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France. The current parent company of Liebherr-France, SAS is Liebherr-EMtec GmbH, which is a wholly-owned subsidiary of Liebherr-International AG, a privately-owned company. No other corporation owns 10% or more of Liebherr-France SAS.

## Merial SAS

Merial SAS (named as Merial in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France. Merial SAS is a wholly-owned subsidiary of Sanofi 4. Sanofi 4 is owned by Aventis Agriculture and Sanofi 1 SAS. Sanofi 1 SAS is a wholly-owned subsidiary of Aventis Agriculture. Aventis Agriculture is a wholly-owned subsidiary of Sanofi. Sanofi is a publicly-held corporation, and no other publicly-held corporation owns 10% or more of its stock.

## Metec Motric S.A. Medizintechnik

Metec Motric S.A. Medizintechnik (named as Aesculap Motric S.A. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Spain. Metec Motric S.A. Medizintechnik has no corporate parent. There are no publicly-held corporations owning 10% or more of its stock.

## N.V. Organon

The entity identified in the lawsuit as N.V. Organon, by and through its undersigned counsel, hereby certifies that it has been succeeded by Merck Sharp & Dohme B.V., a corporation organized under the laws of The Netherlands. Merck Sharp & Dohme B.V. is a wholly-owned indirect subsidiary of Merck & Co., Inc., a publicly-held corporation established under the laws of New Jersey. None of the shareholders of Merck & Co., Inc. owns beneficially ten percent or more of its outstanding shares.

## Novo Nordisk A/S

Novo Nordisk A/S (named as Novo Nordisk in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a publicly-traded corporation organized under the laws of Denmark. There is no publicly-held corporation that owns 10% or more of Novo Nordisk A/S's stock.

## OSRAM Middle East FZE

OSRAM Middle East FZE, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of the United Arab Emirates. OSRAM Middle East FZE is a wholly-owned, indirect subsidiary of Osram Licht AG, a publicly-held corporation traded on the Frankfurt and Munich stock exchanges. No other corporation owns 10% or more of OSRAM Middle East FZE.

## Railtech International SA

Railtech International SA (named as Railtech International in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France. It is owned by Delachaux S.A., a limited company (sociètè anonyme) incorporated under the laws of France, having its registered offices at 119 avenue Louis Roche, 92230 Gennevilliers, France. Delachaux is a privately-held company. No publicly-held corporation owns 10% or more of Railtech International SA.

## Renault Agriculture & Sonalika International

Renault Agriculture & Sonalika International, by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Mauritius. Sixty percent of its shares are owned by CLAAS Tractor S.A.S. and forty percent of its shares are owned by International Tractors Limited, a

subsidiary of Sonalika International Group.  CLAAS Tractor S.A.S. is wholly-owned by CLAAS France Holding S.A.S., which in turn is wholly-owned by CLAAS KGaA mbH.  No other publicly-held corporation owns 10% or more of Renault Agriculture & Sonalika International.

## Renault Trucks S.A.S.

Renault Trucks S.A.S. (formerly known as Renault V.I.), by and through its undersigned counsel, hereby certifies that it is a wholly-owned, indirect subsidiary of AB Volvo.  No other publicly-held corporation owns 10% or more of Renault Trucks S.A.S.

## Roche Diagnostics GmbH

Roche Diagnostics GmbH, by and through its undersigned counsel, hereby certifies that it is a German corporation organized and existing under the laws of Germany.  Roche Diagnostics GmbH is a wholly-owned subsidiary of Roche Deutschland Holding GmbH, a German corporation, which is owned, through a series of intermediate subsidiaries, by Roche Holding Ltd, a publicly-held Swiss corporation.  Upon information and belief, more than 10% of Roche Holding Ltd's voting shares are held either directly or indirectly by Novartis AG, a publicly-held Swiss corporation.

## Rohm and Haas France, S.A.S.

Rohm and Haas France, S.A.S. (erroneously named as Rohm and Haas France S.A. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a simplified limited liability company organized under the laws of France.  Rohm and Haas France, S.A.S. is a wholly-owned, indirect subsidiary of The Dow Chemical Company, a publicly-held corporation traded on the New York Stock Exchange.  No other corporation owns 10% or more of Rohm and Haas France, S.A.S. or The Dow Chemical Company.

## Serono Pharma International

Serono Pharma International (now dissolved), by and through its undersigned counsel, hereby certifies that it was a wholly-owned division of Ares Trading S.A., a corporation organized under the laws of Switzerland.  Ares Trading S.A. is wholly-owned by Merck KGaA, which is traded on the Frankfurt Stock Exchange.  No other publicly-held corporation owned 10% or more of Serono Pharma International.

## Siemens S.A.S. France

Siemens S.A.S. France (erroneously named as Siemens S.A.A. of France in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of France. Siemens S.A.S. France is a wholly-owned, indirect subsidiary of Siemens AG, a publicly-held corporation traded on European exchanges and whose American Depositary Shares (ADS) are traded publicly on the New York Stock Exchange. No other corporation owns 10% or more of Siemens S.A.S. France.

## Siemens Sanayi ve Ticaret A.Ş.

Siemens Sanayi ve Ticaret A.Ş. (erroneously named as Siemens Sanayi ve Ticaret A.S. of Turkey in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Turkey. Siemens Sanayi ve Ticaret A.Ş. is a wholly-owned, indirect subsidiary of Siemens AG, a publicly-held corporation traded on European exchanges and whose American Depositary Shares (ADS) are traded publicly on the New York Stock Exchange. No other corporation owns 10% or more of Siemens Sanayi ve Ticaret A.Ş.

## Solar Turbines Europe S.A

Solar Turbines Europe S.A. (named as Solar Turbines Europe in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Belgium. It is a wholly-owned, indirect subsidiary of Caterpillar Inc., a publicly-held corporation traded on the New York Stock Exchange. State Street Corporation, a publicly-held corporation traded on the New York Stock Exchange, owns 10% or more of Caterpillar Inc.

## St. Jude Medical Export GmbH

St. Jude Medical Export GmbH, by and through its undersigned counsel, hereby certifies that it is a non-public corporation formed and organized under the laws of Austria. St. Jude Medical Export GmbH is a wholly-owned subsidiary of SJM International, Inc., a non-public Delaware corporation. SJM International, Inc. is a wholly-owned subsidiary of St. Jude Medical, Inc., a publicly-held corporation formed and organized under the laws of the state of Minnesota whose shares are traded on the New York Stock Exchange. No other publicly-held corporation owns 10% or more of St. Jude Medical, Inc.

### Sulzer Pumpen (Deutschland) GmbH

Sulzer Pumpen (Deutschland) GmbH, by and through its undersigned counsel, hereby certifies that it is a wholly-owned, indirect subsidiary of Sulzer AG. No other publicly-held corporation owns 10% or more of Sulzer Pumpen (Deutschland) GmbH.

### Sulzer Turbo Ltd. n/k/a Sulzer Markets and Technology AG

Sulzer Turbo Ltd., now known as Sulzer Markets and Technology AG ("SMT"), by and through its undersigned counsel, hereby certifies that it is a wholly-owned subsidiary of Sulzer AG. No other publicly-held corporation owns 10% or more of SMT.

### Textron Inc.

Textron Inc. ("Textron"), by and through its undersigned counsel, hereby certifies that it is a publicly-held corporation organized under the laws of the State of Delaware. Textron has no corporate parent. FMR LLC, a privately-held corporation, holds 10% or more of the stock of Textron.

### Thermo King Ireland Ltd.

Thermo King Ireland Ltd. (named as Thermo King Ireland Limited in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Ireland. Thermo King Ireland Ltd. is an indirect, wholly-owned subsidiary of Ingersoll-Rand plc. No other publicly-held corporation owns 10% or more of Thermo King Ireland Ltd.

### Tractel Secalt S.A.

Tractel Secalt S.A. (named as Secalt S.A. in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized under the laws of Luxembourg. The parent company of Tractel Secalt S.A. is Tractel International SAS, which is privately-owned. No publicly-held corporation owns 10% or more of Tractel Secalt S.A.'s stock.

### Valtra do Brasil Ltda.

Valtra do Brasil Ltda. (erroneously named as Valtra do Brazil in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a direct subsidiary of Valtra International BV and is an indirect subsidiary of AGCO Corporation. AGCO Corporation is a publicly-held company, which

indirectly owns 10% or more of Valtra do Brasil Ltda.'s stock. No publicly-held company other than AGCO Corporation owns 10% or more of Valtra do Brasil Ltda.'s stock.

## Vitol S.A.

Vitol S.A., by and through its undersigned counsel, hereby certifies that it is a private corporation organized under the laws of Switzerland. Vitol S.A. is a wholly-owned subsidiary of Vitol Holding BV (holding company of the Vitol Group), a privately-held Dutch corporation. No other corporation owns 10% or more of Vitol S.A.

## Volvo Construction Equipment AB

Volvo Construction Equipment AB, a successor company to Volvo Construction Equipment International, by and through its undersigned counsel, hereby certifies that it is a wholly-owned, indirect subsidiary of AB Volvo. No other publicly-held corporation owns 10% or more of Volvo Construction Equipment AB.

## The Weir Group PLC

The Weir Group PLC (named as The Weir Group in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a corporation organized and existing under the laws of Scotland. The Weir Group PLC shares are traded publicly on the London Stock Exchange. It has no corporate parent. No publicly-held corporation owns 10% or more of The Weir Group PLC stock.

## Woodhouse International, LLC

Woodhouse International, LLC (named as Woodhouse International in the First Amended Complaint), by and through its undersigned counsel, hereby certifies that it is a foreign company organized and existing under the laws of the United Arab Emirates. It has no corporate parent. No publicly-held corporation owns 10% or more of Woodhouse International, LLC stock.

# **TABLE OF CONTENTS**

DEFENDANTS-APPELLEES' RULE 26.1 CORPORATE DISCLOSURE
    STATEMENTS .......................................................................................i

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE...................................................................1

STATEMENT OF FACTS .........................................................................2

    A.    The Republic of Iraq ..................................................2

    B.    The Oil-for-Food Program.........................................3

    C.    Iraq's Subversion of the Program ..............................5

            1.    Oil Surcharges ...............................................7

            2.    Kickbacks on Humanitarian Goods..................8

    D.    Defendants-Appellees ...............................................10

SUMMARY OF THE ARGUMENT .......................................................11

ARGUMENT .........................................................................................13

    I.    THE DISTRICT COURT CORRECTLY HELD THAT IRAQ
        ITSELF CORRUPTED THE PROGRAM, AND THEREFORE
        ITS CLAIMS ARE BARRED. .........................................13

        A.    Like All Sovereign States, Iraq Is Accountable for the
            Conduct of Its Prior Governments. ...........................14

            1.    States Are Bound by Their Governments' Actions,
                Even After Governments Change...................14

            2.    Iraq Cannot Avoid Responsibility for Its Former
                Government's Actions....................................16

            3.    Iraq's Position Would Contravene the Political
                Question and Act-of-State Doctrines..............24

4.      If Common-Law Agency Principles Applied, They Would Confirm Iraq's Responsibility for Its Prior Government's Actions. ...................................................26

B.      The *In Pari Delicto* Doctrine Bars Iraq's Claims. ....................29

C.      Iraq Lacks Article III Standing to Assert Its Claims. ..............31

II.     THE DISTRICT COURT CORRECTLY DISMISSED IRAQ'S RICO CLAIM ......................................................................................35

A.      Iraq's RICO Claim Is Impermissibly Extraterritorial. ..............35

1.      The Program's Banking Arrangements Were Incidental to the Alleged Scheme. ...................................38

2.      The U.N. Headquarters' Location Was Incidental to the Alleged Scheme. ....................................................40

3.      Iraq's Claims Are Impermissibly Extraterritorial Under an "Enterprise" or a "Pattern" Test. ...................43

4.      Iraq's Attempt to Escape *Norex* Fails. ............................46

B.      The District Court Correctly Held that Iraq Fails to Allege Proximate Causation for Its RICO Claim. ..................47

C.      Alternative Grounds Raised Below Also Justify Dismissal of Iraq's RICO Claim. ...............................................53

III.    THE DISTRICT COURT CORRECTLY HELD THAT THERE IS NO FCPA PRIVATE RIGHT OF ACTION. ...................54

IV.    THE DISTRICT COURT PROPERLY DISMISSED IRAQ'S NON-STATUTORY CLAIMS. .........................................................56

V.     THE DISTRICT COURT PROPERLY DENIED IRAQ LEAVE TO AMEND. .......................................................................58

CONCLUSION .............................................................................................60

Fed. R. App. P. Form 6 (Certificate of Compliance with Rule 32(a)) ...................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. Hoque*,
  No. 01 CIV. 7224, 2002 WL 1964806 (S.D.N.Y. Aug. 23, 2002)......................42

*Alexander v. Sandoval*,
  532 U.S. 275 (2001).................................................................................55

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982).................................................................................33

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)................................................................ 48, 50, 53

*Baker v. Carr*,
  369 U.S. 186 (1962)................................................................ 24, 25

*Banco de España v. Fed. Reserve Bank*,
  114 F.2d 438 (2d Cir. 1940) ................................................. 16, 23

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964).................................................................................26

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985).................................................................................29

*Bhd. of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*,
  457 F.3d 24 (D.C. Cir. 2006) ...............................................................34

*BLD Prods., LLC v. Remote Prods., Inc.*,
  509 F. App'x 81 (2d Cir. 2013) ............................................................59

*Boyd v. AWB Ltd.*,
  544 F. Supp. 2d 236 (S.D.N.Y. 2008) ...............................................52

*Boyle v. United States*,
  556 U.S. 938 (2009).................................................................................53

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008).................................................................................51

*Can v. United States*,
  14 F.3d 160 (2d Cir. 1994) ...................................................................24

*Castellanos v. Pfizer, Inc.*,
  No. 07-60646-CIV, 2008 WL 2323876 (S.D. Fla. May 29, 2008) .....................54

*Cedeño v. Intech Grp., Inc.*,
  733 F. Supp. 2d 471 (S.D.N.Y. 2010) .......................................... passim

*CGC Holding Co. v. Hutchens*,
  824 F. Supp. 2d 1193 (D. Colo. 2011).................................................45

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ...........................................................17

*Cheung v. United States*,
  213 F.3d 82 (2d Cir. 2000) .............................................................25

*Chevron Corp. v. Donziger*,
  871 F. Supp. 2d 229 (S.D.N.Y. 2012) ...............................................45

*Citicorp Int'l Trading Co. v. W. Oil & Ref. Co.*,
  771 F. Supp. 600 (S.D.N.Y. 1991) ...................................................54

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013).................................................................34

*Erie R.R. Co. v. Tompkins*,
  304 U.S. 64 (1938).......................................................................56

*European Cmty. v. RJR Nabisco, Inc.*,
  No. 02-CV-5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ..........................44

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) ...................................................... 53, 54

*First Fid. Bank N.A. v. Gov't of Antigua & Barbuda*,
  877 F.2d 189 (2d Cir. 1989) ...........................................................19

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ........................................................ 48, 51

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)...................................................................55

*Gray v. Evercore Restructuring L.L.C.*,
    544 F.3d 320 (1st Cir. 2008)....................................................30

*Guar. Trust Co. v. United States*,
    304 U.S. 126 (1938)...................................................................14

