# 13-0618-cv

## United States Court of Appeals

*for the*

## Second Circuit

THE REPUBLIC OF IRAQ, including as *Parens Patriae* in behalf of the Citizens of the Republic of Iraq,

*Plaintiff-Appellant,*

v.

SECALT S.A., BNP PARIBAS USA, BNP PARIBAS LONDON BRANCH, BNP PARIBAS PARIS, BNP PARIBAS HONG KONG, DRESSER INTERNATIONAL, DAVID BROWN GUINARD PUMPS S.A.S., FKA BROWN DAVID GUINARD PUMPS S.A.S., ATLAS COPCO CMT SWEDEN AB, ABB INDUSTRIE CHAMPAGNE, ABB NEAR EAST TRADING LTD., ABB SOLYVENT VENTEC, AGCO DENMARK AS, AGCO S.A.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# REPLY BRIEF FOR PLAINTIFF-APPELLANT

BERNSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
(212) 779-1414

– and –

MANEY & GONZÁLEZ-FÉLIX PC
700 Louisiana Street, Suite 4545
Houston, Texas 77002
(713) 806-2500

*Attorneys for Plaintiff-Appellant*

VALTRA DO BRAZIL, AIR LIQUIDE ENGINEERING, AKZO NOBEL N.V., N.V. ORGANON ORGANON, INTERVET INTERNATIONAL B.V. INTERVET, MAIS CO. FOR MEDICAL PRODUCTS, ATLAS COPCO CMT, AWB LTD., B. BRAUN MEDICAL FRANCE, B. BRAUN MELSUNGEN A.G., B. BRAUN MEDICAL INDUSTRIES SDN BHD MALAYSIA, AESCULAP AG AND KG, AESCULAP MOTRIC S.A., AESCULAP SURGICAL INSTRUMENTS SDN, BOSTON SCIENTIFIC S.A., FIATAVIO, BNP PARIBAS SUISSE SA, GLAXO WELLCOME EXPORT LTD., ABB INDUSTRIE AC MACHINES, BNP PARIBAS UK HOLDINGS LIMITED, ABB ELEKTRIC SANAYI AS, BNP PARIBAS SUISSE SA, BUHLER LTD., DAVID B. CHALMERS, JR., CHEVRON CORPORATION, including as successor to Texaco Corp., DAEWOO INTERNATIONAL CORP., DAIMLER CHRYSLER AG, DOW AGROSCIENCES, EASTMAN KODAK S.A., EL PASO CORP. successor to Coastal Corp., EVAPCO EUROPE S.R.L., AVIO FLOWSERVE CORP., FLOWSERVE CORP., FLOWSERVE POMPES formerly Ingersoll Dresser Pompes, FLOWSERVE B.V., GLAXOSMITHKLINE WALLS HOUSE, GLAXO SMITHKLINE EGYPT SAE, SMITHKLINE BEECHAM INTERNATIONAL, ABB AUTOMATION, ABB AG, INGERSOLL RAND ITALIANA SPA, RAND ITALIANA, SPA, GLAXO WELLCOME SA SOUTH AFRICA PRY LTD., THERMO KING IRELAND LIMITED, INGERSOLL RAND BENELUX N.V. PAUL, INGERSOLL RAND WORLD TRADE LTD., CILAG AG INTERNATIONAL, JANSSEN PHARMACEUTICAL, KIA MOTORS, LIEBHERR EXPORT AG, LIEBHER FRANCE SA, SERONO PHARMA INTERNATIONAL, MERIAL, NOVO NORDISK, PAUWELS, RAILTECH INTERNATIONAL, F. HOFFMAN LA ROCHE, ROCHE DIAGNOSTICS GMBH, ROHM AND HAAS FRANCE S.A., SIEMENS S.A.A. OF FRANCE, SIEMENS SANAYI VE TICARET A.S. OF TURKEY, OSRAM MIDDLE EAST FZE, SOLAR TURBINES EUROPE, ST. JUDE MEDICAL EXPORT GMBH, SULZER BUCKHARDT ENGINEERING WORKS LTD., SULZER PUMPEN DEUTSCHLAND GMBH, SULZER TURBO LTD., TEXTRON INC., EVAPCO (AUSTRIA), DAVID BROWN TRANSMISSIONS FRANCE S.A., RENAULT TRUCKS SAS, RENAULT AGRICULTURE AND SONALIKA INTERNATIONAL, RENAULT V.I, VOLVO CONSTRUCTION EQUIPMENT AB, a successor company to Volvo Construction Equipment International, THE WEIR GROUP, OSCAR S. WYATT, JR., VITOL S.A., WOODHOUSE INTERNATIONAL, YORK AIR CONDITIONING AND REFRIGERATION FZE, UNION PUMP S.A.S., FKA DAVID BROWN GUINARD PUMP S.A.S., ATLAS COPCO AIRPOWER N.V., ELI LILLY EXPORT S.A., ASTRA ZENECA AB, EBEWE PHARMA GES M.B.H., DOW AGROSCIENCES S.A.S., DOW AGROSCIENCES LLC, ABG ALLGEMEINE BAUMASCHINEN GESELLSCHAFTMBH, CLYDE UNION S.A.S., FKA UNION PUMPS S.A.S., FKA DAVID BROWN GUINARD PUMPS S.A.S.,

*Defendants-Appellees.*

# TABLE OF CONTENTS

INTRODUCTION AND CLARIFICATION OF FACTS ....................................... 1

1. Saddam Hussein could, and did, abuse his dictatorial control over the Iraqi government to serve personal interests in total abandonment of the national interest. ................................................. 1

2. The diversions from the Programme to the Hussein Regime harmed the nation. ......................................................................... 3

3. The Defendants' assistance was required to corrupt the Programme. ........................................................................... 4

4. Most of the Republic's losses were caused by diversions to the Defendants. ........................................................................... 5

ARGUMENT ............................................................................................ 6

1. Hussein's participation in the Defendants' conspiracy does not bar the Republic's claims. ............................................................ 6

A. General agency principles apply to Hussein's exercise of dictatorial power. ........................................................ 6

(1) The adverse interest exception applies to exercises of governmental authority. ................................................ 7