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)............................................................... 48, 49

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992)........................................................... 48, 50

*Hourani v. Mirtchev*,
    No. 10-1618, 2013 WL 1901013 (D.D.C. May 8, 2013) ....................................39

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011) .....................................................48

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    759 F. Supp. 2d 363 (S.D.N.Y. 2010) ..................................27

*In re Am. Express Co. S'holder Litig.*,
    39 F.3d 395 (2d Cir. 1994) .......................................................51

*In re Bennett Funding Grp., Inc.*,
    336 F.3d 94 (2d Cir. 2003) .......................................................28

*In re Bernard L. Madoff Inv. Sec. LLC*,
    721 F.3d 54 (2d Cir. 2013) .......................................................29

*In re Derivium Capital LLC*,
    716 F.3d 355 (4th Cir. 2013) ...................................................27

*In re Dublin Sec., Inc.*,
    133 F.3d 377 (6th Cir. 1997) ...................................................30

*In re Le-Nature's, Inc.*,
    No. 9-MC-162, 2011 WL 2112533 (W.D. Pa. May 26, 2011)...........................44

*In re Tamoxifen Citrate Antitrust Litig.*,
   466 F.3d 187 (2d Cir. 2006) ............................................................59

*In re The Mediators, Inc.*,
   105 F.3d 822 (2d Cir. 1997) ............................................................28

*In re Toyota Motor Corp.*,
   785 F. Supp. 2d 883 (C.D. Cal. 2011) ............................................44

*J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*,
   937 F. Supp. 216 (S.D.N.Y. 1996) ..................................................54

*Jackler v. Byrne*,
   658 F.3d 225 (2d Cir. 2011) ............................................................31

*Jimenez v. Aristeguieta*,
   311 F.2d 547 (5th Cir. 1962) ..................................................... 18, 19

*Karim v. AWB Ltd.*,
   347 F. App'x 714 (2d. Cir. 2009) ...................................................33

*Karim v. AWB Ltd.*,
   No. 06 Civ. 15400, 2008 WL 4450265 (S.D.N.Y. Sept. 30, 2008)....................33

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013) ....................................................................47

*Klinghoffer v. S.N.C. Achille Lauro*,
   937 F.2d 44 (2d Cir. 1991) ..............................................................42

*Konowaloff v. Metro. Museum of Art*,
   702 F.3d 140 (2d Cir. 2012) ............................................................26

*Lamb v. Phillip Morris, Inc.*,
   915 F.2d 1024 (6th Cir. 1990) ............................................. 54, 55, 56

*Lehigh Valley R.R. Co. v. State of Russia*,
   21 F.2d 396 (2d Cir. 1927) ........................................................ 15, 23

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) ................................................. 49, 50, 52

*Lore v. City of Syracuse*,
670 F.3d 127 (2d Cir. 2012) ...............................................................31

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................... 32, 33

*Mancuso v. Douglas Elliman LLC*,
808 F. Supp. 2d 606 (S.D.N.Y. 2011) ...............................................28

*Mastafa v. Austl. Wheat Bd., Ltd.*,
No. 07 Civ. 7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008)....................50

*McLean v. Int'l Harvester Co.*,
817 F.2d 1214 (5th Cir. 1987) ............................................................54

*Metz v. U.S. Life Ins. Co.*,
662 F.3d 600 (2d Cir. 2011) .............................................................59

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
871 F. Supp. 2d 933 (N.D. Cal. 2012).......................................... 44, 45

*Morrison v. Nat'l Austl. Bank*,
130 S. Ct. 2869 (2010).............................................................. passim

*Nisselson v. Lernout*,
469 F.3d 143 (1st Cir. 2006)..............................................................30

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
540 F. Supp. 2d 438 (S.D.N.Y. 2007) .......................................... 38, 40

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) ........................................................ passim

*Nowak v. Ironworkers Local 6 Pension Fund*,
81 F.3d 1182 (2d Cir. 1996) ..............................................................56

*O'Melveny & Myers v. Fed. Deposit Ins. Corp.*,
512 U.S. 79 (1994).........................................................................56

*Oetjen v. Cent. Leather Co.*,
246 U.S. 297 (1918).......................................................................16

*Official Comm. of the Unsecured Creditors*
   *of Color Tile, Inc. v. Coopers & Lybrand LLP*,
   322 F.3d 147 (2d Cir. 2003) ............................................................ 27, 29

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*,
   437 F.3d 1145 (11th Cir. 2006) ......................................................30

*Paris v. Dep't of Nat'l Store Branch (1) Vietnam*,
   No. 99 Civ. 8607, 2000 WL 777904 (S.D.N.Y. June 15, 2000) .........................40

*People v. Coumatos*,
   224 N.Y.S.2d 504 (Gen. Term 1961) ..............................................42

*People v. Weiner*,
   85 Misc. 2d 161 (N.Y. Crim. Ct. 1976)..........................................42

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*,
   No. 12-cv-9070, 2013 WL 3936191 (S.D.N.Y. July 30, 2013) ............. 36, 37, 39

*Porat v. Lincoln Towers Cmty. Ass'n*,
   464 F.3d 274 (2d Cir. 2006) ..............................................................59

*Republic of Haiti v. Duvalier*,
   211 A.D.2d 379 (N.Y. App. Div. 1995) ......................................... 18, 19

*Republic of Iraq v. First Nat'l City Bank*,
   353 F.2d 47 (2d Cir. 1965) ..............................................................57

*Republic of the Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986) ......................................................... 17, 18, 57

*Republic of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988) ..........................................................18

*Republic of the Philippines v. Westinghouse Elec. Corp.*,
   774 F. Supp. 1438 (D.N.J. 1991) ......................................................18

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)........................................................................54

*Ricaud v. Am. Metal Co.*,
   246 U.S. 304 (1918)........................................................................16

*RSM Prod. Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................................54

*Ruffolo v. Oppenheimer & Co.*,
   987 F.2d 129 (2d Cir. 1993) ................................................................58

*Scientific Drilling Int'l, Inc. v. Gyrodata Corp.*,
   Nos. 99-1077, 99-1084, 1999 WL 674511
   (Fed. Cir. Aug. 30, 1999) ................................................................ 54, 55

*Seidl v. Am. Century Cos.*,
   427 F. App'x 35 (2d Cir. 2011) ................................................................48

*Shoaga v. Maersk, Inc.*,
   Nos. C 08-786, C-05-2213, 2008 WL 4615445
   (N.D. Cal. Oct. 17, 2008) ................................................................54

*Socialist Republic of Rom. v. Wildenstein & Co.*,
   147 F.R.D. 62 (S.D.N.Y. 1993) ................................................................14

*Taylor v. Vt. Dep't of Educ.*,
   313 F.3d 768 (2d Cir. 2002) ................................................................37

*Terenkian v. Republic of Iraq*,
   694 F.3d 1122 (9th Cir. 2012) ................................................................ 2, 23, 25

*The Sapphire*,
   78 U.S. 164 (1870) ................................................................14

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006) ................................................................53

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
   731 F. Supp. 619 (S.D.N.Y. 1990) ................................................................14

*Tymoshenko v. Firtash*,
   No. 11-CV-2794, 2013 WL 1234821 (S.D.N.Y. Mar. 26, 2013) ................................36

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ................................................................48

*Underhill v. Hernandez*,
   168 U.S. 250 (1897) ................................................................16

*United States ex rel. Casanova v. Fitzpatrick,*
    214 F. Supp. 425 (S.D.N.Y. 1963) ...........................................................42

*United States v. Bahel,*
    662 F.3d 610 (2d Cir. 2011) ...................................................................42

*United States v. Nat'l City Bank of N.Y.,*
    90 F. Supp. 448 (S.D.N.Y. 1950) ...........................................................14

*United States v. Noriega,*
    117 F.3d 1206 (11th Cir. 1997) ..............................................................19

*United States v. Noriega,*
    746 F. Supp. 1506 (S.D. Fla. 1990) ........................................................19

*United States v. Palestine Liberation Org.,*
    695 F. Supp. 1456 (S.D.N.Y. 1988) .......................................................41

*United States v. Philip Morris USA, Inc.,*
    783 F. Supp. 2d 23 (D.D.C. 2011) ..........................................................44

*United States v. Richardson,*
    418 U.S. 166 (1974) ................................................................................25

*United States v. Turkette,*
    452 U.S. 576 (1981) ................................................................................53

*United States v. Vilar,*
    Nos. 10-521-cr, 10-580-cr, 10-4639-cr, 2013 WL 4608948
    (2d Cir. Aug. 30, 2013) ..........................................................................44

*United States v. Xu,*
    706 F.3d 965 (9th Cir. 2013) ..................................................................39

*Vicon Fiber Optics Corp. v. Scrivo,*
    201 F. Supp. 2d 216 (S.D.N.Y. 2002) ....................................................52

*WC Capital Mgmt., LLC v. UBS Sec., LLC,*
    711 F.3d 322 (2d Cir. 2013) ...................................................................58

*Westfield v. Fed. Republic of Germany,*
    633 F.3d 409 (6th Cir. 2011) ..................................................................23

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ...............................................................59

**Statutes and Rules**

15 U.S.C. § 78dd ................................................................................55

15 U.S.C. § 78dd-1 ............................................................................55

15 U.S.C. § 78dd-2 ............................................................................55

15 U.S.C. § 78*l* ...................................................................................47

18 U.S.C. § 472 ..................................................................................47

18 U.S.C. § 1503 ................................................................................47

18 U.S.C. § 1511 ................................................................................47

18 U.S.C. § 1951 ................................................................................47

18 U.S.C. § 1955 ................................................................................47

18 U.S.C. § 1962 ................................................................................53

28 U.S.C. § 1331 ................................................................................57

28 U.S.C. § 1367 ................................................................................56

Ch. 482, 61 Stat. 756 (1947) .............................................................42

Fed. R. App. P. 28 .............................................................................31

**Other Authorities**

1 Moore's Digest of Int'l Law .........................................................15

Black's Law Dictionary (9th ed. 2009) ............................................29

Convention on Privileges and Immunities of the United Nations,
  Feb. 13, 1946, 21 U.S.T. 1418 .......................................................42

Dep't of State, Background Note: Iraq,
  http://www.state.gov/outofdate/bgn/iraq/196734.htm (Feb. 6, 2012) ...................3

Press Release, Paris Club,
  *The Paris Club and the Republic of Iraq Agree on Debt Relief*
  (Nov. 21, 2004) ..................................................................................22

Restatement (Third) of Foreign Relations Law
  of the United States (1987) ................................................ 14, 15, 23

S. 3379, 94th Cong., 122 Cong. Rec. 12605 (1976).................................55

S. Rep. No. 94-1031 (1976) .................................................................55

S.C. Res. 540, U.N. Doc. S/RES/540 (Oct. 31, 1983)..............................21

S.C. Res. 778, U.N. Doc. S/RES/778 (Oct. 2, 1992)................................21

S.C. Res. 1115, U.N. Doc. S/RES/1115 (June 21, 1997) ..........................21

S.C. Res. 1154, U.N. Doc. S/RES/1154 (Mar. 2, 1998)............................21

S.C. Res. 1330, U.N. Doc. S/RES/1330 (Dec. 5, 2000) ............................21

S.C. Res. 1472, U.N. Doc. S/RES/1472 (Mar. 28, 2003)...........................21

U.N. Mem. of Understanding,
  U.N. Doc. S/1998/166 (Mar. 27, 1998) ...............................................21

## JURISDICTIONAL STATEMENT

Iraq's Jurisdictional Statement is deficient, omitting Defendants-Appellees' argument that Iraq lacks standing.  (*Infra* § I.C.)

## STATEMENT OF THE ISSUES

Did the district court correctly find multiple grounds for dismissing Iraq's First Amended Complaint:

(1)    Because well-established principles of state continuity make the Hussein government's conduct "attributable to plaintiff itself, the Republic of Iraq," Iraq's claims are barred under the *in pari delicto* doctrine?  (SPA-4, 27, 42.)

(2)    Iraq fails to state a RICO claim because its "RICO and RICO conspiracy [claims] focus on extraterritorial conduct" (SPA-5), and Iraq's allegations do not support proximate causation (SPA-45)?

(3)    The FCPA does not provide a private right of action?  (SPA-47.)

(4)    Iraq's non-statutory claims do not arise under federal common law?  (SPA-47–48.)

-and-

(5)    Iraq should not be given leave to file a third complaint?  (SPA-49.)

## STATEMENT OF THE CASE

Iraq filed its first Complaint on June 27, 2008, against 92 corporations and individuals, many of which allegedly paid surcharges or kickbacks to Iraq in the Oil-for-Food Program ("Program").  (Dkt.4-1 at 51.)  On July 31, 2009, Iraq filed its First Amended Complaint ("FAC").[1]  (A-56.)  Defendants moved to dismiss on

---

[1]    FAC citations are to the Appendix page and complaint paragraph, *e.g.*, "A-74:¶1."

1

January 15, 2010.  (A-283, 316.)  Briefing on the motions concluded on June 22, 2010.  (A-2554.)  Defendants subsequently filed several Notices of Supplemental Authority addressing (1) *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010), and other cases relevant to defendants' argument that the conduct at issue was extraterritorial and therefore not actionable under RICO (A-2940; A-3011; A-3027), and (2) *Terenkian v. Republic of Iraq*, 694 F.3d 1122 (9th Cir. 2012), in which Iraq persuaded the Ninth Circuit that (a) Iraq's current government stands in the shoes of its prior government, (b) participation in the Program is a public act, not commercial activity, and (c) Program contracts lack a "direct effect" in the United States (A-3410, 3547).

The district court heard oral argument on October 26, 2012.  (A-3581.)  Iraq voluntarily withdrew its Robinson-Patman Act claim the day before.  (A-3604.)

On February 6, 2013, the district court issued an Opinion and Order dismissing the FAC with prejudice on multiple grounds (SPA-1–49), but without reaching all issues raised in defendants' motions to dismiss (SPA-49).

Iraq appealed.

## STATEMENT OF FACTS

### A.    The Republic of Iraq

Iraq has been a sovereign, independent state continuously since 1932, and was a founding member of the U.N. in 1945.  (A-100:¶204.)  Iraq was governed as

a constitutional monarchy until a 1958 military coup. The Ba'ath Party took control in 1963, and in 1979 Saddam Hussein became Iraq's president. Dep't of State, Background Note: Iraq, http://www.state.gov/outofdate/bgn/iraq/196734.htm (Feb. 6, 2012) ("Background Note").

After Iraq's 1990 invasion of Kuwait, the Security Council adopted Resolution 661, a sanctions regime restricting transactions with Iraq. (A-105:¶¶241–242; A-464–65 (S.C. Res. 661, U.N. Doc. S/RES/661 (Aug. 6, 1990)).) The Council later authorized a U.S.-led multinational coalition to expel Iraq from Kuwait. (A-105:¶238; A-467–71 (S.C. Res. 687, U.N. Doc. S/RES/687 (Apr. 3, 1991)).)

In 2003, another U.S.-led coalition removed Hussein and the Ba'ath Party and established the Coalition Provisional Authority ("CPA"), which administered Iraq until transitional Iraqi governments paved the way for a permanent government in 2006. (A-77–78:¶¶21–24); Background Note.