(2) Hussein's immense power does not foreclose application of general agency principles. ......................... 8

B. Pursuant to generally accepted agency principles, the Republic's liability to innocent third parties because of the Hussein Regime's illegal conduct is irrelevant. ....................... 11

(1) The Republic is not being sued for *respondeat superior*. ............................................................... 11

(2) The Defendants are not innocent third parties................ 12

(3) Hussein was not synonymous with the nation................ 14

C. Whether Hussein totally abandoned the national interest is a question of fact. ....................15

(1) The Programme's corruption did not benefit, but damaged, the Republic. ....................15

(2) Whether Hussein abandoned the national interest is a fact question. ....................17

(3) The fact question on abandonment does not implicate the political question or act of state doctrines. ....................18

(4) The Republic has standing....................20

D. The Republic should have been granted leave to amend....................20

(1) The Republic expressly requested leave to amend....................20

(2) The Republic's proposed amendments do not contradict its current Complaint. ....................22

(3) The Republic has not had an ample opportunity to amend....................22

2. The Republic of Iraq's RICO claim is territorial. ....................23

A. The lower court's opinion depends on its incorrect conclusion regarding UN territoriality....................24

B. The Programme and pattern of racketeering activity are territorial....................24

(1) The Enterprise is domestic. ....................24

(2) The pattern of racketeering activity is domestic. ....................25

(3) The Defendants fraud against the Treasury Department supports jurisdiction. ....................26

(4) The Republic is not trying to change the Norex rule, but clarify it....................28

3. The Defendants' criminal conduct proximately caused the Republic of Iraq's injury. ....................................................................28

4. This Court should ignore the Defendants' perfunctory arguments. ...........................................................................................30

CONCLUSION ......................................................................................................31

**TABLE OF AUTHORITIES**

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ....................27

*Ash v. Georgia–Pacific Corp.*,
957 F.2d 432 (7th Cir.1992) .................... 13, 15

*Bank of China v. NBM LLC*,
359 F.3d 171 (2d Cir. 2004) ....................17

*Continental Management, Inc. v. United States*,
527 F.2d 613 (Ct. Cl. 1975)....................8, 12

*E.E.O.C. v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991)....................24

*Eastern Trading Co. v. Refco, Inc.*,
229 F.3d 617 (7th Cir. 2000) ....................13

*European Community v. RJR Nabisco, Inc.*,
No. 02-CV-5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ....................25

*First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission*,
877 F.2d 189 (2d Cir. 1989) ....................7, 14

*Frank v. United States*,
78 F.3d 815(2d Cir.1996), *vacated on other grounds*,
521 U.S. 1114 (1997)....................30

*Gomez v. Toledo*,
446 U.S. 635 (1980)....................23

*Grassmueck v. Am. Shorthorn Ass'n*,
402 F.3d 833 (8th Cir. 2005) ....................14

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010)....................25

*In re Bennett Funding Group, Inc.*,
336 F.3d 94 (2d Cir. 2003) ....................................................................8, 14

*In re CBI Holding Co., Inc.*,
529 F.3d 432 (2d Cir. 2008) .......................................................................14

*In re Lemington Home for the Aged*,
659 F.3d 282 (3d Cir. 2011) .......................................................................17

*Jimenez v. Aristeguieta*,
311 F.2d 547 (5th Cir. 1962) ................................................................ 10, 11

*Kemler v. United States*,
133 F.2d 235 (1st Cir. 1942)...................................................................5, 16

*Marine Midland Bank v. John E. Russo Produce Co., Inc.*,
50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980) .......................... 13, 17

*McLaughlin v. Anderson*,
962 F.2d 187 (2d Cir. 1992) .......................................................................21

*Metz v. U.S. Life Ins. Co. in the City of New York*,
662 F.3d 600 (2d Cir. 2011) .......................................................................22

*Morrison v. National Australia Bank, Ltd.*,
130 S. Ct. 2869 (2010)...............................................................................23

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) .........................................................................28

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
322 F.3d 147 (2d Cir. 2003) .......................................................................14

*Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Res. Found. v. PricewaterhouseCoopers, LLP*,
607 F.3d 346 (3d Cir. 2010) .......................................................................13

*Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*,
67 F. Supp. 2d 126 (E.D.N.Y. 1999) ..........................................................16

*Republic of Haiti v. Duvalier*,
211 A.D.2d 379 (1st Dept 1995)..................................................................10

*Republic of the Philippines v. Marcos*,
818 F.2d 1473 (9th Cir. 1987), *rev'd*, 862 F.2d 1355 (9th Cir. 1988)..............9, 10

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990) ..........................................................................23

*Tolbert v. Queens College*,
242 F.3d 58 (2d Cir. 2001) ............................................................................31

*Trajano v. Marcos*,
No. 86-2448, 1989 WL 76894, 878 F.2d 1439 (9th Cir. 1989)............................18

*United States v. Noriega*,
746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) ........10

*Vicon Fiber Optics Corp. v. Scrivo*,
201 F. Supp. 2d 216 (S.D.N.Y. 2002) ..............................................................30

*W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Intern.*,
493 U.S. 400 (1990)........................................................................................19

**RULES**

Fed. R. App. P. 28(a) ..........................................................................................31

Fed. R. App. P. 32(a) ..........................................................................................32

**OTHER AUTHORITIES**

Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure (3d ed. 2010).....................................................18

Restatement (Third) of Agency ........................................................ 11, 12, 13, 16

Restatement (Second) of Agency.......................................................................13

*Introduction and Clarification of Facts*

The Republic of Iraq alleges that Saddam Hussein abused his dictatorial power to serve his personal goals, that Saddam Hussein totally abandoned the interest of the nation he was supposed to serve, and that Saddam Hussein's and the Defendants' corruption of the United Nations Oil for Food Programme was entirely against the national interest and severely damaged the nation. The Defendants feign surprise at these allegations and assert that the Republic's Complaint contradicts them.

Unfortunately, the lower court adopted the Defendants' view and held that the Republic could not challenge any action of Saddam Hussein that "was undertaken in the purported or apparent execution of official duties." SPA-27.

Since Hussein had dictatorial control over the Iraqi government, the lower court's legal rule forecloses any challenge to any of his actions. This appeal thus turns on whether a sovereign can ever challenge the actions of a former dictator.