## B.    The Oil-for-Food Program

On April 14, 1995, Security Council Resolution 986 established the Program as a limited exception to Resolution 661's sanctions regime, while "reaffirm[ing] the commitment of all Member States to the sovereignty and territorial integrity of Iraq." (A-473–77 (S.C. Res. 986, U.N. Doc. S/RES/986 (Apr. 14, 1995)); A-109:¶271.) The U.N. Secretariat and the Government of Iraq then entered into a

3

Memorandum of Understanding on the Implementation of S.C. Resolution 986 ("MOU") in which they agreed to the Program's details and that nothing in the Program "should be construed as infringing the sovereignty or territorial integrity of Iraq." (A-480 (U.N. Doc. SC/3285 (May 20, 1996)); *see* A-111:¶¶279–284.)

Under the Program, the Government of Iraq was permitted to sell oil subject to approval by a Council committee (the "661 Committee"). (A-118:¶¶317–318, A-119:¶324, A-125:¶351; A-473–74.) Iraqi oil sale proceeds were to be deposited into a U.N.-controlled and -monitored escrow account ("Program Account"). (A-111:¶285; A-475–76.)[2] Iraq could expend those proceeds to purchase certain goods and services from suppliers it selected, subject to 661 Committee approval. (A-110:¶274, A-118:¶319, A-121:¶336; A-475–76.)

Iraq played a central and indispensable role in every Program transaction, with sole discretion whether and under what terms to sell oil or buy goods. (A-473–77; *see also* A-120:¶329.) Iraqi governmental ministries selected and contracted directly with oil purchasers and goods suppliers. (A-119:¶323, A-120:¶329, A-121:¶339, A-163:¶522; A-491.) The Iraqi State Oil Marketing

---

[2] The U.N. established the Program Account through a Banking Services Agreement with BNP Paribas ("the Bank"), under which the U.N. was the Bank's sole customer. (A-1205.) Only the U.N. "ha[d] the right to and control of funds in the [Program] Account" and the right "to give binding instructions to the Bank with respect to said funds, the Services [provided under the Agreement], the [Program] Account and the Letters of Credit provided for in th[e] Agreement." (A-1209 (Art.1.3.7).)

4

Organization ("SOMO") was the legal entity contracting with companies purchasing oil, negotiating directly with interested companies in Baghdad. (A-119:¶323.)   Humanitarian-goods suppliers were required to "negotiate and execute a contract with the Hussein Regime."  (A-121:¶339.)  Therefore, contract terms and conditions were negotiated in Baghdad between Iraq and the purchasers/suppliers Iraq chose.  (A-119:¶323, A-121:¶¶335–339; A-491; A-523 (Independent Inquiry Committee Report on the Manipulation of the Oil-For-Food Programme by the Iraqi Regime ("Volcker Report")).)

The 661 Committee monitored Iraq's Program transactions.  (A-118:¶¶316–319, A-119:¶324, A-120–21:¶¶331–336.)[3]  Oil contracts were to be monitored to ensure that contract prices were "fair in view of all relevant circumstances" and that contracts did "not contain any attempt at fraud or deception."  (A-496–97.) U.N.-appointed inspection agents were to monitor Program shipments of oil and supplies and report irregularities to the Secretary General and 661 Committee. (A-482–84, A-491.)

C.    Iraq's Subversion of the Program

Iraq alleges that its own government under Hussein "designed and instigated" a scheme to corrupt the Program.  (A-74:¶4.)   Iraq sought illicit

---

[3]    (*See also* A-495–99 (U.N. Doc. S/1996/636 (Aug. 12, 1996)).)  Iraq references the 661 Committee's procedures in the FAC.  (*See, e.g.*, A-119:¶324, A-121:¶¶334–335.)

revenues by imposing "kickbacks" on supply contracts beginning in 1999 and "surcharges" on oil purchases beginning in 2000. (A-125–31:¶¶350–392, A-163–81:¶¶521–630.) According to Iraq, "the main goal of the conspiracy was to undermine UN sanctions and the US laws prohibiting transactions with State Sponsors of Terrorism" (A-75:¶7), including seeking "to undermine the Programme and its goals," which it viewed as "'economic occupation' by the UN and … the United States" (A-114:¶¶301–302). Iraq sent instructions to its governmental ministries explaining its goals: "'destroying the [MOU] and liberating trade by creating revenues outside of its framework that help achieve this goal, and we don't care whether or not the United States finds out about it.'" (A-114:¶302.) Official Iraqi government directives imposed the alleged kickbacks and surcharges (A-114:¶302, A-127:¶¶362–364, A-128:¶369, A-146:¶458, A-163–64:¶¶526–527, A-165:¶535), and numerous government agencies and ministries, including SOMO and the Ministry of Transportation, administered the scheme (A-119:¶323, A-128:¶369, A-164:¶527, A-165:¶536, A-169:¶569). Iraqi ministries and the state treasury received the alleged surcharges and kickbacks. (A-147:¶469, A-154–55:¶¶482–483, A-169:¶¶568–569, A-172:¶584, A-179–80:¶¶622–624, A-185:¶656.)

1.    <u>Oil Surcharges</u>

Iraq alleges that the Hussein Regime "utilize[d] its control to choose [oil] purchasers for its own illicit purposes" (A-126:¶354), such as "curry[ing] political favor" with "particular countries and individuals it viewed as supportive of the Regime, and particularly of the Regime's desire to eliminate UN sanctions," and "generat[ing] … illicit income … which the Regime could use for non-humanitarian purposes" (A-126:¶¶355–357, A-127:¶362).    Iraq demanded that "anyone who wanted to purchase oil under the Program make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime." (A-127:¶¶363–364, A-129:¶379; A-515–1144.)  Furthermore,

> [a] committee formed by Saddam Hussein and composed of Taha Yassin Ramadan [(Vice President)], Tariq Aziz [(Deputy Prime Minister)], Amer Rashid [(Minister of Oil)], Hikmat Al-Azzawi (Minister of Finance), Mohammed Mehdi Saleh (Minister of Trade), and Abd Al-Tawab Abdullah Al-Mullah Al-Hwaish (Minister of Military Industrialization) set the surcharge amount for each phase.  The Ministry of Oil, along with SOMO, was directed to implement it.  The first step taken by SOMO employees was to inform each beneficiary that a surcharge was imposed on each barrel of oil sold under the Programme and was to be collected directly by the Government of Iraq.

(A-539.)  SOMO and the Ministry of Oil collected the surcharges.  (A-128:¶369, A-146:¶458; A-532 ("Iraq ordered its Ministry of Oil to collect surcharges … [and SOMO] ran a highly organized system to collect oil surcharges.").)

Iraq alleges that, after first "hearing rumors of the surcharge scheme" in December 2000, "the U.N. ultimately imposed retroactive oil pricing to ensure oil was purchased at market rates" in August 2002, ending the surcharge scheme. (A-128:¶368, A-129:¶378.)

## 2.    Kickbacks on Humanitarian Goods

The FAC alleges that in 1999, Iraq began implementing "schemes to systematically divert funds" involving contracts for humanitarian goods. (A-163:¶524.) According to the FAC, Iraq used the "power" conferred by the MOU "to choose the parties from which it would purchase goods" and "induce[d] participation in a corrupt scheme to divert funds from their humanitarian purposes." (*Id.*:¶¶522–523.)

Initially, Iraqi officials "demanded that additional 'transportation fees' be paid [by suppliers] directly to the Hussein Regime on all shipments of humanitarian goods to Iraq." (*Id.*:¶526.) Indeed, a June 1999 official Iraqi government directive required "all Ministries to impose non-negotiable 'transportation fees' on goods requiring inland delivery … . The Regime's Economic and Affairs Committee assigned the fees, and the Ministry of Transportation oversaw their collection." (A-164:¶527.) Iraq's government required vendors to pay the transportation fee "in a variety of manners," including

8

cash payments "directly to the Regime through Iraqi embassies or to Regime accounts in Baghdad." (A-165:¶¶535–536.)

In August 2000, Iraq "decided to impose what it called an 'after-sales-service fee' or ASSF on all Programme contracts," which "significantly increased kickbacks on [Program] purchases." (A-168:¶¶558,560.) The FAC further alleges that Iraqi "Vice President Taha Yassin Ramadan directed, in an August 3, 2000 memo, that all funds generated from the increased fees were 'to be transferred to general treasury,'" and that Iraqi ministries "kept extensive records" of fees received. (A-114:¶302, A-169:¶568–569, A-178–81:¶¶621–628.) The FAC alleges that these payments were made either in cash (then "transferred to Iraq … by diplomatic pouch"), by "transfers to Regime-controlled accounts," or by "payments to front companies loyal to the Hussein Regime." (A-168:¶565.) An October 25, 2000 memorandum to all Iraqi ministries instructed that "Saddam Hussein had ordered the imposition of kickbacks of at least 10% in order to subvert the policies of the UN and the United States government" and that "'[a]ny percentage above [10%] will be welcomed, as [it] is the way sanctions are lifted.'" (A-114:¶302.)

Iraq alleges that its own government added the various fees to the mutually-agreed contract price. (A-164:¶533, A-170:¶¶573–574.) These contracts (including purported kickbacks) were negotiated outside the United States.

9

(A-120:¶¶329,332, A-123:¶343.)  The FAC alleges that contracts reflecting the inflated prices were submitted for payment from the Program Account (A-165:¶534, A-170:¶573); that the U.N. approved these contracts (A-165:¶534, A-175:¶601); and that a U.N. inspection agent authenticated the goods' arrival at Iraq's border (A-121:¶¶337–338).

Finally, the FAC alleges that Iraq's government "divert[ed] goods from the Iraqi people to other Regime purposes, including items transferred to the Ministry of Defense, the Ministry of Military Industrialization, the General Security Directive, and the Presidential Diwan."  (A-185:¶656.)

### D.    Defendants-Appellees

Iraq named 92 individuals and entities as defendants, which it categorized as: (i) "Vendor Defendants"—80 corporations and affiliates alleged to have sold goods to Iraq (A-78–83:¶¶26–70, A-85:¶¶81–82, A-85–87:¶¶88–99, A-87–98:¶¶103–185, A-98–99:¶¶188–197, A-99:¶¶200–201); (ii) "Oil Purchasing Defendants"—two individuals and three corporations allegedly involved in purchasing Iraqi oil (A-85:¶¶83–87, A-87:¶¶100–102, A-98:¶¶:186–187, A-99:¶¶198–199); and (iii) the BNPP Defendants—six subsidiaries, branches, or affiliates of the Bank, a French company (A-83–84:¶¶71–80, A-241:¶976).[4]

---

[4]   The BNPP Defendants are not alleged to have (i) entered into any oil or goods contracts with Iraq; (ii) paid any surcharges or kickbacks; or (iii) had any knowledge of the alleged surcharge and kickback schemes.

Eighty-three of the 92 defendants are foreign entities.  The Defendants-Appellees here are 89 of the 92 defendants sued; three defendants are not participating in this appeal.[5]

## SUMMARY OF THE ARGUMENT

Through governmental acts and actors, Iraq itself masterminded, coordinated, implemented, and profited from subverting the Program.  The district court correctly concluded that these realities foreclose Iraq's claims as a matter of law, both because a wrongdoer cannot recover for its own misdeeds, and because RICO has no extraterritorial application.  That decision should be affirmed for several reasons.

*First*, the district court correctly held that Iraq itself corrupted the Program. Like all states, Iraq is accountable for the conduct of its governments.  (*Infra* § I.A.)  Although Iraq has repeatedly shifted its theories about the conduct at issue, the FAC clearly alleges that conduct consisted of sovereign, governmental acts designed to achieve the Iraqi government's geopolitical goals.  Iraq's current argument for escaping responsibility for these acts—that the Hussein government's

---

[5]  Iraq named one defendant (Mais Co. for Medical Products) about which it made no allegations, and which its allegations did not classify among the 80 Vendor Defendants.  Ebewe Pharma GES M.B.H. was never properly served, did not participate below, and has not joined in this brief.  In addition, because of an automatic stay resulting from pending bankruptcy proceedings, Eastman Kodak S.A. has not joined in this brief.

acts were merely personal, or contrary to Iraq's "national interest"—is thoroughly contradicted by Iraq's own allegations and ignores well-settled law that governmental acts are necessarily attributable to the state. Holding otherwise by inquiring into Iraq's "national interest" would run afoul of the political question and act of state doctrines. And Iraq's invocation of a private agency law exception is doubly misplaced: it does not apply here, and the FAC's own allegations demonstrate that even if it did, Iraq's argument would still fail. The *in pari delicto* doctrine therefore bars Iraq's claims. (*Infra* § I.B.) Alternatively, this Court could also affirm for lack of Article III standing. (*Infra* § I.C.)

*Second*, the district court properly dismissed Iraq's RICO claim (1) as impermissibly extraterritorial because the scheme alleged primarily involves foreign actors and foreign acts, and (2) because Defendants-Appellees' alleged conduct did not directly and proximately cause the harm alleged. (*Infra* § II.)

*Third*, the district court properly dismissed Iraq's FCPA claim because the FCPA provides no private right of action. (*Infra* § III.)

*Fourth*, the district court properly dismissed Iraq's non-statutory claims because they have no federal common-law basis, nor any basis justifying supplemental jurisdiction. (*Infra* § IV.)

12

*Fifth*, the district court properly denied Iraq leave to amend because Iraq did not properly request it, amendment would be futile, and leave would be contrary to law and equity. (*Infra* § V.)

For these and other reasons, the district court's decision should be affirmed.

## **ARGUMENT**

## I. THE DISTRICT COURT CORRECTLY HELD THAT IRAQ ITSELF CORRUPTED THE PROGRAM, AND THEREFORE ITS CLAIMS ARE BARRED.

Because Iraq was the mastermind of the Program's alleged corruption, its claims in this case are properly barred. The overarching legal reason is this: states cannot renounce responsibility for the actions of their governments. States necessarily act through the governmental conduct of their officials; a government's acts are the state's acts. (*Infra* § I.A.1.) The legal consequences of a government's actions remain, notwithstanding that governments change. (*Id.*) Iraq cannot disregard its own conduct when it was ruled by the Hussein Regime. (*Infra* § I.A.2, 4.) The result is that Iraq is suing for wrongs Iraq itself instigated, which the *in pari delicto* doctrine forbids. (*Infra* § I.B.) For the same reasons, dismissal could be upheld on standing grounds: Iraq's own instigation and receipt of surcharges and kickbacks means that it did not suffer a cognizable injury in fact, which would in any case be self-inflicted rather than "fairly traceable" to Defendants-Appellees. (*Infra* § I.C.)

13

A.    **Like All Sovereign States, Iraq Is Accountable for the Conduct of Its Prior Governments.**

1.    00 <u>States Are Bound by Their Governments' Actions, Even After Governments Change.</u>

Iraq remains bound by governmental actions taken under Hussein, even though it now has a different government.  As the Supreme Court held in *Guaranty Trust Co. v. United States*, 304 U.S. 126 (1938), "the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it."  *Id.* at 137.  That one government is more appealing than its predecessor means nothing.  Time and again, courts have held that states as legal entities remain responsible for their governments' actions, despite violent overthrows and dramatic changes in those governments.  *See The Sapphire*, 78 U.S. 164, 167 (1870) (Republic of France liable for conduct of overthrown Napoleonic regime); *Socialist Republic of Rom. v. Wildenstein & Co.*, 147 F.R.D. 62, 65–66 (S.D.N.Y. 1993) (post-communist government bound by Ceausescu regime's litigation conduct); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 622–23 (S.D.N.Y. 1990) (Sudan liable for prior government's obligations, despite successive civil wars); *United States v. Nat'l City Bank of N.Y.*, 90 F. Supp. 448, 452 (S.D.N.Y. 1950) (Soviet Union liable for pre-revolutionary Russian government's treasury notes); *see also* Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 208

14

cmt. a (1987) ("Under international law, the capacities, rights, and duties [of a state] appertain to the state, not to the government which represents it … [and] are not affected by a mere change in the regime or in the form of government or its ideology.").