1. *Saddam Hussein could, and did, abuse his dictatorial control over the Iraqi government to serve personal interests in total abandonment of the national interest.*

With a stroke of their pen, the Defendants convert Saddam Hussein and his Regime into "Iraq" so they can claim that "Iraq" benefited from Hussein's corruption. The Republic, however, contests this factual conclusion, which contradicts the allegations in its Complaint.

The fact that Hussein, as dictator, possessed the power to compel government offices to effect his desired subversion does not alter the nature of his desires. The Republic concedes the obvious—Saddam Hussein wielded great power, to the extent that he could utilize the nation's governmental resources (from the military and secret police to its banks) to fulfill his every whim. In the words of the Complaint, "Saddam Hussein was a tyrant, not a legitimate government ruler…." A-102:¶223.

Hussein wielded power through his Regime. While the Defendants might quibble that use of the term "regime" implies the Iraqi government as a whole, the Republic's Complaint expressly defines the term "Hussein Regime" as "Saddam Hussein and his representatives." A-74:¶2. The Republic's Complaint explains, "the Hussein Regime did not act as a legitimate government, but as a group of corrupted government officials." A-102:¶223. Hussein forced other government officials to comply with his orders by harshly suppressing opposition through execution and imprisonment, including of jurists who tried to maintain a rule of law. A-101-102:¶¶221-23.

Thus, there is no contradiction between the Republic's allegations that the Programme corruption was undertaken by Hussein for Hussein and his family and cohorts and its allegations that governmental officials facilitated Hussein's desired corruption through their offices (whether by threat of execution or to curry

Hussein's favor). The truth is that Hussein abused his immense power over the national government to profit personally at the expense of the nation.

*2. The diversions from the Programme to the Hussein Regime harmed the nation.*

The Republic's Complaint directly contradicts the Defendants' assumption that the diversions to Hussein's "governmental" programs benefited the nation itself. The Republic alleges that, "The greatest damage to the Iraqi people … was not the wholesale theft of their oil revenues, but the effect caused by the diversion of those revenues from humanitarian goods to the illicit purposes of the Hussein Regime." A-262:¶1115-19.

The lower court and the Defendants place great weight on the fact the Defendants' bribes were placed initially in "bank accounts owned or controlled by the Hussein Regime," A-127:¶363, which the Defendants interpret as "government coffers." *E.g.*, Def.Br.-17; *see also* A-139:¶426 ("Regime-controlled accounts at banks in Jordan and Lebanon").

Hussein had complete control over Iraqi government assets, so even if the scheme exclusively utilized nominally government accounts, Hussein's personal interests were still served. The only Iraqi assets that Hussein could not arrogate at will were the Programme assets under the UN's guard. Hussein could obtain Programme assets only after the Defendants had illegally placed those assets under Hussein's control.

*3. The Defendants' assistance was required to corrupt the Programme.*

The Programme was specifically designed to prevent Hussein from gaining control over Programme assets, particularly cash proceeds from the sale of Iraqi oil.

But, while the UN did not trust the Hussein Regime, it did trust the Programme participants. The Programme's core protection against misconduct by the Hussein Regime was the requirement that Programme participants commit to follow Programme procedures. A-119-120:¶¶325, 331. Unfortunately, the UN's trust that Programme participants would abide by their commitments was misplaced.

To obtain approval of their illicit contracts, the Defendants had to mislead the UN overseers and the US Treasury Department, both of whom controlled the Programme's funds, which were blocked assets of the Iraqi nation. A-104,105, 107¶¶230, 242, 253.

BNP was an active participant in the conspiracy. BNP too misled the UN and the Treasury Department, which had given BNP a license to handle the blocked funds. A-1121, 251, 269:¶¶290, 1039, 1159. In particular, the Republic contests the claim in footnote 4 to the Defendants' Brief that the "BNPP Defendants are not alleged to have … had any knowledge of the alleged surcharge and kickback schemes."

BNP admitted its knowledge to the Volcker Committee: "BNP officials acknowledged awareness at the time of the Iraqi surcharge policy as a condition precedent for the purchase of Iraqi oil." A-973. The Republic's Complaint alleges: "Knowing that the 661 Committee was concerned with corruption of the Programme, BNP nonetheless chose to agree to facilitate that corruption by aiding the Oil Purchasing Defendants and other Programme purchasers in keeping relevant and material information from the Programme overseers – the 661 Committee and the OIP." A-257:¶1084; *see also* A-258:¶1086 ("BNP also had strong indications that the scope of the corruption of the Programme was larger than its participation.").

*4. Most of the Republic's losses were caused by diversions to the Defendants.*

The Defendants illegally transferred desperately needed cash to a known terrorist sponsor, in violation of UN and United States sanctions regulations, the FCPA, the RICO statutes, and the PATRIOT Act.

They did so for a reason—money. "Obviously no one would give or offer a bribe unless he expected to gain some advantage thereby…." *Kemler v. United States*, 133 F.2d 235, 238 (1st Cir. 1942).

Yet, there is not a *single* mention of the Defendants' excessive profits in their brief. Avoiding the subject requires some careful editing. For example, the Defendants state, "According to Iraq, 'the main goal of the conspiracy was to

undermine UN sanctions and the US laws prohibiting transactions with State Sponsors of Terrorism.'" Def.Br.-6. The Defendants purport to be quoting the Republic's Complaint, but that paragraph actually states that this was the Hussein Regime's goal—because Hussein wanted to remain in power, and the sanctions threatened his reign. A-75:¶7. The Complaint's next paragraph explains that the "Defendants' goal was more straightforward. They wanted money. To collect that money, they conspired with the Hussein Regime to siphon billions of dollars in oil revenues from a UN humanitarian program." A-75:¶8.

Even humoring the Defendants' claim that they merely helped the Hussein Regime divert national resources from their agreed purpose (humanitarian aid) to other Regime purposes (maintaining Hussein's reign and lifestyle), the diversion came at a cost (the Defendants' excessive profits). As a result, even if the diversions to the Hussein Regime caused the Republic no injury, the Republic was substantially damaged by the diversions to the Defendants.