The district court properly recognized these well-settled legal principles:

> Because sovereigns operate through their governments, both domestic and international law ordinarily impute to a sovereign the acts of its government … . The change in governments—from the Hussein Regime; to the Coalition Provisional Authority that governed subsequent to the fall of Saddam Hussein; to the contemporary Republic—did not create an entirely new state. Rather, those changes altered the leadership and government of a continuously existing state. Therefore, the Republic of Iraq *is the same sovereign entity as the one controlled by the Hussein Regime*."

(SPA-23–24 (citing A-354; A-1357).)[6]   It follows that Iraq under its current government cannot escape the legal consequences of the Hussein Regime's actions: "absolute principles may be substituted for constitutional, … but, though the government changes, the nation remains, with rights and obligations unimpaired."  *Lehigh Valley R.R. Co. v. State of Russia*, 21 F.2d 396, 401 (2d Cir. 1927) (quoting 1 Moore's Digest of Int'l Law, at 249); *see also* Restatement § 207 ("A state is responsible for any violation of its obligations under international law

---

[6]   All emphasis added unless otherwise indicated.

resulting from action or inaction by [] the government of the state … ." (alteration in original)).

2.    Iraq Cannot Avoid Responsibility for Its Former Government's Actions.

Iraq cannot escape responsibility for the Hussein Regime's actions by attempting to divert the inquiry to "whether the conduct was an abuse of authority committed against the national interest" and suggesting that the Hussein Regime's conduct was private, not governmental, if it was against Iraq's interests.  (Br.11, 15.)

Contrary to Iraq's current protestations, the FAC makes clear that Iraq's subversion of the Program was *governmental* conduct in pursuit of *governmental* objectives.  As this Court and the Supreme Court have long held, a governmental act is an act "physically taken by persons capable of exercising the sovereign authority of the foreign nation … [who] purported to act in their official capacity." *Banco de España v. Fed. Reserve Bank*, 114 F.2d 438, 444 (2d Cir. 1940); *see Ricaud v. Am. Metal Co.*, 246 U.S. 304 (1918) (attributing to Mexican government the acts of a Mexican general acting "in his capacity as a commanding officer"); *see also Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918); *Underhill v. Hernandez*, 168 U.S. 250, 254 (1897).  Iraq's own FAC establishes that, as a matter of law, Iraq's conduct in planning, coordinating, and executing the alleged schemes constituted "*public* acts of the *sovereign*," *Republic of the Philippines v. Marcos*,

16

806 F.2d 344, 358 (2d Cir. 1986) (emphasis in original), with the state of Iraq responsible for the legal consequences of those acts.

Indeed, Iraq's FAC repeatedly alleges that Iraq's subversion of the Program was government policy, tailored to achieve geopolitical, governmental goals. (*Supra* Statement of Facts § C.)  It alleges that Iraq's extensive efforts to subvert the Program's objectives were implemented through Iraq's government: Iraqi governmental agencies and ministries imposed the fees and oil surcharges; the funds generated were directed to Iraq's general treasury; and Iraq's state organs received the diverted funds.  (SPA-28; *supra* Statement of Facts § C.)  Nor could Iraq plausibly allege otherwise, as the Volcker Report, which is undeniably Iraq's source document for this suit, confirms that Iraq's subversion of the Program was government policy, not mere personal behavior of Hussein or others holding government posts.  (A-523, 525, 539, 770, 781, 789.)[7]  In short, as the district court correctly recognized, the FAC demonstrates that Iraq's claims involve its own unambiguously governmental conduct in orchestrating the Program's subversion.

---

[7]   Iraq's initial Complaint explicitly incorporated and relied on the Volcker Report.  Although Iraq's FAC did not repeat this explicit incorporation, "[e]ven where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a motion to dismiss] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citations omitted).

Iraq's reliance on cases involving conduct that was clearly for the personal benefit of former heads of state is misplaced. (Br.22–24.) Those cases expressly reiterate the governmental/private distinction and underscore that here, the Iraqi government's direction of payments to government coffers falls decidedly on the governmental side of that distinction. As the district court explained, "the misconduct in *Marcos, Jimenez*, and *Duvalier* was undertaken by each ruler and his close associates or family; the scheme alleged by Iraq was directed by the entire Hussein *Regime*." (SPA-31 (emphasis in original).)

Ferdinand Marcos, for example, allegedly accepted $20 million in personal bribes, paid into foreign bank accounts in Marcos' own name and those of his associates, not into the Philippine treasury. 806 F.2d at 355–56. These were "purely private" acts, not governmental conduct. *Id.* at 359; *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362–63 (9th Cir. 1988) (en banc) (Marcos and wife held $1.5 billion in Swiss bank accounts and transported $8.2 million of cash, jewelry, and property outside the country); *Republic of the Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438, 1444 (D.N.J. 1991) (payments "paid into various numbered accounts in Switzerland, Singapore, and elsewhere").

In *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962), former Venezuelan President Jimenez was sued for "us[ing] his position of power and authority to

divert funds … to *his own use and benefit*," such that his personal net worth grew from $31,000 to over $13 million during his nine-year presidency. *Id.* at 560, 563; *see id.* at 558 (acts were "'for the private financial benefit' of [Jimenez]").

And in *United States v. Noriega*, 746 F. Supp. 1506 (S.D. Fla. 1990), the indictment alleged a conspiracy to import cocaine into the United States for the "personal profit" of Panama's military commander. *Id.* at 1510. The court emphasized that "[t]he inquiry is … whether [Noriega's] acts were taken on behalf of Noriega instead of Panama." *Id.* at 1522; *see also United States v. Noriega*, 117 F.3d 1206, 1211 (11th Cir. 1997) (Noriega transferred over $23,000,000 of his fortune to financial institutions outside of Panama).

*Republic of Haiti v. Duvalier*, 211 A.D.2d 379 (N.Y. App. Div. 1995), concerned the conversion of state funds for personal gain, not whether payments were or should have been made to the government treasury. "[O]ver $5 million in cash [was] deposited" in the "personal bank account at issue" by friends and relatives of the former Haitian dictator's wife. *Id.* at 385.

Iraq's reliance on *First Fidelity Bank N.A. v. Government of Antigua & Barbuda*, 877 F.2d 189 (2d Cir. 1989), is also misplaced. *First Fidelity* involved a single ambassador's apparent misconduct for personal gain and addressed whether that ambassador possessed the "apparent [governmental] authority" on which a third party could rightly rely in a commercial transaction. *Id.* at 194. In stark

contrast, the FAC alleges a government-wide policy announced and carried out by government ministries and officials at all levels. The district court—citing Iraq's own allegations of the Hussein Regime's governmental purpose—correctly attributed such conduct to Iraq. (SPA-27.)

Nor does Iraq's newest theory—questioning the Hussein Regime's legitimacy—make the relevant conduct any less governmental. (SPA-29.) Iraq now argues that "Hussein's Regime was also not a government" at all—just "a faction of the Bath [*sic*] Party that controlled the national government." (Br.14.) This is a puzzling 180-degree reversal from Iraq's statement at oral argument below that "[w]e agree *his regime was* the president of Iraq, *the government of Iraq*." (A-3621; SPA-22 (citing Iraq's counsel's statement and FAC).) Iraq's use of the derogatory label "Hussein Regime" to suggest it was not a government also is unavailing, for "regime" refers to "a form of government" or "a government in power." American Heritage Dictionary 1469–70 (4th ed. 2000) (defining "regime" as "1. A. a form of *government*: *a fascist regime*. b. A *government* in power; administration: *suffered under the new regime*").

Moreover, Iraq's use of the moniker "Hussein Regime" cannot overcome the specific details in the FAC (and the underlying Volcker Report), which clearly identify the Program's corruption as official Iraqi government conduct. Indeed, the FAC is replete with allegations demonstrating that, despite hiding behind the

20

phrase "Hussein Regime," Iraq itself understands its former government's responsibility. (*See, e.g.*, A-75–76:¶¶7,11–12, A-101:¶¶218–219, A-103:¶¶225,227–228, A-104:¶232.)[8]

By the same token, however distasteful the Hussein government may have been, both the U.N. and United States treated it as Iraq's government. Indeed, this was the Program's very premise. The U.N. Secretariat and the "Government of Iraq" entered into both the Program MOU (A-479–92) and the 1998 Memorandum of Understanding between the "United Nations and the Republic of Iraq" regarding weapons inspections, U.N. Mem. of Understanding, U.N. Doc. S/1998/166 (Mar. 27, 1998). Security Council Resolution 1154 endorsed the 1998 MOU between the U.N. and "the Republic of Iraq." S.C. Res. 1154, U.N. Doc. S/RES/1154 (Mar. 2, 1998). During Hussein's rule (1979–2003), dozens of other Council Resolutions referred to the "Government of Iraq" and/or "Iraqi Government" under Hussein. (*See, e.g.*, A-464 (S.C. Res. 661, U.N. Doc. S/RES/661 (Aug. 6, 1990))); S.C. Res.

---

[8] Iraq's FAC largely rephrases portions of the Volcker Report, replacing the terms "Iraq" or "Government of Iraq" with "Hussein Regime," as if such wordplay would make the governmental nature of the "Hussein Regime's" conduct disappear. (*Compare* A-522 ("This Report illustrates the manner in which *Iraq* manipulated the Programme … .") *and* A-525 ("[T]he *Government of Iraq* … us[ed] the sale of oil under the Programme as a tool of foreign policy and a sizeable source of illicit revenue."), *with* A-114:¶302 ("[T]he *Hussein Regime* sought to undermine the Programme and its goals … to subvert the policies of the UN and the United States government.") *and* A-127:¶362 ("[T]he *Regime* seized on a second goal—the generation of illicit income … ").)

540, U.N. Doc. S/RES/540 (Oct. 31, 1983); S.C. Res. 778, U.N. Doc. S/RES/778 (Oct. 2, 1992); S.C. Res. 1115, U.N. Doc. S/RES/1115 (June 21, 1997); S.C. Res. 1330, U.N. Doc. S/RES/1330 (Dec. 5, 2000); S.C. Res. 1472, U.N. Doc. S/RES/1472 (Mar. 28, 2003).

Finally, Iraq has conceded its responsibility for the Hussein government's acts in other international contexts.  (*See* A-511 (S.C. Res. 1483, ¶ 16(e), U.N. Doc. S/RES/1483 (May 22, 2003)) (agreeing "to fulfil[l] all remaining obligations related to the termination of the Programme" and assuming the responsibility to contribute five percent of its oil revenues as reparations for Gulf War misconduct); A-1168 (Letter from Iraqi Prime Minister to Security Council (Dec. 13, 2009), *attached to* S.C. Res. 1905, U.N. Doc. S/RES/1905 (Dec. 21, 2009)) ("Iraq is committed to finding a satisfactory solution to the problem of the debts and claims that it inherited from the previous regime."); A-3591 (Claims Settlement Agreement, U.S.-Iraq, Sept. 2, 2010, T.I.A.S. No. 11,522) (bilateral treaty to settle "certain claims of United States nationals arising from the actions of the former Iraqi regime")); Press Release, Paris Club, *The Paris Club and the Republic of Iraq Agree on Debt Relief* (Nov. 21, 2004), *available at* http://www.clubdeparis.org/ sections/communication/archives-2004/irak6017 (agreement between 18 countries and Republic of Iraq to forgive 80% of Iraq's public external debt incurred while the Hussein Regime was in power).  Iraq has also asserted the Hussein Regime's

governmental status affirmatively, asserting sovereign immunity against claims arising out of its participation in the Program. *Terenkian*, 694 F.3d at 1139. In short, the district court was clearly correct in concluding that the "Hussein Regime" was Iraq's government. (SPA-27–34.)

It follows that Iraq is responsible for the Hussein Regime's governmental actions—even illegal ones. Despite Iraq's complaint of what it calls the "lower court's rule," that "all actions within the despot's authority are legally actions of the nation" (Br.27), the legality of the Hussein Regime's actions is irrelevant to whether they are imputed to Iraq. It is well-settled that *governmental* actions are imputed to the state: "It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal." *Banco de España*, 114 F.2d at 444; *see also Westfield v. Fed. Republic of Germany*, 633 F.3d 409, 418 (6th Cir. 2011) (Nazi regime's property seizures "government[al]" even though subsequent government voided those seizures). Indeed, as the district court recognized (*see* SPA-33), it would be illogical and contrary to settled law for nations to escape the consequences of despotic governments' illegal actions: the nation is bound, regardless of whether the government's conduct violates domestic, foreign, or international laws. *See, e.g.*, *Lehigh Valley*, 21 F.2d at 400; Restatement § 207 cmt. d.

3.   Iraq's Position Would Contravene the Political Question and
     Act-of-State Doctrines.

For good reason, Iraq cites no authority for the proposition that a government acts on the nation's behalf only when acting in the nation's interests. (Br.14–15.)  As noted above, states are responsible for their governments' acts, regardless of whether a subsequent government has a different view of the "national interest."  Inquiring into Iraq's "national interest" is a detour that would unnecessarily involve the American judiciary in criticizing foreign governments' policies, which it is not suited to do.  Such questions are reserved for, and already answered by, the Executive Branch.  *See Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994) ("The President's power to recognize foreign governments is implicit in Sections 2 and 3 of Article II of the United States Constitution."); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) (emphasizing "textually demonstrable constitutional commitment" to political branches).  And here, the Executive Branch action leaves no room for judicial inquiry into Iraq's national interests, but instead accepts that the Hussein Regime was Iraq's government and also that the Iraqi state is *responsible* for the former government's acts.  (*See, e.g.*, A-3587–3603 (Claims Settlement Agreement, T.I.A.S. No. 11,522).)   In its dealings with the United States, Iraq, too, has acknowledged state responsibility for the Hussein government's acts.  (*See id.* (paying $400 million to resolve claims

24

based on acts of prior regime)); *Terenkian*, 694 F.3d at 1139 (asserting sovereign immunity for prior regime's acts).

Even if the matter were not committed to the Executive, no "judicially discoverable and manageable standards" would allow U.S. courts to determine what Iraq's national interests were, much less how its government might best have advanced them. *Baker*, 369 U.S. at 217. Such questions are quintessentially political and for the people and government of Iraq to answer, *without involving the American judiciary*. *See United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring) (Supreme Court has "often" and "unequivocally … expressed its antipathy to efforts to convert the Judiciary into an open forum for the resolution of political or ideological disputes about the performance of government"); *Cheung v. United States*, 213 F.3d 82, 89 (2d Cir. 2000) ("Federal courts lack the authority and institutional competence to make the political judgments involved in ascertaining the legitimacy of foreign systems.").