## *Argument*

### 1. *Hussein's participation in the Defendants' conspiracy does not bar the Republic's claims.*

#### A. *General agency principles apply to Hussein's exercise of dictatorial power.*

The Republic alleges that Hussein utilized his total control over the Iraqi government to serve his personal goals such that Hussein had totally abandoned his principal's (the nation's) interests. The lower court, however, concluded that the

Republic could not challenge any action of Saddam Hussein "undertaken in the purported or apparent execution of official duties." SPA-27. In particular, the lower court found no basis for applying the adverse interest exception to governmental conduct. SPA-43 ("there is no case law that suggests" the adverse interest exception is "available to sovereigns"); Def.Br.-24 ("Iraq cites no authority").

Given Hussein's total control over the Iraqi government, the lower court's rule prevents the Republic from challenging any action directed by Hussein. Indeed, the lower court's rule turns Lord Acton's tenet on its head, allowing challenges to abuse of governmental authority only if that authority is limited.

*(1) The adverse interest exception applies to exercises of governmental authority.*

This Court has stated that "the agency law of developed states" determines whether a governmental agent's conduct binds the sovereign. *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 193 (2d Cir. 1989). The district court found this authority inapplicable on the basis that it deals exclusively with the authority of "one person in a larger government," not what the lower court characterized as the Iraqi government as a whole. SPA-27.

Putting aside for the moment the government-wide distinction, this Court's *First Fidelity Bank* opinion establishes that general agency principles apply to government officials when they exercise their governmental authority. One of

those generally accepted principles is the adverse interest exception, which allows a principal to challenge the actions of agents who abuse their power.[1] Indeed, if the adverse interest exception did not apply to governmental agents, sovereigns could not sue those that bribe their agents. But, that is certainly not the position of the United States government, which has civilly sued both former government officials and the contractors who bribed them for damages.[2]

Thus, at a minimum, the lower court incorrectly concluded that the Republic is precluded from challenging any action that "was undertaken in the purported or apparent execution of official duties." SPA-27.

*(2) Hussein's immense power does not foreclose application of general agency principles.*

The lower court held that a different rule applies when a government official can commandeer an entire government; in such cases, corruption becomes official government policy that can never be challenged. The lower court found no authority to the contrary, but reached that conclusion by incorrectly distinguishing

---

[1] *E.g., In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (The "acts of the agent will not be charged to the corporation if although the agent purportedly acts for the corporation, he 'is really committing a fraud for his own benefit.'") (citation omitted).

[2] *See, e.g.*, http://www.justice.gov/opa/pr/2009/November/09-civ-1196.html (bribes paid to Army contracting officer by government contractors); *Continental Management, Inc. v. United States*, 527 F.2d 613 (Ct. Cl. 1975)(bribes paid to officials of Federal Housing Authority and the Veterans Administration).

applicable authority as describing solely personal corruption of the relevant dictator.

Although the lower court held that this case is unprecedented, its analysis mirrors that rejected by the *en banc* Ninth Circuit in *Republic of the Philippines v. Marcos*, 818 F.2d 1473 (9th Cir. 1987), *rev'd*, 862 F.2d 1355 (9th Cir. 1988) (en banc). The Philippines challenged the actions of its former dictator, Marcos. The original panel's majority opinion reasoned that "governmental acts of a country's chief executive necessarily reflect complex political and policy choices." *Id*. at 1485. Because Marcos had dictatorial power, the panel concluded that all of Marcos' decisions were "political and policy choices" that could not be challenged in court: "By its nature, dictatorial rule is arbitrary and unrestrained by legal authority; martial law is a suspension of the normal rule of law. Offensive as such absolute government may be to our sense of justice, no legal restraints can prevail against dictatorial power." *Id.* at 1489.

Based on the breadth of Marcos' power, the panel concluded, "A dictator can do whatever he can get away with. A court of law in this country simply cannot second-guess how that power is exercised." *Id*.

According to the panel, with such immense power, it was immaterial that "one of the motives behind a particular governmental act may have been selfish, or that it was intended to serve otherwise improper ends." *Id.* at 1485.

Ultimately, in essentially the identical manner as the lower court, the original panel concluded that the Philippines' action was barred because it "challenges not merely individual misdeeds or indiscretions but the very way in which Mr. Marcos wielded governmental power, retained that power and ran the Philippine government," "activities that Marcos could only have undertaken pursuant to his powers as President of the Philippines." *Id*. at 1480, 1479.

The panel's conclusions engendered a strong dissent and were soundly rejected by the *en banc* court, which concluded that the Philippines was free to claim that Marcos abused his dictatorial power to serve his personal ends. 862 F.2d at 1361.

The Fifth Circuit reached the same conclusion when Marcos Jimenez challenged his extradition to Venezuela to answer for corruption charges. *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962). Like Hussein, Jimenez had taken power in a coup, rejected elections, and enjoyed dictatorial power. Yet, the Fifth Circuit held that, though a dictator, Jimenez could still commit acts "in violation of his position and not in pursuance of it." *Id*. at 558.[3]

---

[3] Noriega's and Duvalier's similar claims were also rejected. *United States v. Noriega*, 746 F. Supp. 1506, 1522 (S.D. Fla. 1990) ("The inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama."), *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 382 (1st Dept 1995).

Trying to demonstrate that Jimenez was personally, not governmentally, corrupt, the Defendants point to the fact that Jimenez' "personal net worth grew from $31,000 to over $13 million during his nine-year presidency." Def.Br.-19 (citing, *Jimenez*, 311 F.2d at 563). But, Hussein's corruption was even more lucrative, netting him a personal fortune of approximately $2 billion.[4]

### *B. Pursuant to generally accepted agency principles, the Republic's liability to innocent third parties because of the Hussein Regime's illegal conduct is irrelevant.*

#### *(1) The Republic is not being sued for respondeat superior.*

Like the district court, the Defendants focus on the fact that the Republic has been held liable to innocent third parties for the wrongful conduct of the Hussein Regime. *E.g.*, SPA-32.