Finally, the district court rightly concluded that Iraq's theory—that U.S. courts should decide whether a foreign government acted "against the national interest" (Br.15)—would "run afoul of the act of state doctrine." (SPA-33.) The question of whether an act was governmental "'does not turn on the legitimacy or illegitimacy of governmental purposes. The act of state doctrine prohibits just such an inquiry into the purpose of an official act.'" *Konowaloff v. Metro. Museum of*

*Art*, 702 F.3d 140, 144 (2d Cir. 2012) (quoting and affirming No. 10 Civ. 9126, 2011 WL 4430856 (S.D.N.Y. Sept. 22, 2011)).  To follow Iraq's approach, this Court would have to hold either that (1) Iraq's prior government's official acts were contrary to national interests and therefore invalid; or (2) Iraq's current government does not grasp its own national interests.  *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 437 (1964) (noting heightened concerns when foreign government is "a suitor in our courts").  The district court avoided such a morass by properly rejecting Iraq's flawed theory.

> 4.    If Common-Law Agency Principles Applied, They Would Confirm Iraq's Responsibility for Its Prior Government's Actions.

Iraq cannot evade the settled law that nations bear the consequences of their governments' actions (*supra* § I.A.1–2) by shoehorning this case into the common law of agency and misapplying the "adverse interest" exception to the rule that agents' actions bind the principal.  Iraq argues that the Hussein government's subversion of the Program was adverse to Iraq's interests, and that it is therefore not bound. (Br.14–28.)  But exceptions of the common law of agency are neither necessary nor appropriate to decide whether an entire government's policies and conduct have consequences for the state.  Nevertheless, even if common-law agency principles did apply, two aspects of Iraq's allegations in the FAC would still make Iraq responsible for the acts of the Hussein Regime.

First, as Iraq itself alleges, "[t]he Hussein Regime controlled Iraq" while Hussein was in power. (A-101:¶219; *see also* Br.14 ("controlled the national government"; "levers of economic power were solely in the hands of" Hussein Regime).) Even where common-law agency principles apply, individuals or groups found "'*dominating and controlling* the corporation [and who] orchestrated the fraudulent conduct'" are deemed "*sole actors*" whose conduct binds the principal, regardless of any adverse interest. *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP*, 322 F.3d 147, 165 (2d Cir. 2003) (citation omitted); *see also In re Derivium Capital LLC*, 716 F.3d 355, 368 (4th Cir. 2013) ("[T]he sole actor rule is a well-established principle of agency law," which "provides that an agent's conduct is imputed to the principal if that agent is the principal's sole representative."); *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 380–81 (S.D.N.Y. 2010) (finding New York "essentially appl[ies]" the same "sole actor" rule as Florida, which holds that "if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's fraudulent conduct was adverse to the principal's interests").

Second, the FAC alleges that Iraq subverted the Program to *serve* Iraq's geopolitical goals by requiring payments *to the Iraqi government*, not private persons. (*Supra* Statement of Facts § C.) Even where common-law agency

27

principles apply, these allegations would foreclose Iraq's effort to employ the "adverse interest" exception. That exception applies only where "the agent has *'totally abandoned'* the principal's interests," *In re The Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) (citation omitted), and is "'not applicable when the agent acts both for himself and for the principal, though his primary interest is inimical to the principal,'" *Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 631 (S.D.N.Y. 2011) (citation omitted). Iraq could therefore invoke the adverse-interest exception only if, contrary to the FAC's allegations, the Hussein government's efforts to undermine sanctions had no state benefits.

But Iraq expressly concedes the lack of total abandonment here, urging that "[t]here is an abuse of authority even if some of the diverted funds went to items that benefited the Republic." (Br.25.) "The adverse interest exception," Iraq argues, "applies even if 'certain schemes inured to the benefit of the corporation but … others did not.'" (*Id.* (quoting *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 100 (2d Cir. 2003)).) But Iraq misreads *Bennett*, which concerned a "malfeasor [who] has engaged in *more than one scheme*," and where total abandonment only applied to one of the schemes. 336 F.3d at 100. Even if the oil surcharges and humanitarian kickback schemes were deemed unrelated, neither constitutes total abandonment; both admittedly resulted in payments to Iraqi state coffers. Thus, as

the district court held, Iraq "does not allege the type of abandonment contemplated by the exception." (SPA-43.)

### B.     The *In Pari Delicto* Doctrine Bars Iraq's Claims.

Iraq's responsibility for the Hussein Regime's actions forecloses its claims because "'as a direct result of [its] own actions, the [Republic of Iraq] bears at least substantially equal responsibility for the violations [it] seeks to redress.'" (SPA-41 (citation omitted) (alterations in original)); *see Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307 (1985); Black's Law Dictionary 862 (9th ed. 2009).

This Court recently emphasized that "[e]arly resolution [under the *in pari delicto* doctrine] is appropriate where … the outcome is plain on the face of the pleadings." *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 n.13, 65 (2d Cir. 2013) ("[T]he rule … is well established" where "[t]he pleadings … leave … no doubt" that plaintiff "bore at least 'substantially equal responsibility' for the injuries [plaintiff] now seeks to redress." (citation omitted)). Indeed, this Court and other circuits have routinely affirmed 12(b) dismissals where the complaint's allegations establish the plaintiff's equal or greater fault. *See, e.g.*, *Color Tile,* 322 F.3d at 164 (rejecting argument that "*in pari delicto* can never be established on the pleadings because issues of relative fault are 'quintessential' fact questions for the jury"); *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 325 (1st Cir.

29

2008) ("[T]he *in pari delicto* defense can be successfully asserted at the motion to dismiss stage so long as the facts establishing the defense are: (1) 'definitively ascertainable from the complaint and other allowable sources of information,' and (2) 'suffice to establish the affirmative defense with certitude.'" (quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006))); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1155–56 (11th Cir. 2006) (affirming RICO claim dismissal because *in pari delicto* applied "based on the face of [the] complaint"); *In re Dublin Sec., Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) (affirming dismissal when plaintiff "admit[ted] in his complaint that [his] own actions were instrumental in perpetrating the fraud").

As the district court recognized, "the Complaint affirmatively—and emphatically—alleges that the Hussein Regime orchestrated the wrongful conduct." (SPA-42 (citing relevant allegations).) Iraq admits the corruption it challenges was "designed and instigated by the Hussein Regime." (A-74:¶4.) It alleges that Iraq "direct[ed] oil allocations to particular countries and individuals it viewed as supportive of the Regime" (A-126:¶356), "demanded that anyone who wanted to purchase oil under the Programme make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime" (A-127:¶363), and used its "right to choose the parties from which it would purchase goods … to induce participation in a corrupt scheme to divert funds from their humanitarian purposes"

(A-163:¶¶522–523).    (*Supra* Statement of Facts § C (detailing how Iraq masterminded, planned, and executed the alleged conspiracy).)  These allegations clearly demonstrate that Iraq acted not merely *in pari delicto*, but *in majore delicto*.

Iraq's last-ditch assertion that "a fact question still exists" as to relative fault (Br.30) is baseless.  That assertion is not supported by a single FAC allegation that could plausibly be read to support the conclusion that the Iraqi government was *less* culpable than others in perpetrating the alleged scheme.  Without such allegations, there is no fact question.  This Court should affirm the district court's holding that the *in pari delicto* doctrine bars Iraq's claims.[9]

## C.    Iraq Lacks Article III Standing to Assert Its Claims.

Because Iraq itself instigated the alleged wrongs and received the illicit payments, the district court should also have dismissed (and this Court may affirm) for lack of standing.    Article III requires as an "irreducible constitutional minimum" that (1) plaintiff "suffered an injury in fact," (2) "fairly … trace[able] to

---

[9]    While Iraq argued before the district court that "the *in pari delicto* defense is inapplicable when the government is acting in its sovereign capacity to exercise public rights to protect the public interest" (A-1378 (quotation marks and citation omitted)), it has abandoned that argument on appeal.  *Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012) (issues not raised in an appellant's opening brief are deemed abandoned); *Jackler v. Byrne*, 658 F.3d 225, 233 (2d Cir. 2011) (same); *see also* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain … appellant's contentions and the reasons for them … .").  Likewise, Iraq does not dispute here the district court's holding that *in pari delicto* does not offend RICO's public policy goals.  (SPA-42.)  Iraq has thus also waived any challenge to that holding.

31

the challenged action of the defendant" and (3) "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted).  Because the district court properly rejected Iraq's effort to proceed *parens patriae* based on general harm to its citizenry (SPA-18–19) and Iraq has not appealed that conclusion, Iraq must establish standing in its own right.[10]

Iraq's claims fail the first two standing requirements.

**First**, Iraq was not injured because it received the funds allegedly diverted from the Program.  As explained above, Iraq's government mandated the complained-of acts and directed the resulting proceeds into the Iraqi Treasury. (*Supra* Statement of Facts § C.)  Although the Program Account may have been diminished, the "diverted" monies were paid *to Iraq* at its own direction.  (*Id.*) Therefore, Iraq was not harmed in its own right by the alleged conduct.[11]

---

[10]  By failing to raise the issue, Iraq has waived any challenge to the district court's holding that Iraq lacks standing to proceed *parens patriae*.  (*Supra* n.9.)

[11]  In any event, Iraq could not have suffered any legally-cognizable injury because it was not entitled to receive funds from the Program Account.  Under Resolution 986 and the MOU, Iraq's role was strictly limited to purchasing humanitarian supplies with money in the escrow fund, and "guarantee[ing] their equitable distribution" to the "Iraqi population" pursuant to a U.N.-approved Distribution Plan.  (A-475 (Resolution 986); A-480–81 (MOU).)  Resolution 986 also provided that Program Account funds were allocated to other, non-Program activities to which Iraq also had no entitlement, such as replenishing the Compensation Fund for victims of Iraq's aggression against Kuwait and

Because the Program Account was "*earmarked* for the 'humanitarian needs of the Iraq population,'" any injury from depletion of the Account was "suffer[ed] in some indefinite way in common with all Iraqis who were supposed to benefit from the escrow account." *Karim v. AWB Ltd.*, No. 06 Civ. 15400, 2008 WL 4450265, at *4 (S.D.N.Y. Sept. 30, 2008) (alteration in original) (quotation marks and citation omitted), *aff'd*, 347 F. App'x 714 (2d. Cir. 2009); *see also* 347 F. App'x at 715 (affirming Judge Lynch's decision "for substantially the reasons stated by the district court in its well-reasoned opinion" and finding that "the alleged injuries were not particular to plaintiffs, but were suffered generally by the population of Iraq").[12]  Of course, under *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–03 (1982), alleged injuries to the Iraqi people are not injuries suffered by Iraq in its own right.  When the district court rightly concluded that Iraq could not sue *parens patriae* (SPA-18–19), in other words, it should have recognized that this ruling foreclosed Iraq's standing to proceed.[13]

---

meeting the operating costs of the Special Commission on Iraq's weapons of mass destruction.  (A-475.)

[12]  Indeed, the FAC alleges that "[t]he UN Escrow Account was funded by the sale of Iraqi oil, owned by the Iraqi people according to the Iraqi Constitution." (A-260:¶1100.)

[13]  In fact, this Court recognized that claims of injury by the Iraqi people themselves were "'conjectural or hypothetical,'" not "'actual or imminent,'" and therefore did not pass Article III muster.  *Karim*, 347 F. App'x at 715–16 (quoting *Lujan*, 504 U.S. at 560; *Karim*, 2008 WL 4450265, at *4).  If the

Nor is Iraq's argument bolstered because Iraq "ultimately received the balance of the UN escrow account." (SPA-17.) When the Program was ended in 2003, Security Council Resolution 1483 transferred funds from the Program Account to the CPA's newly-created Development Fund for Iraq ("DFI") controlled by the United States and United Kingdom. (A-510–12 (S.C. Res. 1483, ¶¶ 13, 16–17, U.N. Doc. S/RES/1483 (May 22, 2003)).) And in June 2004, Council Resolution 1546 transferred control of the DFI to Iraq. (A-1159 (S.C. Res. 1546, ¶ 24, U.N. Doc. S/RES/1546 (Jun. 8, 2004)).) But post-Program U.N. transfers of specific funds that remained do not establish Iraq's standing to sue over the prior diversion of Program funds that it was never entitled to receive.

***Second***, even if Iraq suffered an injury, Iraq's own conduct caused it. (*Supra* §§ I.A–B.) Self-inflicted injuries do not confer standing. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1152–53, 1155 (2013); *Bhd. of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006). Here, because the alleged "corruption was designed and instigated by the Hussein Regime" (A-74:¶4), it is not fairly traceable to any conduct of Defendants-Appellees.

---

injury to Iraq's people—the Program Account's intended beneficiaries—is too "conjectural or hypothetical" to meet the injury-in-fact standard, certainly Iraq has no more legitimate claim of actual injury associated with funds that it was not entitled to receive in its own right.

34

Accordingly, Iraq lacks Article III standing.

## II.   THE DISTRICT COURT CORRECTLY DISMISSED IRAQ'S RICO CLAIM.

Even if the *in pari delicto* doctrine did not bar Iraq's claims, its RICO claim is barred by multiple additional grounds.

### A.   Iraq's RICO Claim Is Impermissibly Extraterritorial.

"It is a longstanding principle of American law that legislation of Congress" applies only within the United States "unless a contrary intent appears" in the statute. *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) (quotation marks and citation omitted). Applying that principle in *Morrison*, the Supreme Court held that U.S. securities statutes do not apply extraterritorially because they evince no clear intention to do so. *Id.* at 2878. This Court subsequently confirmed that RICO also has no extraterritorial application and that RICO claims fail where, as here, they are based on "allegations … primarily involv[ing] foreign actors and foreign acts." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 30–33 (2d Cir. 2010).

*Morrison*/*Norex* plainly control here. (SPA-40.) The district court properly dismissed Iraq's RICO claim as impermissibly extraterritorial because "[t]he scheme described by Iraq is primarily foreign, focused on a multinational organization, engineered by a foreign government, and concerned with Iraqi oil, goods, and contracts." (SPA-35; *see also* SPA-40.) Indeed, 83 of the 92

35

defendants are foreign entities. This Court and courts in this Circuit uniformly reject RICO claims based on similar allegations. *See, e.g.*, *Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, No. 12-cv-9070, 2013 WL 3936191 (S.D.N.Y. July 30, 2013) (dismissing complaint alleging bribery of foreign officials and overseas agreements regarding foreign project); *Tymoshenko v. Firtash*, No. 11-CV-2794, 2013 WL 1234821, at *12 (S.D.N.Y. Mar. 26, 2013) (dismissing complaint where "actors, victims and conduct were foreign, and the connection to the United States was essentially incidental" (quotation marks and citation omitted)); *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473–74 (S.D.N.Y. 2010), *aff'd sub nom.*, *Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012).

The FAC itself confirms the overwhelmingly foreign nature of Iraq's case. (SPA-38–39.) It alleges kickbacks and surcharges paid on contracts in *Iraq*, pursuant to a scheme instigated by *Iraq's* government, concerning supplying goods and services in *Iraq*, and aiming to perpetuate the *Iraqi* regime and thwart *international* sanctions:

- The Iraqi government implemented a scheme to divert funds in connection with oil purchased from or goods sold to Iraq, and "designed and instigated" the Program's corruption to obtain illicit revenues, including by imposing "kickbacks" and "surcharges" (A-74:¶¶1,4, A-125–31:¶¶350–392, A-163–81:¶¶521–630, A-182–84:¶¶640–651);

36

- Iraqi government entities ordered and administered the alleged kickbacks and surcharges, which were paid into Iraq's treasury (A-163–64:¶¶526–527, A-165:¶535, A-168:¶565, A-169:¶568, A-178–81:¶¶621–628); and

- Iraq's government directly negotiated Program contracts in Baghdad (A-119:¶323).