Without question, the Republic has borne substantial liabilities because of Hussein's wrongful conduct, including reparations to Kuwait and the settlement of civil torture claims. But, that liability flows directly from general agency law. Principals are generally liable under the doctrine of *respondeat superior* for the acts of their agents, even when those agents abuse their authority. Restatement (Third) of Agency § 2.04 ("Restatement"). The same is true for nations that are represented by their governments as agents.

[4] http://www.forbes.com/2003/02/24/0224kings.html.

This rule, however, is irrelevant to this case because the Republic is not being sued here. The Republic is suing the Defendants for conspiring with the Republic's agent to commit wrongs against the Republic. Therefore, yes: A governmental agent (including the government as a whole) binds the sovereign when the agent acts under the color of his or her authority, even when the agent acts illegally or against the sovereign's interests. But: The sovereign (like any principal) can sue its agent (and those that conspire with its agent) if the agent breaches its duty to the sovereign to act in the sovereign's interest. *See* Restatement § 8.01. The same is true for the Defendants. If BNP's president, working with third parties, embezzles client funds held at the bank, BNP is liable to the client for the lost funds. But: BNP is not foreclosed from suing its president and his co-conspirators for the losses caused by the scheme.

*(2) The Defendants are not innocent third parties.*

A "third party's inducement of or knowing participation in a breach of duty by an agent is a wrong against the principal which may subject the third party to liability. In nearly unbroken succession, courts have declared that victimized principals may obtain non-statutory remedies against outsiders who have knowingly participated in or induced an agent's breach of duty." *Continental Management*, 527 F.2d at 616 (bribery of US government officials; citations omitted).

The Restatement states the general rule: "If the third party colludes with the agent against the principal or otherwise knows or has reason to know that the agent is acting adversely to the principal, the third party should not expect that the agent will fulfill duties of disclosure owed to the principal." Restatement § 5.04, comment b. "This Restatement states explicitly that the adverse-interest exception is inoperative when the third party with whom an agent deals knows or has reason to know that the agent acts adversely to the principal. This Restatement [Third] simplifies the underlying point in [Restatement (Second) of Agency] § 282(2)(b), which is to protect third parties who deal with a principal in good faith." Restatement § 5.04, reporters' note a.

One court, applying the earlier Restatement, rejected the same defense argument that a partnership was barred from recovering for fraud because the fraudulent conspiracy included one of the partners, stating, "This reasoning obviously is wrong, as it would provide a legal immunity for anyone who assisted one partner to defraud another." *Eastern Trading Co. v. Refco, Inc*., 229 F.3d 617, 624 (7th Cir. 2000) (Posner, J.) (citing *Ash v. Georgia–Pacific Corp*., 957 F.2d 432, 436 (7th Cir.1992); *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205, 212–13 (1980)); *see also Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Res. Found. v. PricewaterhouseCoopers, LLP*, 607 F.3d 346, 351-52 (3d Cir. 2010).

*(3) Hussein was not synonymous with the nation.*

The Defendants show their hand and take their core argument to its logical, untenable conclusion when they claim that Hussein qualified under the "sole actor" rule.

The "the sole actor rule applies 'where the principal and agent are one and the same' or, in the corporate context, where 'the principal is a corporation and the agent is its sole shareholder.'" *In re CBI Holding Co., Inc.*, 529 F.3d 432, 453 (2d Cir. 2008) (citation omitted); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003) (applying Texas law) (Sole actor rule applies "when the principal and agent are one and the same.") (cited at Def.Br.-27); *In re Bennett*, 336 F.3d at 100 ("The 'sole actor' rule does not readily apply here because the agent perpetrating the fraud, Patrick, was not one of the principal owners of the enterprise.").

Hussein certainly acted like he was one and the same with the Republic, but, as this Court tacitly noted in *First Fidelity*, the law has rejected a tyrant's claim that, "I am the State," since Louis XIV. 877 F.2d at 192 ("In effect, First Fidelity is telling us: 'L'état, c'est lui.'").

Moreover, the "sole actor exception 'may not be invoked where third persons use the agent to further their own frauds upon the principal.'" *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 841 (8th Cir. 2005) (citation omitted); *see*

*also Ash*, 957 F.2d at 436 ("None of the 'sole actor' cases we could find allows the imputation of knowledge to the principal where the adverse party knew that the agent was acting adversely to his employer—where, indeed, the adverse party participated in the fraud."). As the *Ash* court explained, that the sole actor rule does not mean that "anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim," making "successful schemes … self-protecting." *Ash*, 957 F.2d at 436.

### *C. Whether Hussein totally abandoned the national interest is a question of fact.*

#### *(1) The Programme's corruption did not benefit, but damaged, the Republic.*

The entire point of the Republic's lawsuit is to recover damages caused by the Programme's corruption. The Defendants nonetheless assume that the Republic (the principal) inherently benefited if its agent (Hussein) benefited.

The Republic contends, as the Defendants suggest is necessary, that "the Hussein government's efforts to undermine sanctions had no state benefits." Def.Br.-28. As explained in the Republic's Complaint, Hussein was willing to hold the entire Iraqi population hostage, letting them starve, to maintain his power. A-108-109:¶¶ 265-69.

The Republic, however, also objects to the legal premise that it must disprove at trial that there were any incidental benefits surrounding the

Programme's corruption. The adverse interest exception applies "if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." Restatement § 5.04. If, for example, an agent accepts a bribe to sign a contract, the adverse interest exception applies, regardless of whether the principal earns a profit on the contract, because the principal would have made an even greater profit absent the bribe.[5] The principal may have profited from the contract, but was damaged by the corruption—the bribe. By taking the bribe, the agent puts his own interests above his principal's, thus totally abandoning his fiduciary duty.

Put more broadly, in applying the adverse interest exception, the issue is not whether the principal receives any benefit from the transactions that were corrupted. The issue is whether the principal benefited from the corruption itself, or, in other words, whether the principal would have been better off absent the corruption. If, for example, an agent *gives* a bribe (or defrauds another) to obtain a contract for the principal, the principal benefits from the corruption, in the form of a new contract, even if the principal would have objected to the bribe or fraud.