The district court correctly held that the parties involved, the actions challenged, and the injuries alleged are all primarily foreign. (SPA-38–39.) The only even arguable U.S. conduct Iraq alleges is (1) money transfers involving the Program Account and (2) U.N. activity related to the contracts.[14] That alleged conduct, however, is utterly peripheral to the scheme alleged and cannot bootstrap Iraq's allegations into a domestic RICO claim.

---

[14] Iraq also alleges a hodgepodge of "domestic" connections, largely without citation. (*See* Br.48–49.) For example, Iraq notes that a small fraction of the 92 defendants are U.S. entities or individuals. (*Id.* 49.) But this Court has dismissed RICO allegations as impermissibly extraterritorial even where almost all defendants were U.S. entities. *See, e.g.*, *Norex*, 631 F.3d at 31. Iraq also argues that defendants made misrepresentations to the Treasury Department (Br.48), but its FAC contains no such allegations and Iraq cannot rely on that argument here, *see Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002). Nor would misrepresentations incidental to the alleged scheme render Iraq's RICO claim territorial. *See Cedeño*, 457 F. App'x at 38; *Petroleos*, 2013 WL 3936191, at *3.

37

1.    The Program's Banking Arrangements Were Incidental to the Alleged Scheme.

Courts repeatedly have rejected the argument that using U.S. bank accounts renders a foreign scheme domestic where, as here, the banking arrangements are incidental to the alleged scheme.  In *Norex*, plaintiffs claimed U.S. and foreign defendants "committed numerous acts in the United States … including mail and wire fraud, money laundering, … and bribery" by, among other things, employing U.S. bank accounts for fraudulent transactions.  631 F.3d at 31.  The domestic conduct in *Norex* was far more robust than that alleged here, including allegations that U.S. defendants "'masterminded, operated and directed' the illegal conduct"; "used money transferred through U.S. wires" to bribe foreign officials; "traveled between the U.S. and Russia in aid of various aspects of the alleged [i]llegal [s]cheme"; and made "an extortion attempt … in San Francisco."  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438, 443 (S.D.N.Y. 2007).  Nonetheless, this Court held the conduct was impermissibly extraterritorial, and that using wires and U.S. bank accounts was merely incidental to the scheme.  *See* 631 F.3d at 33.  The scheme in question, after all, involved alleged injuries of a Cypriot corporation (headquartered in Canada) resulting from overwhelmingly-foreign defendants' corrupt use of Russian oil companies to take over the Russian oil market, along with a few American defendants' illegal participation in the Iraq Oil-for-Food and Cuban "oil-for-sugar" programs.  540 F. Supp. at 439–40.

38

In *Cedeño*, this Court confirmed that the alleged use of U.S. banks cannot convert an extraterritorial RICO scheme into a domestic one. There, plaintiff alleged that Venezuelans conspired to abuse Venezuelan government authority to extort and defraud the Venezuelan plaintiff. 733 F. Supp. 2d at 472. Plaintiff alleged—as Iraq does here—that defendants "utilized New York-based U.S. banks to hold, move and conceal the fruits of fraud, extortion, and private abuse of public authority." *Id.* The district court held that using U.S. banks was incidental to the alleged scheme, which was too extraterritorial to state a RICO claim. *Id.* at 472–74. This Court affirmed. 457 F. App'x at 38; *see also Petroleos*, 2013 WL 3936191, at *3 (domestic activities, including use of U.S. banks, "fail[ed] to shift the weight of the fraudulent scheme away from Mexico"); *Hourani v. Mirtchev*, No. 10-1618, 2013 WL 1901013, at *5 (D.D.C. May 8, 2013) (domestic activities, including "laundering money through accounts in the United States[,] cannot change the 'essentially foreign' nature of the racketeering activity in this case" (citation omitted)).[15]

---

[15] Iraq cites *United States v. Xu*, 706 F.3d 965 (9th Cir. 2013), (Br.48), but *Xu* is inapposite, involving conduct far more domestic than Iraq alleges. There, defendants schemed to enter into sham marriages with U.S. individuals who had valid U.S. immigration status to gain U.S. residency and enjoy their fruits of fraud in this country, where they were arrested. 706 F.3d at 973, 978–79. The domestic conduct alleged went far beyond using a U.S.-based bank account.

39

Moreover, the FAC itself demonstrates that the Program Account was incidental to the overall, overwhelmingly-foreign scheme. Money flows through the Account were peripheral to Iraq's extraction of illegal fees, which occurred entirely overseas: the *Iraqi* government designed the scheme in *Iraq*, executed it in *Iraq*, and received its fruits in *Iraq*. (*Supra* Statement of Facts § C.) Where, as here, the alleged "principal fraud" occurred overseas, using U.S. banks to transfer the fruits of the fraud does not state a claim under *Morrison*. *Norex*, 540 F. Supp. 2d at 444.[16]

    2.    <u>The U.N. Headquarters' Location Was Incidental to the Alleged Scheme.</u>

Although Iraq focuses on the location of the U.N. Headquarters District (Br.39–46), that is not the critical issue. The district court properly held that "*the territoriality of the Headquarters District is beside the point*." (SPA-37.) The critical issue is whether Iraq's RICO scheme was geographically centered in New York, rather than internationally. It plainly was not. (SPA-40.)

The Program embodied an *international* political decision by member states of the U.N.—an *international* organization designed "to achieve *international*

---

[16]  Additionally, as a district court in this Circuit has noted, the Program Account is not a "domestic" account. It was established pursuant to agreements and resolutions explicitly providing that it was a U.N. instrumentality. *See Paris v. Dep't of Nat'l Store Branch (1) Vietnam*, No. 99 Civ. 8607, 2000 WL 777904, at *4–5 & n.8 (S.D.N.Y. June 15, 2000).

cooperation in solving *international* problems." *See United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1458 (S.D.N.Y. 1988).  As the district court observed, the Program (designed expressly regarding Iraq) had no physical epicenter—it was instead "an administrative creature of the U.N., conceived, maintained, and staffed by a multinational intergovernmental organization." (SPA-37.)

Submitting Program contracts to Security Council members for approval does not center the alleged scheme's focus in the United States.  The FAC acknowledges that contracts were negotiated and signed abroad and submitted for U.N. monitoring only *after* all the terms were decided.  (A-120:¶¶329–333, A-123:¶343.)  The district court thus correctly dismissed Iraq's RICO claim because the FAC "describes a scheme directed by a foreign government, involving international conduct, and exacting a toll on a foreign plaintiff, which itself is a foreign state"; any activity in the United States was merely incidental.  (SPA-40 (citing *Norex*, 631 F.3d at 32)); *see Morrison*, 130 S. Ct. at 2884.

Iraq's extended discussion of whether U.S. courts have jurisdiction over criminal cases arising within the Headquarters District is simply a red herring. (Br.39–46.)  Pursuant to the Headquarters Agreement, "the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control."  *Klinghoffer v. S.N.C. Achille Lauro*,

937 F.2d 44, 51 (2d Cir. 1991); *see also United States ex rel. Casanova v. Fitzpatrick*, 214 F. Supp. 425, 431 (S.D.N.Y. 1963). To afford some judicial recourse for crimes committed within the District, Section 7(c) of the Agreement provides that "the federal, state, and local courts of the United States shall have jurisdiction" over acts "taking place in the headquarters district." Ch. 482, 61 Stat. 756, 760 (1947), *available at* 22 U.S.C. § 287 note. The U.N. also may waive immunities its personnel otherwise have. *See* Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418; *see also Ahmed v. Hoque*, No. 01 CIV 7224, 2002 WL 1964806, at *5 (S.D.N.Y. Aug. 23, 2002). The cases Iraq cites simply apply these principles. They are inapposite here because Iraq's allegations press a RICO claim related to international transactions in Iraq, not acts that physically occurred within the District.[17]

---

[17] *People v. Weiner*, 85 Misc. 2d 161 (N.Y. Crim. Ct. 1976), and *People v. Coumatos*, 224 N.Y.S.2d 504 (Gen. Term 1961), applied the principle that, under the Headquarters Agreement, U.S. courts have criminal jurisdiction over crimes committed in the District. In *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011), which involved a U.N. employee who had defrauded the U.N., the U.N. itself referred the action to the U.S. Attorney and expressly waived immunity. *Id.* at 620–21. *Bahel* merely held that the U.N. is an international organization and that U.S. membership "plainly seeks to promote the United States' foreign policy objectives." *Id.* at 626–28, 630. Iraq's invocation of the *Chalmers* decisions is similarly unavailing. (Br.45.) Neither case addressed the extraterritorial reach of U.S. statutes or whether allegations in the indictment were "domestic."

Finally, Iraq argues that U.S. courts must have jurisdiction where the U.N. is, in Iraq's word, "robbed." (Br.46.) But that is not what the FAC alleges, despite Iraq's current claim that it is the *only* direct victim of Defendants-Appellees' alleged conduct. (*Id.* at 51–53.) As the district court held, the alleged scheme "sought to divert money around the Programme, not out of it." (SPA-38–39.)

In the end, Iraq's entire discussion of the U.N. is misplaced; this Court need not address the status of the Headquarters District at all. Even assuming conduct in the District was domestic, it was too incidental to save Iraq's claim. Merely alleging *some* domestic conduct is not enough. As *Morrison* stressed, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." 130 S. Ct. at 2884 (emphasis in original). Any alleged U.N. conduct was too far removed from this overwhelmingly extraterritorial scheme to transform it into a domestic one. (*Supra* Statement of Facts § C, § II.A.)

### 3.     Iraq's Claims Are Impermissibly Extraterritorial Under an "Enterprise" or a "Pattern" Test.

Although the "primarily foreign" test of *Morrison*/*Norex* governs here and requires dismissal, focusing on either the alleged enterprise or pattern of racketeering yields the same result. Citing no authority, Iraq contends it need only show *either* the enterprise *or* the pattern of racketeering is domestic. (Br.37–39.) This Court did not adopt that theory when proposed in *Cedeño*, nor should it now.

*See* 457 F. App'x at 38.[18]    Even if it did, Iraq's RICO claim would still fail because neither the enterprise nor the pattern is domestic.

**First**, Iraq's claim fails an "enterprise" test under Iraq's own cases. *European Community v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011), illustrates why dismissal is appropriate here. There, the court explained that the enterprise test required finding the alleged scheme's "nerve center" or "brains," then determining whether the scheme was "organized, orchestrated, [or] planned" domestically or abroad. *Id.* at *6–7. The FAC alleges that the Iraqi government organized and planned the alleged scheme. (*Supra* Statement of Facts § C.) Thus, the "brains" were plainly in Iraq. (SPA-40.)[19]

---

[18]    Since *Morrison*, courts have rejected numerous Executive Branch theories regarding RICO's extraterritorial reach. *See, e.g.*, *United States v. Vilar*, Nos. 10-521-cr, 10-580-cr, 10-4639-cr, 2013 WL 4608948 (2d Cir. Aug. 30, 2013) (rejecting argument that presumption against extraterritoriality applies only in civil cases); *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011) (same). Iraq cites *In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533, at *2 n.3 (W.D. Pa. May 26, 2011), for the proposition that RICO has "at least two" foci. (Br.38.) But the cited footnote is actually contrary to Iraq's position, stating that RICO's purpose "does not assist, in any appreciable way, a conclusion regarding RICO's 'focus.'" 2011 WL 2112533, at *2 n.3.

[19]    The other "enterprise" cases Iraq cites also support dismissal. In *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011), foreign plaintiffs brought RICO claims, alleging harm in the United States based on false domestic advertising of Toyota vehicles and decisions to downplay American customer complaints. The court dismissed the RICO claims as extraterritorial. *Id.* at 915. *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933 (N.D. Cal. 2012), involved conduct far more domestic than alleged here: plaintiff brought RICO claims against three U.S. corporations allegedly

**Second**, Iraq's claim also fails a "pattern" test under Iraq's own cases. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012), the only "pattern" case Iraq cites from within this Circuit, is instructive. The court examined where the scheme was *conceived and orchestrated* (United States); the location of the alleged *victim* (United States); and the location of the *predominant actors* (United States). *Id.* at 241. Here, by contrast, the scheme was *conceived and orchestrated* abroad (Iraq); the alleged *victim* was abroad (Iraq); and the *predominant actors* were overwhelmingly foreign (Iraq is the plaintiff, defendants are overwhelmingly foreign, and the U.N. is an international organization).[20]

Under either the enterprise or the pattern test, the FAC alleges an extraterritorial RICO scheme.

---

arranging shipments within the United States. The court found the allegations to constitute "more than the merely incidental domestic activity which, *Morrison* warned, would do nothing to shake the watchdog from its post." *Id.* at 943.

[20] The other "pattern" cases Iraq cites are inapposite. In *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193 (D. Colo. 2011), the plaintiff alleged a scheme to extract money from U.S. borrowers, using U.S. collateral and U.S. attorneys and mortgage brokers to close the loans. *Id.* at 1201. The court found these allegations to be "a far cry from those of *Norex* and *Cedeño*, where the actors, victims and conduct were foreign, and the connection to the United States was essentially incidental." *Id.* at 1210; (*see also* SPA-39–40 (distinguishing *CGC*)).

4.    Iraq's Attempt to Escape *Norex* Fails.

Iraq tries to distinguish *Norex* with the misguided argument that this case invokes the Travel Act as a predicate act.  (Br.50.)  But *Norex* also involved the Travel Act.  *See* 631 F.3d at 31 ("Norex further alleges that defendants committed numerous acts in the United States in furtherance of its scheme that constitute racketeering within the meaning of RICO, including … Travel Act violations … .").

Next, Iraq recycles an argument this Court has already rejected twice: that RICO applies extraterritorially because certain statutes incorporated into RICO as predicate acts have limited extraterritorial application.  (Br.50.)  As Iraq concedes, *Norex* rejected this argument.   (*Id.*); *see* 631 F.3d at 33 ("*Morrison* similarly forecloses Norex's argument that because a number of RICO's predicate acts possess an extraterritorial reach, RICO itself possesses an extraterritorial reach." (citing 130 S. Ct. at 2882–83)).   In *Cedeño*, this Court confirmed that *Norex* "foreclose[s]" that argument and *again* rejected it.  457 F. App'x at 38.

This Court's *Norex* reasoning is sound.   No "clear indication of extraterritorial application," *Morrison*, 130 S. Ct. at 2878, can be gleaned from the fact that some statutes with extraterritorial application are listed in RICO's definition of "racketeering activity."  Many statutes in that definition concern only

domestic activities.[21]  Furthermore, the federal securities laws at issue in *Morrison* had provisions reaching foreign registrants.  *See, e.g.*, 15 U.S.C. § 78*l*(g).  But the Supreme Court still found insufficient indication that the securities laws were intended to apply extraterritorially.  *Morrison*, 130 S. Ct. at 2878.