---

[5] *E.g.*, *Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*, 67 F. Supp. 2d 126, 130 (E.D.N.Y. 1999) ("[T]here is a legal presumption that, at a minimum, the prices paid by plaintiff to Grinnell were inflated by the amount of the bribes and, accordingly, the bribe amounts are recoverable as damages."); *Kemler*, 133 F.2d at 238 ("Obviously no one would give or offer a bribe unless he expected to gain some advantage thereby.").

Hussein put his own interests above those of the nation and its citizens. Even from the Defendants' viewpoint, the corruption cost the Republic the billions in excessive profits earned by the Defendants for their role in the scheme.

In any event, the Defendants do not indicate any benefit received by the Republic from their corruption, and the Republic certainly does not concede it benefited in any way.

*(2) Whether Hussein abandoned the national interest is a fact question.*

Whether an agent has "an interest adverse to the purported principal" sufficient to invoke the adverse interest exception is "an issue of fact." *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 N.Y.2d 31, 41, 427 N.Y.S.2d 961, 968 (1980); *see also Bank of China v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004) ("clearly raises an issue of fact for the jury to decide."); *In re Lemington Home for the Aged*, 659 F.3d 282, 293 (3d Cir. 2011) ("[A]pplicability of the 'adverse interest' exception presents a genuine issue of material fact.").

The Republic has no doubt it can prove at trial that Hussein and his Regime totally abandoned the national interest when they corrupted the Programme, and that the nation was damaged as a result.

*(3) The fact question on abandonment does not implicate the political question or act of state doctrines.*

The district court squarely rejected application of the political question and the act of state doctrines. As to the political question doctrine, the lower court stated, "Analyzing whether the Hussein Regime's acts may be attributed to Iraq does not raise political questions, either." SPA-22. "[A]nalyzing whether or not a former government's conduct can be attributed to its sovereign is a legal question. It turns on the manageable principles discussed below, and is necessarily decided in some form in any case applying the Foreign Sovereign Immunities Act ('FSIA') or the act of state doctrine, and many that do not." SPA-22-23. The lower court rejected application of the act of state doctrine because "the policy reasons for the doctrine counsel against its application here," in particular because the Republic is itself challenging the actions of its former self-appointed ruler. SPA-20.

Neither of these prudential doctrines is applicable here. These related concepts are designed to prevent interference with the Executive Branch's control over foreign relations,[6] but the Executive Branch has prosecuted more than half the Defendants for the very conduct alleged by the Republic. A-1349/A-1456-2168;

---

[6] "The act of state doctrine is the foreign relations equivalent of the political question doctrine." *Trajano v. Marcos*, No. 86-2448, 1989 WL 76894, at *2, 878 F.2d 1439 (9th Cir. 1989); *see also* 13C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3534.2.1 (3d ed. 2010) ("The act of state doctrine bears a close affinity to the political question doctrine in the field of foreign affairs.").

*see also W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Intern.*, 493 U.S. 400, 407 (1990) (act of state doctrine inapplicable to allegation that company bribed Nigerian government officials).

The Defendants assert that, "the district court rightly concluded that Iraq's theory—that U.S. courts should decide whether a foreign government acted '*against the national interest*' (Br.15)—would 'run afoul of the act of state doctrine.'" Def.Br.-25 (citing SPA-33; emphasis added). The district court made no such statement. The district court stated: "if courts had to examine whether a government's act was *lawful* in order to decide whether it was attributable to the state, they would often run afoul of the act of state doctrine…." SPA-33 (emphasis added).

The lower court's stated rationale was that nations cannot avoid responsibility for their agent's acts under color of law by claiming those acts were unlawful. But, the Republic is not trying to avoid responsibility to innocent third parties harmed by Hussein's abuse of power. Rather, the Republic seeks to hold Hussein's co-conspirators responsible for their damage to the nation. In addition, the Republic is not asserting that Hussein's actions are not attributable because they were unlawful, but because Hussein abused his governmental authority to serve his personal ends, and even then, the Republic raises those allegations solely against its corrupt agent's co-conspirators.

*(4) The Republic has standing.*

The lower court found standing because, in its words, "the Republic of Iraq had a concrete, if not exclusive, interest in the funds contained within the UN escrow account." SPA-17.

The Defendants try to revive their standing argument, but the effort rests on the same premise as their *in pari* delicto defense—Hussein and his Regime are synonymous with the nation, and therefore, "Iraq" received the diverted funds, so there is no damage. The argument fails for the same reason as the Defendants' adverse interest argument.

The Defendants also omit the fact that they pocketed billions from the scheme. It is simply untrue that "Iraq … received the funds allegedly diverted from the Program." Def.Br.-32. The Defendants received far more spoils than their co-conspirator, Hussein.

*D. The Republic should have been granted leave to amend.*

*(1) The Republic expressly requested leave to amend.*

The Defendants characterize the Republic's request for leave as "perfunctory," Def.Br.-58, but the Republic expressly requested leave to amend in its opposition to the Defendants' motions to dismiss, under a heading entitled "Leave to Amend." A-1442-43.

The Republic was even more express in the hearing on the motion:

> I think it's clear to the Court that all of this comes down to whether it's possible for—or plausible, in the words of the U.S. Supreme Court, for this Court or this jury to determine at some point that *Saddam Hussein was acting against the national interest and solely for his personal benefit*. And the truth of the matter is when this jury box is filled, none of these defendants are even going to have the gall to stand up in front of a jury and say we were helping Iraq and Saddam Hussein to serve the interests of the nation. The principle is so absurd that they couldn't get a jury to believe it.
>
> This Court shouldn't grant a motion to dismiss on the basis of a position that is not pled, not believable, not plausible. *We state clearly—and if we need leave to amend, we ask for it—Saddam Hussein was our agent, he turned against his principal, the nation, he turned against his people, and he did so for his own personal gain* to live like a king.

A-3649-50 (emphasis supplied).[7]

"Of course, the lack of a formal motion is not sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear." *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) (citation omitted). In contrast, the Defendants' authority describes situations in which a plaintiff failed to explain how amendment would solve the underlying

---

[7] Counsel also argued:

> [Hussein's] actions were personally motivated—because let us be clear, that's exactly what we're alleging. And we don't have to have already alleged it, because this is an affirmative defense that hasn't even been pled yet. We are going to allege it. And not only that, it's the truth. He diverted money from food and medicine so he could continue to live like a king while his people starved.