Iraq's effort to narrow the *Morrison* ruling similarly fails.  The Supreme Court has clearly stated that the *Morrison* presumption applies to *all* federal statutes.  *See id.* at 2877, 2881.  Since *Morrison*, the Supreme Court has held that even statutes that might appear to have an affirmative indication of extraterritorial application—like the Alien Tort Statute—do not apply extraterritorially.  *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).  Iraq's attempt to read an affirmative indication of extraterritorial application into RICO fails.

### B.    The District Court Correctly Held that Iraq Fails to Allege Proximate Causation for Its RICO Claim.

The district court also properly dismissed Iraq's RICO claim because Defendants-Appellees' alleged conduct did not directly and proximately cause the harm alleged.

---

[21]    *See, e.g.*, 18 U.S.C. § 472 (counterfeit securities); *id.* § 1503 (obstruction of justice); *id.* § 1511 (obstruction of state or local law enforcement); *id.* § 1951 (interference with commerce); *id.* § 1955 (illegal gambling).

Civil RICO claims require proximate causation. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).[22]   "[T]he central question … is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).   "[W]hen factors other than the defendant's [conduct] are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi*, 559 U.S. at 9 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 271, 274 (1992)).  Courts rarely "go beyond the first step" in the causal chain. *Holmes*, 503 U.S. at 271–72 (quotation marks and citation omitted).

According to Iraq, "it is the *only* direct victim" of Defendants-Appellees' alleged conduct because the "conspiracy targeted [its] property."  (Br.51–53 (emphasis in original).)  But the property in question was not Iraq's (*supra* n.11), and the number of victims is utterly unrelated to the real issue: the directness of a connection between Defendants-Appellees' conduct and the alleged injury.  For

---

[22]  Iraq's attempt to discount *Hemi* as a plurality opinion is misguided (Br.53 n.16); this Court has repeatedly relied on *Hemi*. *See, e.g.*, *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323, 327 (2d Cir. 2011); *Seidl v. Am. Century Cos.*, 427 F. App'x 35, 37 (2d Cir. 2011) (*Hemi* is "controlling precedent"); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134, 136 (2d Cir. 2010).

numerous reasons, the FAC's allegations demonstrate the absence of sufficient proximity between Defendants-Appellees' conduct and Iraq's supposed injury.

To begin, Iraq's alleged causal chain between the defendants' alleged conduct and its injury is attenuated and inherently speculative.  Indeed, Iraq's chain hinges upon multiple other intervening actors, including various U.N. bodies. As the district court aptly summarized, Iraq "traces defendants' conduct into the Programme, through the Programme apparatus, and then out again … .  All told, the UN approval and letter of credit process required at least eleven different steps by five different entities: the UN, the U.S. Treasury Department, BNP, Iraq, and a defendant."  (SPA-45 (citing A-122:¶340)); *see Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) ("The mere recitation of the chain of causation alleged by the plaintiff[] is perhaps the best explanation of why [it] do[es] not [show proximate causation] in this case." (quotation marks and citation omitted)).

Iraq's argument that "a complex scheme can still create proximate cause" misses the point.  (Br.54–55.)  Complexity is not the issue—*directness* between defendants' conduct and plaintiff's injury is.  Because Iraq's theory rests "not just on separate *actions*, but separate actions carried out by separate *parties*," *Hemi*, 559 U.S. at 11 (emphases in original), it is "too attenuated to support recovery"

49

(SPA-45).  *See also UFCW*, 620 F.3d at 134, 136.[23]   Each intervening step involving parties other than Defendants-Appellees further attenuates the proximity between their alleged actions and Iraq's alleged injury, contrary to the direct connection that proximate causation requires.  *See Anza*, 547 U.S. at 458–59; *Holmes*, 503 U.S. at 271–72.

Moreover, Iraq's role as the instigator and perpetrator of the alleged scheme is fatal to its RICO claim.  A RICO plaintiff must be among "the reasonably foreseeable victims of a RICO violation," *i.e.*, "the targets, competitors and intended victims of the racketeering enterprise." *Lerner*, 318 F.3d at 124.  Here, however, as previously discussed (*supra* Statement of Facts § C, § I.A.2), Iraq "designed and instigated" the alleged scheme (A-74:¶4), and dictated the terms under which the Program would operate (A-127:¶363, A-163:¶526), in order to enrich its own treasury with Program funds and further its own "goals … [of] undermin[ing] the Iraq Sanctions Program" and otherwise "subvert[ing] the policies of the UN and the United States government" (A-114:¶302).  Iraq was therefore not the targeted victim of the scheme, but its intended beneficiary.  Iraq's

[23]   *Mastafa v. Australian Wheat Board, Ltd.*, No. 07 Civ. 7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008), does not support Iraq's argument that the FAC has adequately alleged RICO proximate causation.  (Br.55–56.)  *Mastafa*, which involved a cause of action under the Alien Tort Statute, mentions only "but for" causation (briefly), while primarily analyzing the peculiarities of aiding and abetting liability, which "is not itself a tort" but a "form of 'vicarious liability'" not subject to typical causation principles.  *See* 2008 WL 4378443, at *2.

50

current objection to the wisdom of the RICO scheme it instigated does not render it the intended victim of that scheme.  When wrongdoers seeking their own interests end up suffering from plans gone awry, they are not fairly characterized as the intended or *proximate* victims of a RICO scheme.  *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994).[24]

Iraq's reliance on *Bridge v. Phoenix Bond & Indemnity Co*., 553 U.S. 639 (2008), also fails because the scheme at issue there was totally different from the facts alleged in the FAC.  (Br.52.)  In *Bridge*, the plaintiff had not caused his own alleged injury.  There was no problem of attenuated causal chains because the tax-lien auction process (awarding properties pro rata to bidders submitting zero-discount proposals) made it mathematically certain that the defendant's impermissible submission of bids in multiple corporate names reduced the distribution to other bidders.  553 U.S. at 644 n.3.

The district court also properly recognized that "causal remoteness"—dispositive as to *all* Defendants-Appellees—"even more significantly alienates

---

[24]  While conceding the alleged RICO scheme was "directed at the UN," Iraq contends it is like a bank customer whose safe deposit box is pilfered by defrauding a bank officer.  (Br.51–52.)  But here, Iraq instigated the alleged fraud *and* received the fraudulently-obtained funds.  To apply the analogy, Iraq is the one that did the pilfering.  Proximate causation, moreover, does not concern who may ultimately be harmed by alleged wrongdoing.  Rather, "[t]he purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts."  *Gelt Funding*, 27 F.3d at 769.

BNP from liability," given its unique and limited Program role.  (SPA-46.)  The BNPP Defendants are *not* alleged to have paid any kickbacks or surcharges, arranged for their payment, or played any role in structuring contracts that caused Iraq's supposed injuries.    (*See* SPA-46; A-129–30:¶380, A-168:¶565, A-170:¶¶573–574.)    The Bank provided non-discretionary banking services exclusively *to the U.N.*, which the district court correctly recognized "cannot have been the proximate cause of Iraq's injury."  (SPA-46.)

Iraq's response that the BNPP Defendants made diversion of Program funds possible by hiding from the U.N. and U.S. Treasury the role others played in oil purchases (Br.56) is unsupported by the FAC.  In fact, the Volcker Report notes that "the role of oil traders was *generally known* to the United Nations."  (A-980.)  Moreover, a predicate act does not proximately cause an injury if it merely "further[s] the alleged RICO conspiracy"—which is all that has been alleged about the BNPP Defendants here.  *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 253 & n.23 (S.D.N.Y. 2008); *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002) ("A predicate act does not proximately cause an injury if it merely furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act." (citation omitted)); *see also Lerner*, 318 F.3d at 123.  The BNPP Defendants' supposed hiding of third parties' conduct does not advance Iraq's proximate causation argument.  *See Lerner*, 318 F.3d at 123–24

52

(affirming dismissal of RICO claim where defendant escrow banks failed to report lawyer's dishonored checks).

In sum, Iraq has not alleged that Defendants-Appellees' acts "led directly to [its] injuries" and therefore its RICO claim "does not satisfy the requirement of proximate causation." *Anza*, 547 U.S. at 461.[25]

### C.    Alternative Grounds Raised Below Also Justify Dismissal of Iraq's RICO Claim.

Defendants-Appellees identified below numerous additional deficiencies in Iraq's RICO pleadings the district court did not reach (*see* SPA-46), which constitute alternative grounds for affirming, *see, e.g., Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006) (court may affirm on "any grounds supported by the record"). ***First***, Iraq fails to allege a RICO enterprise existing "separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981).   Nor does Iraq adequately plead an "association-in-fact," which fundamentally requires a "common purpose." *Boyle v. United States*, 556 U.S. 938, 945–46 (2009) (quoting *Turkette*, 452 U.S. at 583). ***Second***, even if Iraq properly alleged an enterprise, it does not allege that Defendants-Appellees directed the enterprise. *See Reves v. Ernst & Young*, 507

---

[25] The failure of Iraq's substantive 18 U.S.C. § 1962(c) claim likewise requires dismissal of its RICO conspiracy claim. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004).

U.S. 170, 179 (1993); *Satinwood*, 385 F.3d at 175–76. **Third**, Defendants-Appellees also argued in the district court that Iraq's claims (including its RICO claims) are time-barred. (A-384–92.) Iraq's claims accrued between 1999 and June 3, 2003, when the Program ended. (A-384–87.) Iraq did not file suit until June 27, 2008—well after the four-year limitations period for its RICO claims had expired—and Iraq has pled no basis for tolling the limitations periods. (A-387–91.)[26]

## III.  THE DISTRICT COURT CORRECTLY HELD THAT THERE IS NO FCPA PRIVATE RIGHT OF ACTION.

Every court to consider whether the FCPA affords a private right of action has declined to find one, and Iraq's contrary argument is meritless.[27]

---

[26] For similar reasons, Iraq's breach of contract (four or six years), breach of fiduciary duty (three years), unjust enrichment (three years), and fraud (six years) claims are also time-barred, at least in part. (A-388–90.)

[27] *See, e.g.*, *Scientific Drilling Int'l, Inc. v. Gyrodata Corp.*, Nos. 99-1077, 99-1084, 1999 WL 674511, at *3 (Fed. Cir. Aug. 30, 1999); *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1028–30 (6th Cir. 1990); *McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1219 (5th Cir. 1987); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 412 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *Shoaga v. Maersk, Inc.*, Nos. C 08-786, C-05-2213, 2008 WL 4615445, at *4 (N.D. Cal. Oct. 17, 2008), *aff'd*, 384 F. App'x 620 (9th Cir. 2010); *Castellanos v. Pfizer, Inc.*, No. 07-60646-CIV, 2008 WL 2323876, at *2 (S.D. Fla. May 29, 2008); *J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*, 937 F. Supp. 216, 226 (S.D.N.Y. 1996); *Citicorp Int'l Trading Co. v. W. Oil & Ref. Co.*, 771 F. Supp. 600, 607 (S.D.N.Y. 1991).

The FCPA contains no express private right of action and courts have routinely found no implied right. The FCPA has no "rights-creating" language focused on a benefited class; it focuses on the entity regulated. 15 U.S.C. § 78dd; *Alexander v. Sandoval*, 532 U.S. 275, 286, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (citation omitted)).

The FCPA's "detailed enforcement scheme" also weighs against implying a right of action. *Scientific Drilling*, 1999 WL 674511, at *3–4; *see* 15 U.S.C. §§ 78dd-1(e), 78dd-2(d), (f), (g); *Sandoval*, 532 U.S. at 289; *Lamb*, 915 F.2d at 1029. Indeed, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 289–90; *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 289–90 (2002). "Because this legislative action clearly evinces a preference for compliance in lieu of prosecution," a private remedy "most assuredly would hinder congressional efforts to protect companies and their employees concerned about FCPA liability." *Lamb*, 915 F.2d. at 1029–30; *see Scientific Drilling*, 1999 WL 674511, at *3.

Iraq's legislative-history argument also fails. Iraq cites suggestions for an express private remedy that were ultimately rejected. (Br.57–58); *compare* S. 3379, 94th Cong. §§ 9, 10, 122 Cong. Rec. 12605, 12607 (1976), *with* S. Rep. No. 94-1031, at 12–13 (1976). Accordingly, the Fifth Circuit correctly rejected the

argument that this legislative history creates an implied private right.  *Lamb*, 915 F.2d at 1029.[28]

This Court should affirm the dismissal of Iraq's FCPA claim.

## IV.  THE DISTRICT COURT PROPERLY DISMISSED IRAQ'S NON-STATUTORY CLAIMS.

Because Iraq's federal claims must be dismissed, the district court correctly found no basis to assert supplemental jurisdiction over Iraq's state-law claims under 28 U.S.C. § 1367.  (SPA-47 (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996) (no supplemental jurisdiction where there is no original federal jurisdiction)).)  Iraq argues that federal common law governs these claims, and that the district court should therefore have exercised federal question jurisdiction.  (Br.59–60.)  This argument is incorrect.

"There is no federal general common law."  *O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 83 (1994) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  "[T]he judicial creation of a federal rule of decision is warranted" only in "extraordinary cases."  *Id.* at 89.  Here, the district court correctly found that Iraq's common law claims (fraud, breach of fiduciary, breach of contract, and unjust enrichment) do not require a federal rule of decision.

---

[28]  Iraq's argument that eliminating an FCPA private right of action was done to avoid creating a negative inference about such a right under other provisions of the Securities and Exchange Act of 1934 is erroneous.  (Br.58.)  Iraq points to no case where the uniform body of FCPA precedent was used to this effect.

Iraq argues that *Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir. 1965), and *Marcos*, 806 F.2d 354, mandate applying federal common law because Iraq's suit implicates U.S. foreign relations.  (Br.59–60.)  The district court correctly distinguished these decisions, which involved enforcing foreign judicial decrees against property held by former foreign officials.  (SPA-47); *Marcos*, 806 F.2d at 354 (federal common law applicable where a "claim raises, as a necessary element, the question whether to honor the request of … the foreign government's directives to freeze property in the United States subject to future process in the foreign state"); *First Nat'l*, 353 F.2d at 50 (upholding federal common law where court is required to apply "foreign confiscation decrees purporting to affect property within the United States").  That is not this case.

Nor does Iraq cite any authority for extending these decisions to claims "leveled against co-conspirators of the Republic's former ruler."  (Br.60.)  As the district court held, the "relation to international entities does not mandate the application of [federal] common law.  If it did, all cases with foreign sovereigns would apply federal common law."  (SPA-47.)[29]

---

[29]  Iraq also does not address the district court's correct holding that none of Iraq's non-statutory claims "contain a 'question qualified as substantial,' the resolution of which would be 'dispositive of the case and would be controlling in numerous other cases' sufficient to create an independent basis of federal jurisdiction pursuant to 28 U.S.C. § 1331."  (SPA-48 (citation omitted).)

Finally, even if the Court exercised jurisdiction, Iraq's non-statutory claims also fail as a matter of law because they are barred by the *in pari delicto* doctrine (*supra* § I.B) and because Iraq's own involvement precludes any finding of proximate cause (*supra* § II.B). The district court made this point in its ruling (SPA-48), and Iraq does not address it now.[30]

## V.   THE DISTRICT COURT PROPERLY DENIED IRAQ LEAVE TO AMEND.

The district court correctly dismissed the FAC with prejudice. Iraq neither moved to amend nor filed a proposed amended pleading below, instead making a perfunctory request in its opposition brief and at oral argument. (A-1442–43; A-2531; A-3650.) The new allegations Iraq raises here do not warrant reversal.