A-3647.

problems. *E.g.*, *Metz v. U.S. Life Ins. Co. in the City of New York*, 662 F.3d 600, 603 (2d Cir. 2011) (cited at Def.Br.-59) (Plaintiff "merely claims in conclusory fashion that had she been permitted to amend, she could have pled allegations sufficient to make out a claim ….").

*(2) The Republic's proposed amendments do not contradict its current Complaint.*

The Defendants try to cast the Republic's claim that Hussein abused his power to serve his own ends as a new allegation on appeal, inconsistent with the Republic's Complaint, but there is nothing internally inconsistent (or untrue) with the Republic's allegations that Hussein could bend Iraqi governmental institutions to his will, and that he did so to serve personal, not national, interests. Hussein simply abused his expansive governmental power to serve himself, not the nation.

*(3) The Republic has not had an ample opportunity to amend.*

The Defendants conclude their argument against leave by stating, "Iraq has already significantly amended its pleading, and had ample opportunity to refine its claims…." Def.Br.-60.

The Republic has not previously been granted leave to amend. While the operative pleading is the Republic's First Amended Complaint, that Complaint was filed as part of a stipulation with the Defendants (Court Dkt. 10) and was filed *before* the Defendants filed their consolidated motion to dismiss on January 15,

2010. Other than the supplemental briefing on *Morrison v. National Australia Bank, Ltd.*, 130 S. Ct. 2869 (2010), briefing on the Defendants' motion was completed on August 10, 2010, and then Court took the matter under advisement until a hearing on October 26, 2012, and its ruling on February 6, 2013.

The Republic's situation is nearly exactly that addressed by this Court in *Ronzani v. Sanofi S.A.*:

> Ronzani's original complaint was amended, pursuant to Rule 15(a), "as a matter of course ... before a responsive pleading [was] served." In his supplemental memorandum in opposition to the motion to dismiss, Ronzani offered to amend his pleading to correct any perceived deficiencies with respect to his claims under the federal securities laws. In dismissing the amended complaint, however, the district court did not mention Ronzani's offer to amend and gave no reason for denying it. Since Ronzani had not previously been given leave to amend, and had offered to amend his complaint, we hold that the court abused its discretion in dismissing the complaint without leave to amend.

899 F.2d 195, 198 (2d Cir. 1990) (elipses in original).

Leave is more appropriate here than in *Ronzani* because the Republic seeks leave to amend to clarify facts in response to the Defendants' affirmative defense of *in pari delicto*. The Republic was not required to anticipate that defense in its Complaint. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith.").

### 2. *The Republic of Iraq's RICO claim is territorial.*

#### A. *The lower court's opinion depends on its incorrect conclusion regarding UN territoriality.*

The Defendants do not even try to support the lower court's conclusion that the UN and its activities are extraterritorial. Instead, they try to minimize the importance of that mistaken conclusion by focusing on an out-of-context statement in the lower court's opinion that "the territoriality of the Headquarters District is beside the point," Def.Br.-40 (citing SPA-40). The full quote, however, indicates that the lower court's conclusion on extraterritoriality rests heavily on its mistaken legal conclusion:

> In any event, the territoriality of the Headquarters District is beside the point: the UN, which operated the Programme, and its inner-workings are not "places over which the United States has sovereignty or has some measure of legislative control" and therefore are not United States territories. *See E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Classifying UN organs as U.S. domestic entities risks the very sort of international discord that the rule against extraterritorial application aims to avoid.

SPA-40.

#### B. *The Programme and pattern of racketeering activity are territorial.*

When the Defendants' UN-related contacts are included in the analysis, there is no question of territoriality.

*(1) The Enterprise is domestic.*

The Enterprise is the Programme, which clearly had its "nerve center" in New York, where the corrupt contracts were approved, where the Defendants' fraud was directed, and where the Republic's property was kept. *E.g.*, A-77:¶16; *European Community v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957, at *6-7 (E.D.N.Y. Mar. 8, 2011) (relying on *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (applying nerve center test for diversity purposes)).

The Defendants misinterpret the ruling in *European Community*, 2011 WL 843957, at *6-7 (cited at Def.Br.44). The issue is not, as the Defendants' suggest, "determining whether *the scheme* was 'organized, orchestrated, [or] planned," but where *the enterprise* is organized, orchestrated, and its activities planned. Def.Br.-44 (emphasis supplied; quoting *European Community*, 2011 WL 843957, at *6-7). The proper rule is stated clearly in *European Community*, 2011 WL 843957, at *5-6, and *Hertz*, 559 U.S. at 93. *European Community* discusses where the defendants' scheme was planned only because the enterprise alleged in that case was an association-in-fact enterprise comprised of the defendants and organized around their challenged activities. *European Community*, 2011 WL 843957, at *7.

*(2) The pattern of racketeering activity is domestic.*

With one notable exception, the Republic alleges a pattern of RICO predicate acts that depend *entirely* on the Defendants' conduct in the United States.

The mail and wire fraud predicate acts are premised on misrepresentations to the UN and the US Treasury Department (not the Hussein Regime). The money laundering predicates are based on transactions flowing through the UN Escrow Account, held by Defendant BNP in New York.

The sole exception is the Travel Act predicate, which is premised on both domestic and extraterritorial activities of the Defendants. Domestically, the Defendants violated the International Emergency Economic Powers Act (the "IEEPA"), incorporated into Travel Act as alleged in the Republic's Complaint. A-267:¶1147. The Defendants violated the FCPA, also incorporated through the Travel Act, but the FCPA, even under the strict construction rules of *Morrison*, expressly applies to "Foreign Corrupt Practices."

*(3) The Defendants fraud against the Treasury Department supports jurisdiction.*

In a footnote, the Defendants claim this Court should ignore the Defendants' misrepresentations to Treasury Department because the "FAC contains no such allegations." Def.Br.-37 n.14. The Defendants, however, can reach that conclusion only by very strictly reading the Republic's Complaint.