A district court may deny leave to amend where amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, … it is not an abuse of discretion to deny leave to amend."); *see also WC Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 334 (2d Cir. 2013). Iraq's proposed amendment cannot cure the FAC's fatal flaws, and amendment is futile.

---

[30]  Even if federal common law were applicable here, Iraq's fraud claim should still be dismissed because the elements of federal and New York common law fraud are identical. (A-2608–09.)

58

Indeed, Iraq's proposed amendments contradict and are inconsistent with the allegations in the FAC, and the district court may deny leave to amend accordingly. *See BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81, 82 (2d Cir. 2013). Iraq now argues, contrary to its previous allegations, that the Hussein Regime's conduct was personal, not governmental. This directly contradicts the FAC (*supra* Statement of Facts § C; SPA-27–29 ("The Complaint alleges a public goal, undertaken with public resources, pursued for political purposes, and using means available only to state actors.")), and is no basis for challenging the district court's refusal to allow amendment.

Moreover, "[i]t is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss." *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006); *see Metz v. U.S. Life Ins. Co.*, 662 F.3d 600, 602–03 (2d Cir. 2011). This is particularly true where a plaintiff fails to demonstrate how amendment would cure defects in the complaint. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 140 (2d Cir. 2011) (plaintiff "never indicated … how further amendment would permit him to cure the deficiencies in the complaint"). On the record before it, the district court properly dismissed Iraq's claims with prejudice. *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274 (2d Cir. 2006).

Finally, Iraq has already significantly amended its pleading, and had ample opportunity to refine its claims during the five years this case has been pending. Equity weighs against granting Iraq leave to further amend.

## **<u>CONCLUSION</u>**

For the reasons above, the district court's decision should be affirmed.

September 10, 2013                          Respectfully submitted,


                                            /s/ Brant W. Bishop, P.C.
                                            Thomas D. Yannucci, P.C.
                                            Brant W. Bishop, P.C.
                                            John R. Bolton
                                            Robert B. Gilmore
                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth Street, N.W.
                                            Washington, D.C. 20005
                                            (202) 879-5000

                                            *Counsel for Defendants-Appellees
                                            Siemens S.A.S. France, Siemens Sanayi
                                            ve Ticaret A.Ş., and OSRAM Middle
                                            East FZE*

        (Full signature pages of all joining Defendants-Appellees follow)

/s/ John D. Harkrider

John D. Harkrider
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2210

Gail L. Gottehrer
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8195

*Counsel for Defendant-Appellee
Tractel Secalt S.A. (formerly Secalt
S.A.)*

/s/ Robert S. Bennett

Robert S. Bennett
Christopher T. Handman
Ellen S. Kennedy
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Jennifer L. Spaziano
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

*Counsel for Defendants-Appellees
BNP Paribas USA, BNP Paribas
London Branch, BNP Paribas Paris,
BNP Paribas Hong Kong, BNP
Paribas U.K. Holdings, and BNP
Paribas (Suisse) SA*

/s/ Robert A. Van Kirk

Robert A. Van Kirk
Katherine M. Turner
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Counsel for Defendants-Appellees
Clyde Union S.A.S., David Brown
Transmissions France, S.A., and
Textron, Inc.*

/s/ Edward Flanders

John F. Pritchard
Edward Flanders
Ranah L. Esmaili
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
1540 Broadway
New York, NY 10036
(212) 858-1000

*Counsel for Defendants-Appellees
Atlas Copco CMT Sweden AB and
Atlas Copco Airpower N.V.*

/s/ James P. Gillespie, P.C.

James P. Gillespie, P.C.
Karen McCartan DeSantis
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

*Counsel for Defendants-Appellees ABB
AG, ABB Electrik Sanayi A.Ş., ABB
France SAS (successor in interest to
ABB Automation SAS and to ABB
Industrie Champagne by way of its
merger into ABB Automation SAS),
ABB Industrie AC Machines (now ABB
Industrie, AG/ABB Schweiz AG), and
ABB Near East Trading Ltd.*

/s/ Michael J. Tiffany

Michael J. Tiffany
LEADER & BERKON LLP
630 Third Avenue
New York, NY  10017
(212) 486-2400

Christopher S. Riley
BARNES & THORNBURG LLP
121 W. Franklin Street, Suite 200
Elkhart, IN  46516
(574) 293-0681

*Counsel for Defendant-Appellee ABB
Solyvent Ventec*

/s/ Elliot Cohen

Elliot Cohen
TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0700
(212) 704-6000

*Counsel for Defendants-Appellees
AGCO Danmark A/S (erroneously
named as AGCO Denmark A/S), AGCO
S.A., and Valtra do Brasil Ltda.
(erroneously named as Valtra do
Brazil)*

/s/ Darrell Prescott

Darrell Prescott
BAKER & McKENZIE LLP
452 Fifth Avenue
New York, NY  10018
(212) 626-4476

*Counsel for Defendant-Appellee Air
Liquide Engineering*

/s/ Nancy Kestenbaum

Nancy Kestenbaum
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

Mark H. Lynch
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000

*Counsel for Defendants-Appellees Akzo
Nobel N.V., AstraZeneca AB, CILAG
AG International, Intervet
International B.V., Janssen
Pharmaceutical, Merial SAS, and N.V.
Organon*

/s/ Robert H. Baron

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Counsel for Defendant-Appellee AWB
Limited (now known as Agrium Asia
Pacific Limited)*

/s/ Karl Geercken

Karl Geercken
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

*Counsel for Defendants-Appellees*
*Aesculap AG (improperly named as*
*Aesculap AG & KG), Metec Motric*
*S.A. Medizintechnik (improperly named*
*as Aesculap Motric S.A.), Aesculap*
*Surgical Instruments SDN BHD*
*(improperly named as Aesculap*
*Surgical Instruments SDN), B. Braun*
*Medical S.A.S. (improperly named as*
*B. Braun Medical France), B. Braun*
*Melsungen A.G., and B. Braun Medical*
*Industries SDN BHD*

/s/ Tai H. Park

Tai H. Park
PARK & JENSEN LLP
630 Third Avenue
New York, NY 10017
(646) 200-6310

*Counsel for Defendant-Appellee*
*Boston Scientific S.A.S.*

65

/s/ Robert L. Hickok

Robert L. Hickok
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Kenneth J. King
PEPPER HAMILTON LLP
New York Times Building
37th Floor
620 Eighth Avenue
New York, NY 10018-1405
(212) 808-2700

*Counsel for Defendants-Appellees
GlaxoSmithKline International Ltd.,
GlaxoSmithKline Export Ltd.,
GlaxoSmithKline S.A.E., and
GlaxoSmithKline South Africa (Pty)
Ltd.*

/s/ Philip E. Urofsky

Philip E. Urofsky
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20005
(202) 508-8060

Danforth Newcomb
H. Miriam Farber
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

*Counsel for Defendants-Appellees
Renault Trucks S.A.S. (formerly
known as Renault V.I.), ABG
Allgemeine Baumaschinen-
Gesellschaft mbH, Volvo Construction
Equipment AB (a successor company
to Volvo Construction Equipment
International), Sulzer Pumpen
(Deutschland) GmbH, Sulzer Turbo
Ltd. (now known as Sulzer Markets
and Technology AG), Bühler AG
(incorrectly named as Buhler Ltd.),
and Daimler Chrysler AG (now known
as Daimler AG)*

/s/ Francis I. Spagnoletti

Francis I. Spagnoletti
David S. Toy
SPAGNOLETTI & CO.
401 Louisiana Street, 8th Floor
Houston, TX  77002
(713) 653-5600

*Counsel for Defendant-Appellee David B. Chalmers, Jr.*

/s/ Thomas R. Valen

Thomas R. Valen
GIBBONS P.C.
One Gateway Center
Newark, NJ  07102-5310
(973) 596-4500

*Counsel for Defendants-Appellees Daewoo International Corp. and Kia Motors Corporation (erroneously named as Kia Motors)*

/s/ Mark A. Robertson

Mark A. Robertson
FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, NY  10103-3198
(212) 318-3304

*Counsel for Defendant-Appellee El Paso LLC (named as El Paso Corp.)*

/s/ Meir Feder

Meir Feder
Thomas E. Lynch
JONES DAY
222 East 41st Street
New York, NY  10017
(212) 326-3939

*Counsel for Defendant-Appellee Chevron Corporation*

/s/ Jason Jurgens

Jason Jurgens
Nathan M. Bull
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
(212) 504-6000

*Counsel for Defendants-Appellees Dow AgroSciences LLC and Dow AgroSciences S.A.S.*

/s/ R. Michael Smith

R. Michael Smith
BOWIE & JENSEN, LLC
29 W. Susquehanna Ave., Suite 600
Towson, MD  21204
(410) 583-2400

*Counsel for Defendant-Appellee Evapco Europe S.r.l.*

/s/ Thomas B. Kinzler

Thomas B. Kinzler
David Zalman
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178
(212) 808-7800

*Counsel for Defendants-Appellees*
*Flowserve Corporation, Flowserve*
*Pompes S.A.S., and Flowserve B.V*

/s/ Richard D. Klingler

Richard D. Klingler
Steven J. Horowitz
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000

Dorothy J. Spenner
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300

*Counsel for Defendants-Appellees Eli*
*Lilly Export S.A., Novo Nordisk A/S,*
*Ingersoll-Rand Italiana S.p.A.,*
*Ingersoll-Rand World Trade Ltd., and*
*Thermo King Ireland Ltd.*

/s/ Robert P. Parker

Robert P. Parker
ROTHWELL, FIGG, ERNST &
     MANBECK, P.C.
607 14th Street, N.W.
Washington, D.C.  20005
(202) 783-6040

*Counsel for Defendant-Appellee*
*Doosan Infracore Benelux SA (as*
*successor to Ingersoll Rand Benelux*
*N.V.)*

/s/ Brett A. Spain

Brett A. Spain
WILLCOX & SAVAGE P.C.
440 Monticello Avenue
Wells Fargo Center, Ste. 2200
Norfolk, VA  23510
(757) 628-5500

*Counsel for Defendants-Appellees*
*Liebherr Expert AG and Liebherr*
*France, SA*

68

/s/ Michael S. Cohen

Michael S. Cohen
NIXON PEABODY LLP
Suite 300
50 Jericho Quadrangle
Jericho, NY  11753
(516) 832-7500

*Counsel for Defendant-Appellee*
*Serono Pharma International*

/s/ Peter L. Altieri

Peter L. Altieri
David J. Clark
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY 10177
(212) 351-4500

*Counsel for Defendant-Appellee*
*Railtech International SA*

/s/ John G. Harkins, Jr.

John G. Harkins, Jr.
HARKINS CUNNINGHAM LLP
4000 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103-7044
(215) 851-6700

*Counsel for Defendant-Appellee Rohm*
*and Haas France, S.A.S.*

/s/ John P. Doherty

John P. Doherty
ALSTON & BIRD LLP
90 Park Avenue
New York, NY  10016
(212) 210-9400

*Counsel for Defendant-Appellee CG*
*Holdings Belgium N.V. (f/k/a Pauwels*
*International N.V.)*

/s/ Brian S. Weinstein

Brian S. Weinstein
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY  10017
(212) 450-4000

Jason McCullough
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, D.C.  20005
(202) 962-7000

*Counsel for Defendants-Appellees F.*
*Hoffmann-La Roche Ltd and Roche*
*Diagnostics GmbH*

/s/ Gregory L. Baker

Gregory L. Baker
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 861-1696

*Counsel for Defendant-Appellee Solar*
*Turbines Europe S.A.*

| | |
|---|---|
| */s/ Judith A. Lockhart, Esq.* | */s/ Lawrence Walker Newman* |
| Judith A. Lockhart, Esq.<br>CARTER LEDYARD & MILBURN LLP<br>2 Wall Street<br>New York, NY 10005<br>(212) 238-8603 | Lawrence Walker Newman<br>BAKER & MCKENZIE LLP<br>452 Fifth Avenue<br>New York, New York 10018<br>(212) 891 3970 |
| *Counsel for Defendant-Appellee St. Jude Medical Export GmbH* | *Counsel for Defendant-Appellee Burckhardt Compression AG (named as Sulzer Buckhardt Engineering Works Ltd.)* |
| */s/ Clay J. Pierce* | */s/ Michael H. Ginsberg* |
| Clay J. Pierce<br>DRINKER BIDDLE & REATH, LLP<br>1177 Avenue of the Americas,<br>   41st Floor<br>New York, NY 10036-2714<br>(212) 248-3140 | Michael H. Ginsberg<br>JONES DAY<br>500 Grant Street<br>Suite 4500<br>Pittsburgh, PA 15219<br>(412) 391-3939 |
| *Counsel for Defendant-Appellee Renault Agriculture & Sonalika International* | *Counsel for Defendant-Appellee The Weir Group PLC* |
| */s/ J.A. Canales* | */s/ Penny Shane* |
| J. A. Canales<br>CANALES & SIMONSON, P.C.<br>Attorneys at Law<br>2601 Morgan Avenue - P.O. Box 5624<br>Corpus Christi, TX 78465-5624<br>(361) 883-0601 | Penny Shane<br>Andrew P. Giering<br>SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, NY 10004<br>(212) 558-4837 |
| *Counsel for Defendant-Appellee Oscar S. Wyatt, Jr.* | *Counsel for Defendant-Appellee Vitol S.A.* |

/s/ Walter P. Loughlin                     /s/ Casey D. Laffey, Esq.

Walter P. Loughlin                         Casey D. Laffey, Esq.
K&L GATES                                  REED SMITH LLP
599 Lexington Avenue                       599 Lexington Avenue, 22nd Floor
New York, NY  10022-6030                   New York, NY  10022
(212) 536-4065                             (212) 549-0389

Andrew Siegel                              *Counsel for Defendant-Appellee*
Christopher A. Payne                       *Johnson Controls Air Conditioning*
SANDLER SIEGEL, PLLC                       *and Refrigeration FZE (f/k/a York*
6600 LBJ Freeway                           *Airconditioning & Refrigeration FZE)*
Suite 183
Dallas, TX  75240
(972) 284-0731

*Counsel for Defendant-Appellee*
*Woodhouse International, LLC*

71

## FED. R. APP. P. FORM 6 (CERTIFICATE OF COMPLIANCE WITH RULE 32(A))

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

September 10, 2013                          */s/ Brant W. Bishop, P.C.*
                                            Thomas D. Yannucci, P.C.
                                            Brant W. Bishop, P.C.
                                            John R. Bolton
                                            Robert B. Gilmore
                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth Street, N.W.
                                            Washington, D.C.  20005
                                            Telephone: (202) 879-5000

                                            *Counsel for Defendants-Appellees
                                            Siemens S.A.S. France, Siemens Sanayi
                                            ve Ticaret A.Ş., and OSRAM Middle
                                            East FZE*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing BRIEF FOR DEFENDANTS-APPELLEES was filed electronically on this 10th day of September, 2013, and will, therefore, be served electronically upon all Filing Users registered with PACER for this case.

*/s/ Brant W. Bishop, P.C.*
Brant W. Bishop, P.C.