The Republic's Complaint asserts that, "under United States law, once Iraq's assets had been blocked, the United States Treasury's Office of Foreign Asset Control (or 'OFAC') had to approve any transfers of such assets within or from the United States." A-107:¶253. The Republic's RICO claims include mail and wire

fraud, which would encompass the Defendants' misrepresentation to the Treasury Department. A-266:¶1142. The Republic's money laundering predicate includes the Defendants' violations of the IEEPA, the statute that prohibits violations of a Treasury Department license. A-267:¶1147. These allegations sufficed for the lower court, which lists the "U.S. Treasury Department" as one of the entities that had to approve Programme contracts. SPA-45 (citing A-122:¶340).

If such allegations are, nonetheless, insufficient, the Republic should be granted leave to amend its Complaint to make such claims clearer. The Republic drafted its Complaint in 2009, when this Court's jurisprudence applied RICO extraterritorially. As this Court stated in a similar situation, when plaintiffs "understandably drafted their complaint in accordance with pre-*Morrison* doctrine, they cannot be faulted for their failure to allege facts suggesting" all relevant United States conduct. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012). In *Absolute Activist*, the plaintiffs raised new factual allegations in their *reply brief* and at *oral argument*, yet this Court directed the district court to grant leave to amend. *Id.*

In this case, the Republic explained the significance of the misrepresentations to the Treasury Department in its responses to the Defendants' supplemental briefing on *Morrison*'s significance to this matter. A-3084-90.

*(4) The Republic is not trying to change the Norex rule, but clarify it.*

Intentionally or not, the Defendants miss the point of the Republic's argument on *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010). The Republic does not assert that *Norex* incorrectly held that RICO is not generally extraterritorial. Instead, the Republic argues that RICO has to be applied as written, and if a RICO claim raises predicate acts that are expressly extraterritorial, those predicate acts are not excised from RICO by the rule of construction set out in *Morrison* and *Norex*. That is, RICO is not generally extraterritorial, it is extraterritorial in the specified instances set out in the statute.

*3. The Defendants' criminal conduct proximately caused the Republic of Iraq's injury.*

Through their conspiracy, the Defendants illicitly obtained billions of dollars of Iraqi oil wealth—either by buying Iraq's oil at below market price or by diverting proceeds from the sale of the oil. Yet, the Defendants try to avoid the fact that their scheme targeted the Republic's property by claiming that "the property in question was not Iraq's." Def.Br.-28. The sole support for this assertion is a footnote that states "Iraq could not have suffered any legally-cognizable injury because it was not entitled to receive funds from the Program Account." Def.Br.-32. n.11. This factual assertion contradicts the lower court's conclusion that "the

Republic of Iraq had a concrete, if not exclusive, interest in the funds contained within the UN escrow account." SPA-17.

The Republic owned the funds in the Escrow Account and received the surplus at the Programme's termination. A-260, 264:¶¶1100, 1131.

The fact that Hussein was prevented from controlling the funds during the Programme's life does not defeat the nation's ownership, but it does confirm proximate cause. The Defendants could obtain the Republic's property only by defrauding the guardians of the Republic's property—the UN and the US Treasury Department. Neither had any discretion to authorize direct payments to the Hussein Regime; the core purpose of the Programme and the UN and US sanctions was to prevent transfers to the Hussein Regime, A-105-107:¶¶241-54, so, had the Defendants disclosed "the surcharge scheme, the UN would not have approved the contracts, ending the surcharge scheme." A-129:¶378; *see also* A-165:¶538.

Ultimately, the lower court's proximate cause analysis depends, and fails, on the same basis as its attribution analysis. In the Defendants' words, "Iraq was therefore not the targeted victim of the scheme, but its intended beneficiary." Def.Br.-50.

BNP tries to avoid proximate cause because it merely "facilitated" the Defendants' conspiracy. A-982 (UN Report); *see also* A-955 (UN Report) (BNP "fostered the payment of illicit surcharges."); A-257:¶1084 ("Complaint") ("BNP

nonetheless chose to agree to facilitate that corruption…”). While some courts have used the term “facilitate” to describe conduct that does not proximately cause damage, they have done so only when the act of facilitation is of “an injury that happened or could have happened independently of the act.” *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002) (cited at Def.Br.-52).

BNP’s conspiratorial role was not so limited. As set out in the Complaint, if BNP had not conspired to hide Programme violations, “the corruption of the oil side of the Programme would have been impossible.” A-256:¶¶ 1071-72.

*4. This Court should ignore the Defendants’ perfunctory arguments.*

In a single paragraph, the Defendants posit “alternative grounds” for affirming the lower court. Def.Br.-53-54. None of the grounds are mentioned in the district court’s opinion. Nor are they included in the Defendant’s list of issues on appeal.[8]

The Defendants present no argument for their alternative grounds. A bare list of potential arguments does not suffice. “Issues not sufficiently argued are in general deemed waived and will not be considered on appeal.” *Frank v. United States*, 78 F.3d 815, 833 (2d Cir.1996), *vacated on other grounds*, 521 U.S. 1114 (1997). “[S]imply stating an issue does not constitute compliance with [Federal

[8] The Republic addresses only those issues that warrant reply but does not waive any raised in its principal brief.

Rule of Appellate Procedure] 28(a): an appellant or cross-appellant must state the issue and advance an argument." *Id.*; *see also Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (It is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

*Conclusion*

The judgment of the lower court should be reversed, and this action remanded.

Dated: September 24, 2013

By: *[/s/ Mark Maney]*

MANEY & GONZÁLEZ-FÉLIX PC
Mark Maney
Roliff Purrington
700 Louisiana, Suite 4545
Houston, Texas 77002
Tel: 713-806-2500
Fax: 713-893-6016

BERNSTEIN LIEBHARD LLP
Stanley D. Bernstein
Christian Siebott
10 East 40th Street
New York, New York 10016
Tel: 212-779-1414
Fax: 212-779-3218

*Counsel for Plaintiff/Appellant*
*The Republic of Iraq*

**Certificate of Compliance Pursuant to F.R.A.P. 32(a)**
**Certificate of Compliance With Type Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1. This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) in that it contains 6,938 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. The attached opening brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) in that it is proportionately spaced typeface Times New Roman using 14 point type by the Microsoft Word program.

*/s/ Mark Maney*
Mark Maney

*Attorney for Plaintiff-Appellant*